**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>NATHANIEL CHASTAIN,<br><br>Defendant. | No. 22-cr-305 (JMF) |

# MEMORANDUM OF LAW IN SUPPORT OF NATHANIEL CHASTAIN'S MOTION TO EXCLUDE THE REPORT, TESTIMONY, AND OPINIONS OF PROFESSOR DANIEL TAYLOR

David I. Miller
Daniel P. Filor
Nicholas T. Barnes
Charles J. Berk
GREENBERG TRAURIG, LLP
One Vanderbilt Avenue
New York, NY 10017
(212) 801-9200

*Counsel for Nathaniel Chastain*

# TABLE OF CONTENTS

**Page**


TABLE OF CONTENTS ..... i

TABLE OF AUTHORITIES ..... ii

PRELIMINARY STATEMENT ..... 1

STATEMENT OF FACTS ..... 3

LEGAL STANDARD ..... 6

ARGUMENT ..... 8

TAYLOR'S REPORT, PROPOSED TESTIMONY, AND OPINIONS SHOULD BE EXCLUDED IN THEIR ENTIRETY ..... 8

I. TAYLOR'S COLLECTIVE OPINIONS USURP THE ROLE OF THE JUDGE AND JURY ..... 8

II. TAYLOR'S FIRST EXPERT OPINION IS WHOLLY IRRELEVANT AND UNHELPFUL TO THE JURY ..... 13

a. Taylor's First Opinion, Which Improperly Focuses on Information Value to the Market, as Opposed to OpenSea, Is Excludable as Irrelevant and Confusing ..... 13

b. Taylor's First Expert Opinion Should Also Be Excluded Because It Is Premised Upon the Easily Understood Concept of Supply and Demand ..... 15

III. TAYLOR'S SECOND EXPERT OPINION SHOULD ALSO BE EXCLUDED BECAUSE IT IS IRRELEVANT AND UNHELPFUL TO THE JURY ..... 17

IV. TAYLOR'S THIRD EXPERT OPINION SHOULD SIMILARLY BE EXCLUDED AS IRRELEVANT AND UNHELPFUL TO THE JURY ..... 20

V. TAYLOR'S COLLECTIVE OPINIONS SHOULD BE EXCLUDED AS UNRELIABLE BECAUSE THEY IGNORE CRITICAL DISCLOSURES THAT UNDERMINE HIS OPINIONS ..... 21

CONCLUSION ..... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**


*Andrews v. Metro N. Commuter R.R. Co.*,
882 F.2d 705 (2d Cir. 1989)....................7, 8, 16

*Carpenter v. United States*,
484 U.S. 19 (1987)....................9, 11, 13

*Cleveland v. United States*,
531 U.S. 12 (2000)....................9, 13

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993)....................1, 6, 7, 8

*Fashion Boutique of Short Hills, Inc. v. Fendi USA Inc.*,
314 F.3d 48 (2d Cir. 2002)....................14

*Feinberg v. Katz*,
No. 01 Civ. 2739 (CSH), 2007 WL 4562930 (S.D.N.Y. Dec. 21, 2007) ....................11, 12

*In re Fresh Del Monte Pineapples Antitrust Litig.*,
No. 04-md-1628 (RMB) (MHD), 2009 WL 3241401
(S.D.N.Y. Sept. 30, 2009)....................22

*Highland Capital Mgmt., L.P. v. Schneider*,
379 F. Supp. 2d 461 (S.D.N.Y. 2005)....................13

*Hygh v. Jacobs*,
961 F.2d 359 (2d Cir. 1992)....................7, 13

*Kelly v. United States*,
140 S. Ct. 1565 (2020)....................10

*Kumho Tire Co., Ltd. v. Carmichael*,
526 U.S. 137 (1999)....................7

*Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*,
387 F. Supp. 2d 794 (N.D. Ill. 2005)....................22, 23

*Marx Co., Inc. v. Diners' Club, Inc.*,
550 F.2d 505 (2d Cir. 1977)....................12, 22

*Mink Mart, Inc. v. Reliance Ins.*,
65 F. Supp. 2d 176 (S.D.N.Y. 1999)....................21, 22

*In re Rezulin Prods. Liab. Litig.*,
309 F. Supp. 2d 531 (S.D.N.Y. 2004)....................8, 14, 20, 21

*In re Rezulin Prods. Liab. Litig.*,
369 F. Supp. 2d 398 (S.D.N.Y. 2005)....................22

*U.S. Commodity Futures Trading Comm'n v. Moncada*,
No. 12 Civ. 8791 (CM), 2014 WL 2945793 (S.D.N.Y. June 30, 2014) .............................8, 11

*United States v. Blaszczak*,
56 F.4th 230 (2d Cir. 2022) ................................................................................ *passim*

*United States v. Castillo*,
924 F.2d 1227 (2d Cir. 1991).............................................................................................7

*United States v. Jacques Dessange, Inc.*,
99 CR 1182, 2000 WL 294849 (S.D.N.Y. March 21, 2000) ...................................................7

*United States v. Long*,
917 F.2d 691 (2d Cir. 1990)...........................................................................16, 21, 22

*United States v. Lumpkin*,
192 F.3d 280 (2d Cir. 1999)...............................................................................................7

*United States v. Mahaffy*,
693 F.3d 113 (2d Cir. 2012)...............................................................................................9

*United States v. Mejia*,
545 F.3d 179 (2d Cir. 2008).............................................................................................16

*United States v. Newkirk*,
684 F. Appx. 95 (2d Cir. 2017).........................................................................................14

*United States v. Ojeikere*,
No. 03 CR 581 (JGK), 2005 WL 425492 (S.D.N.Y. Feb. 18, 2005) ................................7, 16

*United States v. Sanders*,
No. 12 Crim. 0574 (LAK), 2013 WL 1421487 (S.D.N.Y. 2013)....................................14, 22

**Statutes**

18 U.S.C. § 1343 ......................................................................................................9, 12

**Other Authorities**

FED. R. EVID. 403 ..............................................................................................8, 15, 21

FED. R EVID. 702 .......................................................................................................... *passim*

FED. R EVID. 704 ...............................................................................................................7

United States Supplemental Letter Brief, *United States v. Blaszczak*,
Nos. 18-2811, 18-2825, 18-2867, 18-2878 (2d Cir. June 4, 2021).........................................10

Defendant Nathaniel Chastain (the "defendant" or "Mr. Chastain") respectfully submits this Motion to Exclude the Report, Testimony, and Opinions of Professor Daniel Taylor from trial in this matter, pursuant to Federal Rule of Evidence 702 and the Supreme Court's Decision in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

## PRELIMINARY STATEMENT

In noticing its intent to rely on Professor Daniel Taylor ("Taylor") as its purported "valuation" expert, the government seeks to circumvent well-settled precedent outlining the parameters of permissible expert testimony. To protect the integrity of the trial process—a process to which Mr. Chastain is constitutionally entitled—this Court should exclude Taylor's expert report, opinions, and proposed testimony, which are fundamentally plagued by incurable improprieties on several fronts.

First, Taylor's proposed testimony is not helpful to the trier of fact, as Taylor impermissibly opines on ultimate legal issues in this case, including whether information regarding soon-to-be-featured NFTs was confidential business information, had value to OpenSea, and thus qualified as OpenSea's property. Far from educating the jury, Taylor would simply dictate to them how the law should be applied to the facts of this case and suggest what legal conclusions they should reach concerning the hotly-contested definition of "property" under the federal wire fraud statute.

Second, portions of Taylor's proposed testimony are (i) wholly irrelevant to key issues in this case and (ii) rely on easily-understood economic concepts and factual conclusions that do not fall beyond the ken of an average juror. Indeed, straying from disputed issues, Taylor opines in part on the value of information concerning upcoming NFT features *to third-party purchasers*—an issue that is wholly irrelevant to the instant prosecution and thus confusing to the jury—as opposed to the value of that information *to OpenSea*.

Third, additional portions of Taylor's proposed testimony are based exclusively on irrelevant and unhelpful analogies that will also confuse the jury. By way of example, Taylor incomprehensibly compares the misappropriation of Coca-Cola's secret recipes to the alleged misappropriation of information concerning upcoming featured NFTs. As applied, Taylor's analogy falls flat because Mr. Chastain has not been charged with misappropriating the secret ingredients (or codes) underlying OpenSea's product (its platform). Further, any premature disclosure of soon-to-be-featured NFTs, unlike the disclosure of Coca-Cola's ingredients, would in no way harm OpenSea's profitability. Indeed, regardless of any such disclosure, OpenSea stands in the same position, collecting the same commission each time an NFT is sold on its platform.

Fourth, Taylor's ultimate opinion that inherent economic value is in some way related to an erosion of trust resulting from the misuse of that information is not only irrelevant, but illogical. The purported erosion of trust, resulting from an individual's alleged misuse of information, is an effect that is unrelated to the value of that information *ex ante*.

Fifth, Taylor's proposed testimony is unreliable because it fails to consider critical exculpatory evidence that wholly undermines his opinions. Highlighting this deficiency, Taylor opines that information regarding soon-to-be-featured NFTs had inherent economic value to OpenSea without accounting for the fact that OpenSea itself did not consider the relevant information to have such value. Indeed, when considered in the appropriate context, Taylor's opinions wither away in the shadow cast by OpenSea's Co-Founder and CEO, who specifically informed the government "that there [was] [nothing] intrinsically valuable to OpenSea [in] keep[ing] the identity of the featured work secret."

Where, as here, Taylor's expert report, opinions, and proposed testimony, individually and collectively, are unhelpful, irrelevant, illogical, and unreliable—and will result in fundamental prejudice that cannot be cured through cross-examination—they should be excluded in their entirety.

## STATEMENT OF FACTS

### Factual Background

For the relevant facts of this case, Mr. Chastain respectfully refers the Court to the factual and procedural background section contained in the Memorandum of Law filed in support of his Motion to Dismiss the Indictment. *See* [Dkt. No. 19 at 3-5.]

### Taylor's Report and Proposed Testimony

By letter dated February 23, 2023, the government notified the defense that it intends to call Taylor as an expert witness during its case-in-chief. *See* Declaration of Nicholas T. Barnes ("Barnes Decl."), Ex. A. Attached to the government's letter, Taylor's expert disclosure explains that Taylor intends "to provide an expert opinion in connection with certain issues and economic theories related to the use and value of confidential business information raised in [this matter]." *Id.* (Taylor Expert Report ("Report") at p. 1). In total, Taylor sets forth three opinions that he intends to offer at trial, along with a summary of the alleged bases for those opinions. As relevant here, if permitted to testify, Taylor asserts that he would convey the following expert opinions to the jury:

1) Confidential business information about upcoming featured digital art was valuable because it provided information about expected future demand that could be used in a profitable investment strategy;

2) The fact that OpenSea did not sell or license the information about upcoming featured digital art to a third party does not mean it was not valuable to OpenSea because there are a variety of business reasons why companies gain value keeping information confidential; and

3) In the context of marketplaces like OpenSea, controlling and maintaining the confidentiality of certain business information can serve a valuable purpose by maintaining trust. Marketplaces rely on trust among market participants, and misuse of certain confidential information can erode that trust, reducing market participation and transaction volume. The public reaction to the discovery of Chastain's trading and OpenSea's response are consistent with an erosion of trust in the marketplace.

*Id.* (Section I(A)). The bases for these opinions are set forth in Sections II and III of Taylor's report.

In Section II, Taylor cites basic principles of supply and demand, and opines that "confidential business information about upcoming featured art was valuable." *Id*. at p. 2. The crux of his discussion is rooted in the idea that the price of an item may increase when the demand for the item increases, and the supply remains unchanged. *See id*. ("Information about future demand for an item is valuable because it can be used to predict prices" and the predictive value of that information "is inexorably tied to profit [one] can make using that information."). Taylor subsequently attempts to tie these concepts to language in the Indictment. *See id.* at p. 3. He notes, for example, that "when OpenSea highlights or 'features' certain digital art prominently on its homepage, it increases visibility and demand for the art[,] [which] in turn increases the value of the art." *Id.* He then opines that information about soon-to-be-featured digital art is valuable because there is an existing market (or demand) for this type of information, demonstrated by third-party NFT purchasers that "have shown increasing interest in trading digital art." *Id.*

Next, Taylor draws upon the Indictment to note that "Chastain—by virtue of his position at OpenSea—was aware of confidential business information" regarding soon-to-be-featured NFTs and used that information to "'trade' the digital art and earn profits for himself." *Id.* In conclusory fashion, Taylor then opines that: (i) the relevant information constituted the "confidential business information" of OpenSea; and (ii) such information was "valuable" because Chastain ultimately "monetized [it] for his own benefit." *Id.*

In Section III, titled "Economic Interest in Controlling Access to the Information," Taylor opines that even though OpenSea did not monetize its "confidential business information" about soon-to-be-featured NFTs, "that does not imply that the information had no value to OpenSea." *Id.* Premising his position (again) on the conclusion that the information at issue is in fact the "confidential business information" of OpenSea, Taylor attempts to support his opinion by offering two examples to suggest that companies generally have an economic interest in controlling access to their confidential business information. As Taylor explains, Coca-Cola has an economic interest in keeping soft drink ingredients confidential, and publicly-traded companies have an economic interest in redacting "pricing information from the contracts that they publicly disclose." *Id.* at pp. 2-3.

Taylor subsequently opines that OpenSea itself had an economic interest in "controlling access to confidential information about upcoming featured digital art." *Id.* at p. 4. Taylor bases his opinion on a series of inferences, ultimately suggesting that the inherent economic value of confidential business information can be determined by assessing the erosion of trust—*i.e.*, the effect—caused by the misuse of that information. *See id.* at p. 3. In the context of this case, Taylor opines that Mr. Chastain's alleged conduct caused an erosion of trust in the OpenSea marketplace, and he bases that opinion on pejorative phrases found in two online articles. *See id.* (noting that "Chastain's trading" was characterized as an "abuse of power" and a "scandal").

Notably, in forming his opinions about whether information about soon-to-be-featured NFTs had value to OpenSea, Taylor did not reference the government's July 11, 2022 *Brady* disclosure, including, *inter alia*, the following notes from attorney proffers and FBI reports describing interviews with OpenSea employees:

- Interview of OpenSea Co-Founder and CEO: "[He] does not believe that there is anything intrinsically valuable to OpenSea to keep the identity of the featured work secret."
- Interview of OpenSea senior officer: "OpenSea did not think there was inherent value in the confidentiality of the featured NFT artist selection, as OpenSea would still get a cut of the sales and would have made the identity of it public regardless."
- Interview of OpenSea employee: "[Employee] did not think that the featured work section was created to serve a business purpose."

Finally, in its February 23, 2023 letter, the government notified the defense that it anticipates calling one or more non-expert law enforcement witnesses who will:

> (1) testify about, and present data and charts, summarizing how cryptocurrency and non-fungible tokens moved between wallets on the blockchain in connection with the transactions at issue in this case; (2) testify about, and present data and charts summarizing, internet-protocol ("IP") address data from Metamask and other sources, to show that the defendant used the same IP addresses that were used to create wallets at issue in this case; and (3) present charts summarizing OpenSea data about purchases, sales, and prices of non-fungible tokens that were featured on OpenSea's website and testify about those charts.

*See* Barnes Decl., Ex. A. The defense reserves the right to object to law enforcement testimony should the government seek to elicit expert opinions from these witnesses.

**LEGAL STANDARD**

Under Federal Rule of Evidence 702, which incorporates the principles set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), an expert's opinion is admissible *only if*: (i) the expert's "scientific, technical, or other specialized knowledge" will assist the trier of fact in understanding the evidence or determining a fact in issue; (ii) the opinion is "based on sufficient

facts or data"; (iii) the opinion is "the product of reliable principles and methods"; and (iv) the expert "has reliably applied the principles and methods to the facts of the case." FED. R EVID. 702; *Daubert*, 509 U.S. at 589, 597 (trial courts must draw upon their "gatekeeping" functions to "ensure that any and all [expert testimony] is not only relevant, but reliable"); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (applying *Daubert* principles to non-scientific expert testimony).

While an expert opinion "is not objectionable just because it embraces an ultimate issue," *see* FED. R EVID. 704, such an opinion falls outside the scope of admissibility when it improperly states a legal conclusion, *see United States v. Jacques Dessange, Inc.,* 99 CR 1182 (DLC), 2000 WL 294849, at *2 (S.D.N.Y. March 21, 2000) ("[E]xpert testimony that amounts to the statement of a legal conclusion must be excluded."); *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) ("This circuit is in accord with other circuits in requiring the exclusion of expert testimony that expresses a legal conclusion."). A district court must exclude expert testimony that will "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999) (internal quotation marks and citations omitted).

Additionally, although experts may be properly qualified to explain sophisticated concepts in complex cases, *see United States v. Ojeikere*, No. 03 CR 581 (JGK), 2005 WL 425492, at *5-6 (S.D.N.Y. Feb. 18, 2005), expert testimony is excludable where it is directed "solely to lay matters which a jury is capable of understanding and deciding without the expert's help," *United States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991) (internal quotation marks and citations omitted); *see also Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 708-09 (2d Cir. 1989) (vacating jury

verdict where district court allowed expert to testify "about matters that were neither scientific nor in any way beyond the jury's ken").

Experts cannot testify about matters that are irrelevant to "key issue[s]" in the case, *see U.S. Commodity Futures Trading Comm'n v. Moncada*, No. 12 Civ. 8791 (CM), 2014 WL 2945793, at *2 (S.D.N.Y. June 30, 2014), and prior to the admission of any potentially relevant expert testimony, the court must determine "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, " *see Daubert*, 509 U.S. at 595 (citing FED. R. EVID. 403).

As the party seeking to offer Taylor's expert opinion testimony, the government bears the burden of proving by a preponderance of the evidence that the testimony is admissible. *Daubert* 509 U.S. at 592 n.10; *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 539 (S.D.N.Y. 2004) ("*Rezulin II*"); FED. R EVID. 702 Advisory Committee's Note ("[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.").

## ARGUMENT

## TAYLOR'S REPORT, PROPOSED TESTIMONY, AND OPINIONS SHOULD BE EXCLUDED IN THEIR ENTIRETY

### I. TAYLOR'S COLLECTIVE OPINIONS USURP THE ROLE OF THE JUDGE AND JURY

Taylor's report and proposed testimony weaves a tangled web of problematic legal issues that run afoul of permissible expert testimony. As an initial matter, Taylor improperly dictates a legal conclusion regarding a key issue in this case, as he seeks to instruct the jury that information regarding soon-to-be-featured NFTs is confidential business information, has economic value, and is therefore property. *See, e.g.,* Report at p. 2 ("Confidential business information about upcoming

featured digital art was valuable."); p. 3 ("Chastain's access to confidential business information about upcoming featured digital art gave him an 'edge' in the market that he monetized for his own benefit. This, in turn, demonstrates the information itself was valuable and could be monetized."); p. 5 ("OpenSea had an economic interest in controlling access to confidential business information about upcoming featured digital art."). Through this proposed testimony, Taylor plainly misappropriates to himself (i) the role the Court will have in instructing the jury on what constitutes property under 18 U.S.C. § 1343; and (ii) the role the jury will have in applying the facts of the case to that law.

As relevant here, for information regarding soon-to-be-featured NFTs to qualify as "property" under the wire fraud statute, the government must prove, *inter alia*, that the relevant information was the confidential business information of OpenSea (*i.e.*, that the information was considered *and* treated as confidential by OpenSea), *see United States v. Mahaffy*, 693 F.3d 113, 135 n.14 (2d Cir. 2012); and that the information had inherent value to OpenSea, *see United States v. Blaszczak*, 56 F.4th 230, 244 (2d Cir. 2022) (confidential information not "inherently valuable" to victim agency where "premature[] disclos[ure] … [had] no direct impact on government's fisc"); *see also Carpenter v. United States*, 484 U.S. 19, 26 (1987) ("[N]ews matter … is stock in trade, to be gathered at the cost of enterprise … to be distributed and sold to those who will pay money for it.") (internal quotation marks and citation omitted); *Cleveland v. United States*, 531 U.S. 12, 15 (2000) ("[I]t does not suffice … that the object of the fraud may become property in the recipient's hands … the thing obtained must be property in the hands of the victim."). Absent such proof, the instant wire fraud charge cannot stand.

Mr. Chastain previewed this issue for the Court in his Motion to Dismiss the Indictment, contending, *inter alia*, that information regarding soon-to-be-featured NFTs, in the specific context

of this case, is not the property of OpenSea, in part because the information itself has no inherent economic value to OpenSea. *See* Mot. to Dismiss at 11-19 (asserting that the relevant information "is completely devoid of inherent economic value" as it is neither the "stock in trade" of OpenSea, nor "acquired or compiled by [OpenSea] in the course and conduct of its business") (internal quotations and citations omitted). In opposition, the government vigorously contested this view of the law, summarily labeling the relevant information as OpenSea's "confidential business information" and insisting that its own conclusory categorization of the information brought it within the purview of the definition of property under the wire fraud statute.

Critically, this issue now stands informed by the Second Circuit's recent decision in *United States v. Blaszczak*, 56 F.4th 230 (2d Cir. 2022). In *Blaszczak*, the defendants were convicted of several property-related crimes, including wire fraud, stemming from the alleged misappropriation of confidential information concerning the timing and substance of proposed CMS rule changes. *See id.* at 234. Following the Supreme Court's decision in *Kelly v. United States*, 140 S. Ct. 1565 (2020), and in consideration of the government's consent to remand the case to the Second Circuit in light of *Kelly*—as well as the United States Solicitor General's Letter Brief to the Second Circuit, which notably asserted that confidential business information is defined by "inherent market value to [its] owners"[1]—the Second Circuit granted the government's request to remand the case to the District Court for dismissal of the substantive property-related counts, as well as one corresponding conspiracy count. *See id*. at 234-237.

In so remanding, the Court reaffirmed that the wire fraud statute requires the deprivation of money or property to be an object of the fraud, *see id.* at 242-43, and held that the relevant agency did not have a property interest in confidential information relating to its upcoming

[1] *See* United States Supplemental Letter Brief at 7, *United States v. Blaszczak*, Nos. 18-2811, 18-2825, 18-2867, 18-2878 (2d Cir. June 4, 2021) (ECF No. 497).

regulatory decisions, as the information itself did not constitute the agency's "'stock in trade,'" nor was the information "'distributed and sold to those who would pay money for it,'" *see id*. at 243 (citing *Carpenter*, 484 U.S. at 26). In other words, the property-related counts were properly dismissible because the relevant confidential information was not "inherently valuable" to the alleged victim.[2] *See id.* at 244 (observing that a planned regulation was not "inherently valuable" to CMS and that the "premature[] disclos[ure]" of any such regulation "[had] no direct impact on the government's fisc").

In light of *Blaszczak's* clear holding, the Solicitor General's brief in that case, and in consideration of the fact that the government now seeks to have Taylor opine on the economic value of the relevant information, the government has effectively conceded that evidence of the information's inherent economic value to OpenSea is required to sustain its burden of proof. The government, however, cannot sustain this burden by offering up an "expert" who will do nothing more than direct the factfinders to conclude that "upcoming featured digital art" was in fact "confidential business information" that was economically valuable to OpenSea. *See* Report at p. 3-5; *see also Moncada*, 2014 WL 2945793, at *2 ("The expert cannot tell the trier of fact what result to reach.").

*Feinberg v. Katz*, No. 01 Civ. 2739 (CSH), 2007 WL 4562930 (S.D.N.Y. Dec. 21, 2007) is instructive. In *Feinberg*, plaintiff asserted fraud claims based on allegations that the defendants, co-owners of an apparel manufacturer, failed to notify creditors of financial losses associated with factory closings, and overstated the company's financial projections in statements issued to

[2] That the information at issue was government information, as opposed to corporate information, is a distinction without a difference. Indeed, in dissent, Judge Sullivan noted that the wire fraud statute would not, and does not, differentiate between "a manufacturer's confidential information concerning the costs of production for assorted medical devices" and "the government's confidential information regarding the reimbursement rates for those very devices." *See Blaszczak*, 56 F.4th at 256 (Sullivan, J., dissenting). And absent such differentiation, the Majority's holding and analysis extends equally to corporate information.

creditors. *See id*. at *1. Plaintiff proffered expert testimony concluding that certain omissions from defendant's financial statements were material and that creditors would not have issued credit had the relevant information been available. *See id*. at 3. Excluding the testimony, Judge Haight held that "materiality" was an element of fraud to be assessed by the factfinder and defined by the court, and further observed that the expert's opinion was "a breathtaking tour de force of inadmissibility" "manag[ing] in a single sentence to both usurp the trial judge's function of instructing the jury on the law and tell the jury what result to reach on the facts." *Id*. at *9.

So too here. Even a cursory review of the above-referenced motion papers reveals that the definition of "property" is a key issue in this case.[3] And moving forward, now informed by the Second Circuit's decision in *Blaszczak*, the jury here will be tasked with deciding whether information concerning upcoming featured NFTs qualifies as OpenSea's property. Considered in conjunction with this key issue, however, Taylor's expert testimony, like the proposed expert testimony in *Feinberg*, is "a breathtaking tour de force of inadmissibility," instructing the jury to conclude not only that the relevant information qualifies as the "confidential business information" of OpenSea,[4] but also that it had inherent economic value to OpenSea. *See* Report at p. 5 ("OpenSea had an economic interest in controlling access to confidential business information about upcoming featured digital art."). The impact of this instruction is self-evident: Taylor directs the jury to find that NFT featured artist information is property under 18 U.S.C. § 1343.

---

[3] As the Court observed during the October 22, 2022 Pre-Trial Conference: "I think there is some disagreement in the parties' briefing in the motion to dismiss with respect to what factors are to be considered in determining whether confidential business information is property." Tr. at 12:18-22.

[4] Notably, in forming his opinions, Taylor relied upon "[t]he Confidentiality Agreement and Invention Assignment agreement signed by Chastain dated January 28, 2021." *See* Report at p. 6. It is impermissible for Taylor to opine or conclude that information about soon-to-be-featured NFTs was the confidential business information of OpenSea based on this document. As held by the Second Circuit in *Marx Co., Inc. v. Diners' Club, Inc.*, 550 F.2d 505, 510 (2d Cir. 1977), "[t]he question of [contract interpretation] is for the jury and the question of legal effect is for the judge. In neither case do we permit expert testimony."

Under these circumstances, Taylor is less an expert than he is a mouthpiece for the prosecution, trumpeting the government's closing arguments with the added perception of credibility that often goes hand-in-hand with an expert designation. *See Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005) (noting that experts are not permitted to act as counsel in making argument at trial) (internal quotation marks and citations omitted). His proposed testimony should be excluded in its entirety. *See Hygh*, 961 F.2d at 364 ("Even if a jury were not misled into adopting a legal conclusion proffered by an expert witness, the testimony would remain objectionable by communicating a legal standard—explicit or implicit—to the jury.").

## II. TAYLOR'S FIRST EXPERT OPINION IS WHOLLY IRRELEVANT AND UNHELPFUL TO THE JURY

### a. Taylor's First Opinion, Which Improperly Focuses on Information Value to the Market, as Opposed to OpenSea, Is Excludable as Irrelevant and Confusing

As discussed above, the jury will be tasked with determining whether information concerning soon-to-be-featured NFTs was OpenSea's confidential business information (and treated as such), valuable to OpenSea, and thus constituted OpenSea's property under the wire fraud statute. In addition to Taylor's testimony being improper for the reasons set forth above, Taylor's first opinion is irrelevant to this key issue. Instead of addressing value *to OpenSea*, *see, e.g., Carpenter*, 484 U.S. at 26 ("news matter" at issue had inherent economic value to the Wall Street Journal as its "stock in trade"); *Cleveland*, 531 U.S. at 15 (2000) ("[T]he thing obtained must be property in the hands of the victim."), Taylor's opinion is predicated on the value, or potential value, of the relevant information *to purchasers in the marketplace*. The disconnect is fatal.

As several courts in this Circuit have observed, expert testimony that is not probative of a case issue is irrelevant and inadmissible. *See, e.g., United States v. Newkirk*, 684 F. Appx. 95, 96-97 (2d Cir. 2017) (affirming district court's decision to preclude testimony from defendant's proposed expert where testimony would have been irrelevant to defense); *Fashion Boutique of Short Hills, Inc. v. Fendi USA Inc.*, 314 F.3d 48, 60 (2d Cir. 2002) (excluding expert testimony where expert made no attempt to itemize damages, as required by law, and instead sought to testify as to the general value of the relevant business, which was irrelevant to the state law claim at issue); *United States v. Sanders*, No. 12 Crim. 0574 (LAK), 2013 WL 1421487, at *2 (S.D.N.Y. 2013) (excluding expert testimony on "custom and usage in the insurance industry" as irrelevant to the issue of "whether accurate information would have been material to the insurance carriers").

*Rezulin II* provides useful guidance. There, plaintiffs' proposed experts indicated that they intended to offer testimony that, among other things, the defendants acted in an "unethical manner" with respect to their presentation of clinical prescription drug data. *Rezulin II*, 309 F. Supp. 2d at 542. Judge Kaplan, however, focusing on the elements of the claims at issue, excluded the experts' opinions, noting that the "principal issues" in the litigation were "whether the defendants breached their legal duties to the plaintiffs in the manufacturing, labeling and marketing of [the relevant prescription drug] and, if so, whether any such breaches were the proximate causes of the injury." *Id*. at 544. In so holding, the court bluntly concluded that "the ethical character of [defendants'] actions [was] simply not relevant to [the] lawsuits." *Id*.

As was the case in *Rezulin II*, Taylor's first opinion stands far afield from one of the "principal issues" lying at the heart of this litigation: whether information concerning upcoming featured NFTs was valuable *to OpenSea*. At best, Taylor irrelevantly concludes that this information was, or could have been, valuable *to everyday purchasers*, tenuously opining that there

exists a market for this sort of information because certain hedge funds "have shown increasing interest in trading digital art." *See* Report at 2. Such extraneous testimony would improperly confuse the jury about the applicable law and issues to be decided.

Similarly problematic is the subsequent basis for Taylor's opinion, apparently confirmed by records he reviewed, that Mr. Chastain had an "edge" in the market because he was able to monetize this information for his own benefit. *See id*. Beyond the fact that Mr. Chastain's purported benefit from the alleged scheme is wholly irrelevant to whether the information has value to OpenSea, permitting such testimony would cause undue prejudice, misleading and confusing the jury into falsely concluding that any alleged financial benefit, as opposed to the purported misappropriation of confidential information of value, was the object of the fraud. *See* FED. R. EVID. 403.

Finally, as discussed in greater detail below, the jurors do not need an expert to tell them that Mr. Chastain had an "edge" or purportedly realized a monetary benefit from the alleged scheme. *See* Report at 2. The jury is perfectly capable of drawing their own conclusions after reviewing the above-referenced records and considering testimony from percipient witnesses, including current and/or former OpenSea employees.[5]

**b. Taylor's First Expert Opinion Should Also Be Excluded Because It Is Premised Upon the Easily Understood Concept of Supply and Demand**

Taylor's first opinion purports to discuss "The Value of Confidential Business Information about Featured Art," and beginning with the "the law of supply and demand," Taylor offers his "expertise" to explain an easily understood concept: that the price of an item will increase when

[5] As noted above, the government has stated in its February 23, 2023 letter that law enforcement witnesses will not testify as expert witnesses. *See* Barnes Decl., Ex. A. Should those law enforcement witnesses impermissibly cross the line dividing lay testimony from expert testimony, the defense will object accordingly.

the demand for the item increases, and the supply remains unchanged. *See* Report at p. 2. With this building block in hand, Taylor then concludes that "[i]nformation about future demand for an item is valuable because it can be used to predict prices." *Id.* And, according to Taylor, the predictive value of that information "is inexorably tied to profit [one] can make by using that information." *Id.* Or, more succinctly, economic jargon exists to explain why umbrellas might be more expensive on a rainy day. *See id.*

Initially, as discussed above, any testimony regarding this basic economic principle of supply and demand should be excluded because it merely serves as the basis for Taylor's wholly irrelevant opinion regarding informational value to third-party purchasers in the marketplace. Additionally, however, Taylor's testimony should be excluded because it is not "beyond the jury's ken." *Andrews*, 882 F.2d at 708 (expert testimony inadmissible where it "invaded an area in which the jury was not in need of expert assistance"); *see also United States v. Mejia*, 545 F.3d 179, 191, 194 (2d Cir. 2008) ("Testimony is properly characterized as 'expert' only if it concerns matters that the average juror is not capable of understanding on his or her own."); *United States v. Long*, 917 F.2d 691, 701-03 (2d Cir. 1990) (expert testimony should have been excluded where it concerned the structure and operations of an illegal kickback scheme that were not beyond the ken of an average juror).

In *United States v. Ojeikere*, the government, in prosecuting the defendant for wire fraud, sought to admit expert testimony from a Postal Inspector regarding the structure of "advance fee schemes." 2005 WL 425492, at *1, 4. Judge Koeltl, however, excluded the expert testimony because the facts of the case were simple, the scheme was "simple and easy to understand," and the testimony would not have "assist[ed] the jury to understand the alleged fraud." *Id.* at *5.

Similarly, Taylor's proposed testimony on "the law of supply and demand," at its core, rests upon the notion that the price of a good may increase when the supply of that good is limited but the demand for the good is high. In the context of this case, involving an alleged scheme that is by no means complex, expert testimony is not necessary to explain this "simple and easy to understand" concept to a jury. *See id*. Indeed, as conceded by Taylor, the concept itself is "ubiquitous," demonstrated by the increased cost of umbrellas on a rainy day, or perhaps, the rising and falls costs of gasoline and everyday groceries. *See* Report at p. 2. Jurors will not and do not need an expert to explain this concept. Accordingly, Taylor's easily understood testimony, serving as the foundation for his irrelevant opinion, should be excluded.

## III. TAYLOR'S SECOND EXPERT OPINION SHOULD ALSO BE EXCLUDED BECAUSE IT IS IRRELEVANT AND UNHELPFUL TO THE JURY

Taylor begins Section III of his report by restating his second opinion: that even though "OpenSea did not monetize the confidential business information about upcoming featured digital art … that does not imply that the information had no value to OpenSea." Report at p. 3. Taylor then proceeds to opine that the value of that information is derived from the right to control that information, s*ee id*. ("There are a litany of circumstances where confidential business information is valuable to a company's operations and the company has an economic interest in controlling access to that information."),[6] exemplified by Coca-Cola's interest in maintaining the secrecy of its ingredients and a publicly-traded company's interest in maintaining the secrecy of pricing

[6] In its Opposition to Mr. Chastain's Motion to Dismiss the Indictment (at 15-16), the government appeared to invoke the right to control theory of wire fraud by stating, *inter alia*, that: (i) OpenSea potentially had a business interest in keeping "exclusive control" over information about upcoming featured NFTs; (ii) the information at issue was potentially valuable; and (iii) OpenSea's decision to refrain from "tapp[ing] into" the potentially valuable information was a discretionary economic decision. Now, the government appears to draw upon "expert" testimony to advance that theory. As the Court is aware, however, the validity of the right to control theory of wire fraud is currently before the Supreme Court in *Ciminelli v. United States*. Based on the government's invocation of this theory, we reiterate that that Supreme Court's upcoming decision may have bearing on this case.

information contained in publicly-disclosed contracts, *see id*. at pp. 3-4. Taylor's examples, however, miss the mark and will only serve to confuse the jury.

Beginning with Coca-Cola, Taylor utterly fails to compare Coke products (*i.e.*, its soft drinks and the recipes underlying those drinks) to OpenSea's product (*i.e.*, its platform and the computer programming underlying that platform). Nonetheless, Taylor notes that "[i]f a competing manufacturer were to gain access to the formula for Coca-Cola, they could replicate the distinct taste of the product [and] sell it under a different name," which could negatively impact Coca-Cola's market share. *Id*. at p. 3. Further, Taylor notes that the secret ingredients of Coke products are valuable because "[they] contribute[] to the uniqueness of Coca-Cola and its brand." *Id*. Drawing Taylor's analogy out to its logical conclusion, he ostensibly opines that: (i) if OpenSea's competitors were to obtain information about a soon-to-be-featured NFT, then OpenSea would lose market share; and (ii) the secrecy of the information about OpenSea's soon-to-be-featured NFTs contributes to the uniqueness of OpenSea's brand. But clearly, neither is true.

First, Coca-Cola's product is its soft drink, defined by the ingredients of its secret recipe that gives Coke its distinct taste. *See* Report at 3. OpenSea's product, however, is its platform, and the unique "ingredients" of its product is the computer programming code underlying that platform. Accordingly, from the outset, Taylor's analogy is irrelevant and unhelpful to the jury, where it is premised on the misappropriation of a product's secret ingredients, and Mr. Chastain is not alleged to have misappropriated the secret ingredients, or programming, underlying OpenSea's platform.

Second, unlike Coca-Cola and its secret recipe, one cannot reliably conclude that OpenSea's bottom line would suffer if its competitors were to learn of a soon-to-be-featured NFT prior to its feature. Indeed, like the information at issue in *Blaszczak*, "premature disclos[ure]" of

a soon-to-be-featured NFT "[would have] no direct impact on [OpenSea's] fisc," *Blaszczak*, 56 F.4th at 244, as OpenSea would still collect its commission from any subsequent purchase of that NFT. *See* Government's July 11, 2022 *Brady* Disclosure Letter (according to an OpenSea senior officer, "OpenSea did not think there was inherent value in the confidentiality of the featured NFT artist selection, as OpenSea would still get a cut of the sales and would have made the identity of it public regardless.")

Third, unlike the recipes for Coca-Cola products, information about soon-to-be-featured NFTs does not contribute to the uniqueness of OpenSea's brand, nor does the subsequent feature itself. OpenSea is merely an "online marketplace," *see* Indictment ¶ 1, providing users with the opportunity and capability to purchase and sell NFTs, just like any other platform in the digital art space. Consequently, OpenSea's brand does not rise and fall in connection with the secrecy of upcoming NFT features, *see* Government's July 11, 2022 *Brady* Disclosure Letter (OpenSea's Co-Founder and CEO "does not believe that there is anything intrinsically valuable to OpenSea to keep the identity of the featured work secret"), especially when, as noted in Mr. Chastain's Motion to Dismiss (at p. 17 and 17 n.17), various NFT platforms engage in identical promotional techniques.

Finally, Taylor's publicly-traded company analogy suffers from similar deficiencies. Even accepting Taylor's premise that the revelation of secret product pricing could be used against companies in future negotiations, and therefore, negatively impact the companies' future financial prospects, the same cannot be said of OpenSea. The potential revelation of soon-to-be-featured NFTs has no impact on the purchase price of other NFTs featured on OpenSea's platform at a later date. Moreover, as noted above, the potential revelation of such information does not have an impact on the commissions that OpenSea collects from future NFT sales.

At bottom, Taylor's second opinion should be excluded because it hinges on analogies that are irrelevant to key issues in this case and completely unhelpful to a jury. Indeed, Taylor's testimony on these points will serve to only confuse the jury, in a way that is incurable by cross-examination, and should thus be excluded.

## IV. TAYLOR'S THIRD EXPERT OPINION SHOULD SIMILARLY BE EXCLUDED AS IRRELEVANT AND UNHELPFUL TO THE JURY

Taylor next opines that "OpenSea had an economic interest in controlling access to confidential business information about upcoming featured digital art because the misuse of that information risked undermining trust in OpenSea's marketplace." Report at p. 5. Taylor's opinion, however, is irrelevant and illogical. Any purported erosion of trust, generated by an individual's misuse of information, is an effect wholly unrelated to the value of that information *ex ante*.

Following Taylor's logical contortions, anything will have inherent economic value to a company where its disclosure tends to harm that company's reputation. Say, for example, a grocery store employee stalks a coworker after obtaining his coworker's address from the company computer system. Later, the employee gets arrested, the general public (including random bloggers) deem the incident to be a "scandal," and as a result of the ensuing "erosion of trust" in this particular marketplace, the company's bottom line suffers. Here, according to Taylor, the coworker's address has inherent economic value to the business because the employee's misuse of the address ultimately caused harm to the company's bottom line. But the reputational harm (or erosion of trust) linking Taylor's faulty premise to his flawed conclusion, derives from the publicity of the employee's workplace misconduct, not from the inherent value of the relevant information. Accordingly, where, as here, there is "too great an analytical gap" between the

inherent value of information and the erosion of trust caused by the misuse of that information, Taylor's testimony should be excluded. *See Rezulin II*, 309 F. Supp. 2d at 540.

Notably, even if Taylor's faulty reasoning were accepted—and it should not be—his opinion is also unreliable because he does not offer any data to support his conclusions. Instead, without conducting an event study or empirical analysis, he blanketly opines that "a reduction in trust reduces the number of transactions that are conducted, and fewer transactions lead to less transaction fees for the marketplace." *See* Report at p. 4. Applied here, the jury in all likelihood would speculate that Mr. Chastain's alleged actions actually harmed OpenSea's market share and position in the relevant market space. But such an opinion begs the question: Did that actually happen? Absent "sufficient facts or data," as required by Rule 702, which Taylor has not provided (and perhaps cannot), Taylor would improperly prejudice and mislead the jury into concluding that Mr. Chastain's alleged actions *caused* some unproven economic harm to OpenSea. *See* FED. R. EVID. 403; *Long*, 917 F.2d at 704-05 (expert testimony unduly prejudicial where it "invited the jury to take a somewhat exaggerated view of [the defendant's] criminal activities").

## V. TAYLOR'S COLLECTIVE OPINIONS SHOULD BE EXCLUDED AS UNRELIABLE BECAUSE THEY IGNORE CRITICAL DISCLOSURES THAT UNDERMINE HIS OPINIONS

Exacerbating the already improper and excludable testimony discussed above, Taylor's report additionally ignores key facts that are detrimental to his arguments, rendering his opinions wholly unreliable. Indeed, absent proper consideration of the readily available exculpatory evidence undermining his position, Taylor presents as nothing more than a hired gun for the government.

To be reliable, and therefore assist the trier of fact, expert reports and testimony must have sufficient factual underpinnings. *See Mink Mart, Inc. v. Reliance Ins.*, 65 F. Supp. 2d 176, 180-81 (S.D.N.Y. 1999) (excluding expert testimony where it was based on speculation and not evidence

that product in question malfunctioned); *In re Fresh Del Monte Pineapples Antitrust Litig.*, No. 04-md-1628 (RMB) (MHD), 2009 WL 3241401, at *7-8 (S.D.N.Y. Sept. 30, 2009) (excluding "unreliabl[e]" expert testimony on relevant market where expert "overlook[ed] relevant facts," "[did] not consider meaningfully" reasonable substitutes, and "quickly dismissed" such substitutes based on "scant evidence"). Moreover, in forming their opinions, experts must consider all relevant data and avoid cherry-picking the facts used in their analyses. *In re Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d 398, 425 (S.D.N.Y. 2005) ("*Rezulin I*") ("[I]f the relevant scientific literature contains evidence tending to refute the expert's theory and the expert does not acknowledge or account for that evidence, the expert's opinion is unreliable.").

Here, while opining that information regarding soon-to-be-featured NFTs has inherent value to OpenSea, Taylor pervasively ignores critical disclosures that contradict his opinions.[7] To this end, Taylor utterly fails to account for OpenSea's statements—quoted at pp. 5-6 *supra*—specifically concluding that the relevant information had no such value. Here, Taylor's complete failure to "acknowledge or account" for evidence "tending to refute [his] theory" renders his opinions unreliable and inadmissible—cross examination is not a cure—and thus, his opinions should be excluded. *Rezulin I*, 369 F. Supp. 2d at 425; *see also Long*, 917 F.2d at 702 (noting that cross examination could not blunt the prejudicial effect of expert testimony on generalized information not directly related to the case at hand); *Marx*, 550 F.2d at 511 ("[C]ompelling the opponent to cross-examine to repair the damage [resulting from improper expert testimony] is to invite disaster, for much will turn on the obstinancy [sic] of the expert."); *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 800 (N.D. Ill. 2005) ("[W]here an expert [can]not

[7] Moreover, Taylor's proposed testimony improperly supplants the necessary testimony of percipient witnesses. *See Sanders*, 2013 WL 1421487, at *2 (precluding expert testimony as unhelpful to jury in light of evidence offered by percipient witnesses).

demonstrate reliability … [t]he opportunity for vigorous cross examination and the presentation of contrary evidence … is not a basis for allowing otherwise inadmissible testimony to be admitted.”).

## CONCLUSION

For the foregoing reasons, Mr. Chastain respectfully moves the Court to exclude in their entirety the report, testimony, and opinions of Daniel Taylor from trial. Should the Court rule that Taylor's report, testimony, and opinions, or portions thereof, are admissible, Mr. Chastain has designated a counter-expert to, among other things, rebut Taylor's “expert” opinions and conclusions.

Dated: New York, New York
March 29, 2023

Respectfully submitted,

GREENBERG TRAURIG, LLP

By: */s/ David I. Miller* .
David I. Miller
Daniel P. Filor
Nicholas T. Barnes
Charles J. Berk
One Vanderbilt Avenue
New York, NY 10017
Telephone: (212) 801-9200
Facsimile: (212) 801-6400

*Attorneys for Defendant*
*Nathaniel Chastain*