N4RKCHA1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

       v.                         22 CR 305 (JMF)

NATHANIEL CHASTAIN,

                                    Trial
           Defendant.

------------------------------x

                                New York, N.Y.
                                April 27, 2023
                                9:00 a.m.

Before:

                    HON. JESSE M. FURMAN,

                                  District Judge

                      APPEARANCES

DAMIAN WILLIAMS
      United States Attorney for the
      Southern District of New York
NICOLAS ROOS
THOMAS S. BURNETT
ALLISON C. NICHOLS
      Assistant United States Attorneys

GREENBERG TRAURIG, LLP
      Attorneys for Defendant
BY:  DAVID I. MILLER
      DANIEL P. FILOR
      GREGORY W. KEHOE
      CHARLES BERK
      NICHOLAS BARNES

N4RKCHA1

1          (Trial resumed; in open court; jury not present)

2          THE COURT:  First, there are a bunch of things to

3    cover because the government seems to have been up all night.

4    But first let me make a record on something, which is:  The

5    first alternate juror, Mr. Sklar, you may recall during voir

6    dire, he mentioned he had a friend who had a startup or ran a

7    startup, or something of that nature, and couldn't remember the

8    name of it.  He appears to have remembered it and shared it

9    with Ms. Smallman.  I think it's something called Floor.

10          Perhaps more relevant, because I don't see why that

11   would matter, he said that having now heard from Mr. Atallah,

12   that that name rings a bell, but he also made clear to

13   Ms. Smallman that he didn't know or remember anything about him

14   that would affect his ability to be fair and impartial.

15          So I am inclined to think that there's no need for any

16   follow-up, but I wanted to share that with both sides.  If you

17   think otherwise, you should let me know.

18          Number two, let me make a record on my ruling this

19   morning by text-only order regarding the Skinner charts.

20          I feel compelled to note that the defense submission

21   was filed at 1:06, not by 11:59, when I was awake and ready for

22   it.

23          MR. FILOR:  Apologies, your Honor.

24          THE COURT:  All right.  I would, frankly, be more

25   sympathetic if it were a substantial filing that had citations

1    to the law, but it was a three-page filing that largely recited

2    Professor Skinner's CV, and, in that sense, I don't see why it

3    needed to be filed late.

4            But be that as it may, the motion was granted.  Let me

5    explain why.

6            First, I think the issues relating to the charts, and

7    the charts, are not relevant to the issues in this case.  Trust

8    is certainly relevant because it helps explain why OpenSea

9    treated the relevant information as confidential.  That is to

10   say, it is relevant to the state of mind of OpenSea or of its

11   principals before and at the time of the charged conduct.

12   Whether Mr. Chastain's conduct, upon being revealed, affected

13   trust in the company is irrelevant to that issue and irrelevant

14   to any issue at trial.  And I would note, on that score, that

15   the defense's own submission states that the evidence is

16   intended to "rebut any suggestion that there was an effect."

17           That's not the issue in this trial.  Actual harm is

18   not something that the government needs to prove.  So whether

19   there was an effect is not relevant; it's the state of mind

20   prior to and at the time of the defendant's conduct.  That is

21   from page 2 of the defendant's response.

22           Second, even if it is relevant, I agree with the

23   government that the testimony and charts are unreliable, and

24   therefore failed my gatekeeping review under *Daubert.*  There is

25   no possible way that that testimony or the charts count for all

possible variables.

Mr. Chastain's employment was terminated promptly upon OpenSea finding out about his conduct, and OpenSea took various remedial measures to evaluate the impact of his conduct. One would have to come up with a way of analyzing the but-for world in which the public found out about his conduct, but OpenSea didn't take those remedial measures. I don't see how Professor Skinner could do that; and the response certainly doesn't explain how he can, except to say that he will explain his direct. But my job under *Daubert* is to determine whether the jury can even hear direct; that is to say, there's a gatekeeping role, and that conclusory assertion, which amounts to trust, just doesn't cut it.

Confounding matters, there was testimony — there has been testimony — in this trial that OpenSea was growing exponentially during the relevant time; thus, the fact that users' transactions and the like increased after the defendant's conduct was revealed proves nothing. Again, one would have to compare the after period to what would have been in the absence of the defendant's conduct, and I see no way one could possibly know that and exclude the other possible variables, and Professor Skinner has certainly not explained how he knows it.

And, finally, even if the defense could overcome these hurdles, the evidence would fail the Rule 403 balancing test.

N4RKCHA1

The government has represented that it will not present

evidence through Dr. Taylor or otherwise regarding the impact

of the defendant's conduct.  At most, therefore, the evidence

is relevant to the issue that I flagged in my pretrial ruling

to rebut any argument that the literature of trust applies to

OpenSea.  Frankly, I find it hard to see how this evidence does

rebut that, but to the extent that it does, the dangers of

unfair prejudice — namely, that even with a curative

instruction, the jury will improperly consider the alleged lack

of actual harm on OpenSea — substantially outweigh any

probative value.

So, for those reasons, the motion was granted.

MR. FILOR:  Thank you, your Honor.

May I briefly proffer a little bit on that?

THE COURT:  No.

MR. FILOR:  May I make a record?

THE COURT:  No.

MR. FILOR:  Okay.  Thank you.

THE COURT:  You had an opportunity to do that.  You

did it an hour and six minutes late, and we're done.

I want to prioritize and focus on the things that need

to be addressed this morning.

I would think, on that score, the argument in the

second most penultimate filing of the government regarding

Dr. Skinner's demonstrative exhibits is probably the most time

sensitive or relevant.  To the extent that we can touch on

other issues, we'll get to other issues, but does the defense

wish to be heard on that?  As I understand it, it's two of the

pages of the demonstrative, the one about baseball cards and

the one about a level playing field, and, I would imagine,

related testimony.

MR. FILOR:  Yes, your Honor.

As the Court is aware, that brief came in, I believe,

at midnight or thereabouts last night.  I did have an

opportunity to review it on my phone.  Briefly to respond to

that, as the Court is aware, the disclosure that the experts

make is not intended to be a verbatim of their testimony.  All

of the demonstrative charts, which are not being presented to

the jury to be put into evidence, they're as a demonstrative

teaching aid, all of those bullet points relate to the trust

issue that we expect Dr. Taylor to be bringing up.

Specifically, the only way that trust can relate to the OpenSea

marketplace for NFTs would be if it is considered to be a level

playing field and if other requirements are met, such that it

is closer to a regulated securities market.

All of these trust issues, and any potential erosion,

theoretical erosion, of trust, and the academic literature with

respect to trust, which focuses on the securities industry, not

the NFT marketplace, those all need to be discussed with

respect to academic literature cited by Taylor, which is what

1    Professor Skinner responds to.  He's read all of the academic

2    literature that was presented by Taylor, and these are the ways

3    to respond to those issues.

4           So it's purely rebuttal, your Honor.

5           THE COURT:  So, can you articulate and explain — what

6    relevance does the analogy to baseball cards versus stocks have

7    to that?  I don't hear the government arguing that if

8    Dr. Taylor testifies that the literature of trust applies to

9    OpenSea, it's fair game for Dr. Skinner to rebut that

10   testimony.

11          I should ask the government — I assume you're still

12   planning to call Professor Taylor, or has that changed?

13          MR. BURNETT:  We're still in the same position we were

14   in yesterday, where we're going to wait to see how the

15   testimony before him comes in today to make a final decision,

16   your Honor.

17          THE COURT:  All right.  So I'll presume that you are,

18   since I have to proceed.

19          MR. FILOR:  Thank you, your Honor.

20          THE COURT:  I don't understand the baseball card

21   analogy.  Whether NFTs are more like stocks or more like

22   baseball cards doesn't really go to any issue in the case,

23   because there's no dispute that they are traded.  I just don't

24   understand the relevance.

25          MR. FILOR:  Your Honor, I didn't fully understand it,

to be honest, before I learned about it from Professor Skinner.

The reason is because all of the literature with respect to

trust — and it is a very limited universe, there's a half a

dozen articles, including his colleagues of Professor Skinner

at the University of Chicago, who wrote those papers and

participated in the studies — the trust is only with respect to

the stock market.  That's what's been tested so far.

To extrapolate it to the NFT marketplace is not a fair

comparison.  And for the reasons that stocks in a regulated

area, versus trading art or baseball cards or any number of

other things that are not a regulated playing field, that those

regulated securities markets have rules, they have regulations,

they have the SEC looking over them, and the position of the

SEC and their role is to try to create a level playing field.

There's nobody doing that in the NFT marketplace, which is more

similar to other traded goods, like baseball cards or fine art.

And there has not yet been any academic literature attempting

to bring the trust argument and the level playing field

argument to the NFT market.

So that's why, when Professor Skinner looks at the

articles cited by Professor Taylor, where Professor Taylor is

trying to extrapolate into new areas that are not regulated,

the question is, well, why would trust be applicable in the NFT

marketplace?  Or some other marketplace, some other traded

goods marketplace, why is it, what do the studies underlying

1    Professor Taylor's report require that got you to the trust

2    place, that that is an important element?  Because in the NFT

3    marketplace, we have already seen testimony about OpenSea's

4    drops that allow certain NFTs to be bought by just a small

5    group before it goes to the market.  Before it goes to the

6    public, there can be multiple drops.  There are these various

7    rooms that we've heard about from the witnesses, white lists

8    and alpha rooms, where people have access to mint these things

9    first before anybody else.  None of those things could happen

10   in the regulated securities, stocks and bonds markets.

11        They are allowed to be in the NFT market, OpenSea

12   encourages it, it's on their website.  There's no reason,

13   Professor Skinner will say, to be able to extrapolate this

14   trust idea, which, again, is only in half a dozen academic

15   articles at all.

16        So it's cutting-edge that Professor Taylor is trying

17   to extrapolate, and so Professor Skinner would like to be able

18   to address that, both with respect to the academic literature

19   and why trust should not be relevant to the NFT market.

20        THE COURT:  All right.

21        Before I hear from the government on the last slide,

22   the level playing field slide, I think the concern is

23   severalfold:

24        Number one, the source doesn't seem to support the

25   proposition for which it's cited, which is to say — and I

visited the web page itself — it appears to be a description of

how some people sell NFTs, not encouragement, per se; and, in

that sense, to the extent that it is cited as OpenSea

encouraging conduct that's inconsistent with having a level

playing field, I don't think it's accurate.

Number two, it's the website today, in April 2023.

Absent evidence that that website was the same in 2021, at the

relevant time for this trial, it strikes me that it's not

relevant to the issues in this case.

And, number three, I think you already have evidence

from which you can make the argument that you just made,

namely, that, in essence, the jury shouldn't believe

Mr. Atallah and Mr. Finzer's testimony that the information

here was confidential — again, I want to keep the focus on

that; that's the only relevant issue on this score — they

shouldn't believe that testimony because to the extent that

they cite trust as an element of it, they were not otherwise

behaving in a manner that was consistent with emphasizing and

valuing trust.  There's plenty of basis to make that argument.

It just strikes me as overkill to -- anyway, this case is not,

ultimately, about whether OpenSea, as I said yesterday, lived

up to its values and whether it was a fair market.  That's not

what this case is about.  The case is about whether this

qualified as property and confidential business information.

MR. FILOR:  Your Honor, I understand those points.

1    Those are perfectly good cross-examination points, and I would

2    expect the government to do their best to go after

3    Professor Taylor on some of the things like that.

4         But a level playing field is a requirement that is the

5    basis for the trust that Professor Taylor is asserting was at

6    issue here.

7         So I think it's fair for them to cross-examine on the

8    issue, but I think Professor Skinner should be able to attack

9    the basis for Professor Taylor's opinions, if he takes the

10   stand.

11        THE COURT:  Okay.  But I don't see how he can rely on

12   materials from 2023 to support testimony about what was or

13   wasn't the case in 2021.

14        Let me say the following:  I'll hear from the

15   government, but my inclination is to say it's fair game for him

16   to say that to the extent that a company operating in a

17   marketplace allowed preferential treatment for certain people,

18   et cetera, that that's not consistent with promoting trust or

19   whatever, is inconsistent with prioritizing trust.  That might

20   be fair game, and then you can argue to the jury, you know, you

21   heard testimony that OpenSea did, at the relevant time, allow

22   for preferential treatment, et cetera, et cetera, and,

23   therefore, you shouldn't believe the testimony that they valued

24   trust.  I think that is different than him relying on a web

25   page from 2023 for the proposition that OpenSea did not value

1    trust and/or did not have a level playing field.  I think the

2    latter probably crosses the line.

3              MR. FILOR:  Understood, your Honor.

4              With the Court's indulgence, to the extent Professor

5    Skinner is able to use a Wayback Machine or something else to

6    find an historical website that was in effect, we would renew

7    the application to present that slide, your Honor.

8              THE COURT:  All right.  Well, that's a hypothetical

9    I'm not confronted with at the moment.

10             Mr. Burnett, did you wish to respond?

11             MR. BURNETT:  Sure.

12             On the baseball card point, I don't think we have any

13   issue with Mr. Skinner saying that the literature on trust is

14   largely focused on equities markets as it exists now, so that's

15   a bad analogy for NFTs.  What we're concerned about is the

16   intermediate step that's, well, and NFTs are more like baseball

17   cards.  If he wants to make the point that the literature is

18   about stocks and NFTs are different than stocks, he should make

19   that point.  He doesn't need to add the comparison to baseball

20   cards, which I think, from our perspective, is like just an

21   attempt to trivialize the nature of the case and doesn't

22   meaningfully clarify any of the issues.

23             There's also no evidence that he is in a position to

24   really meaningfully compare the market for baseball cards and

25   the market for NFTs in a way that's useful for the jury or that

1    applies his expertise in any way.

2            MR. FILOR:  May I briefly?

3            THE COURT:  Yes.

4            MR. FILOR:  With respect to the last point, that's

5    certainly a perfectly good cross-examination point, and I would

6    expect the government to be able to ask Professor Skinner about

7    those things.

8            With respect to the baseball card point, it's not a

9    card itself that's the issue versus an NFT; the comparison is

10   the marketplace.  That's what he's speaking about.

11           That being said, there are baseball cards that are

12   worth a lot of money, so we're not trivializing anything.

13   Professor Skinner's point is about the marketplace versus the

14   securities regulated markets.

15           Thank you, your Honor.

16           THE COURT:  I'm going to sustain the government's

17   objections as follows:

18           First, as to the baseball card one, it's really just

19   to the column that pertains to baseball cards because I think

20   the risk of unfair prejudice, namely that the jury will hear it

21   to be trivializing what we're talking about, the bottom line is

22   I just don't think the analogy is necessary or has any

23   probative value and, in that sense, can only cause prejudice.

24   I don't see any problem with the stocks column or the NFTs

25   column as a way of drawing a distinction between the market for

stocks and the market for NFTs and why the literature on trust

applies only to the former and not to the latter.  But I think

the intermediate step of comparing them to baseball cards is

not necessary to explain or make that argument or offer that

opinion, and, therefore, has no probative value, and to the

extent that it has any, I think the risks of unfair prejudice

are substantially outweighed.

Certainly, at the moment, I will sustain the objection

to the level playing field slide.  If, through a Wayback

Machine or something else, Dr. Skinner can tether it to

evidence at the relevant time, perhaps I would let that in,

but, more broadly, I think it probably suffices for him to say

that to the extent that a marketplace provided for preferential

treatment, et cetera, et cetera, that that would not be

consistent with the marketplace prioritizing or emphasizing

trust.  In that regard, I'm not sure that he needs to opine on

whether OpenSea did or didn't.  I think that's argument that

counsel can make to the jury.

So, the bottom line is I'm not sure it should come in

at all, but, at a minimum, it doesn't come in in its present

form.  So, if you want to try and cure it, I'll take it as it

comes, and if we can address it at a break, we'll address it at

a break.

MR. FILOR:  Thank you, your Honor.

THE COURT:  On Dr. Edman, do we want to quickly try

1    and address that?  I do want to get started, but what's our

2    thought on timing when we would get there?

3              MR. MILLER:  I'm sorry, are you looking at me or the

4    government?

5              THE COURT:  I don't really know who I'm looking at.  I

6    imagine we're not going to get to Dr. Edman before the lunch

7    break, at a minimum, so maybe we should table that until the

8    lunch, and then we'll see where we are.

9              MR. ROOS:  That's right.

10             THE COURT:  Okay.

11             I think on the most recent submission, regarding

12   Mr. Thakrar, first, I don't see the government seeking any

13   relief as to Mr. Thakrar.  I think it's just laying down a

14   marker for what the permissible bounds of that testimony are.

15   I'm familiar with the law but appreciate the reminder.  If the

16   defense has any different view of what they can do, you're

17   welcome to tell me in advance, but, otherwise, I can rule on

18   objections as they come.

19             And on the Defense Exhibit 48, I assume that, too, we

20   can take up later.  Is that correct?

21             MR. ROOS:  We're not exactly sure which witness it's

22   coming through, but assuming it's part of the defense case,

23   that's totally fine with us.

24             THE COURT:  All right.

25             Which witness is that likely to come through?

1      MR. FILOR:  Ms. Sheffield, your Honor.

2      THE COURT:  Okay, understood.

3          And yesterday, you identified, I think, five potential

4  witnesses, but there were only four on the email that you sent

5  last night.  Is that because you've pared your list or because

6  it's about who's testifying today?

7      MR. MILLER:  Well, I think there's two parts.

8          One, I do think we pared our list down a little bit,

9  and, two, we're just trying to game out today.  I don't think

10  there's a scenario by which we would get through everything by

11  the end of the day.  Maybe I'm wrong, but, obviously, we'll be

12  prepared to do whatever we need to do.

13      THE COURT:  All right.

14          So lunch break is not long — I don't want to eat too

15  much of it dealing with these issues — but since we'll have a

16  better sense of where we are at that point, let's table those

17  issues until then.

18          Anything else that we need to discuss before we get

19  Mr. Finzer back on the stand and get the jury in?

20          Nothing?  Great.  Thank you.

21          Let's get Mr. Finzer, and Ms. Smallman will get the

22  jury.

23          While we're doing that, is somebody in a position to

24  make a record as to what exhibits are in through the

25  stipulations?

1          MR. ROOS:  I knew that was coming.

2          We conferred last night.  I think after this witness,

3     I will offer the ones there was confusion on pursuant to the

4     stip that they're listed in.

5          THE COURT:  Okay.  The third time is a charm.

6          Good morning, Mr. Finzer.

7          MR. ROOS:  This may be the fourth time, but...

8          (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Good morning, ladies and gentlemen.  Sorry

3     to keep you waiting.  As you know, I like to start as close to

4     9:00 as possible, but we had a couple of matters we needed to

5     deal with this morning just to speed things along.

6          With that, we will continue with the direct testimony

7     of Mr. Finzer.

8          Mr. Finzer, I remind you that you remain under oath.

9          Ms. Nichols, you may proceed.

10         MS. NICHOLS:  Thank you, your Honor.

11    DEVIN FINZER, resumed.

12    DIRECT EXAMINATION CONTINUED

13    BY MS. NICHOLS:

14    Q.  Good morning, Mr. Finzer.

15    A.  Good morning.

16         MS. NICHOLS:  Mr. Bianco, could we please pull up

17    Government Exhibit 214, which is in evidence.

18    Q.  Mr. Finzer, do you remember that we were talking about this

19    document yesterday?

20    A.  Yes.

21    Q.  Just can you remind the jury, what is this document?

22    A.  This is the confidential information and invention

23    assignment agreement for Nate Chastain.

24    Q.  What was your role in drafting or approving this document

25    for OpenSea?

1    A.  My role was setting up the service that sent out this

2    document and deciding to use documents for new employees.

3            MS. NICHOLS:  Can we please scroll down, Mr. Bianco,

4    and just highlight the bottom paragraph, 2(b).

5    Q.  Mr. Finzer, what is the definition of confidential

6    information that is given in the first sentence of this

7    paragraph here?

8    A.  Information and physical material not generally known or

9    available outside the company and information and physical

10   material entrusted to the company in confidence by third

11   parties.

12   Q.  So what restrictions, if any, does this agreement place on

13   employees' use of confidential information?

14   A.  This agreement tells employees not to share confidential

15   information outside of the company or to use that confidential

16   information for their own personal benefit.

17           MS. NICHOLS:  Can we take down that highlighting,

18   Mr. Bianco.

19           Can we have the zoom back, but just not the

20   highlighting.  Thank you.

21   Q.  So, Mr. Finzer, do you see how, in the second sentence,

22   after the one that you've already read, there is then a list of

23   items?

24   A.  Yes.

25           MS. NICHOLS:  Can we go, Mr. Bianco, now to the second

1    page.

2    Q.  Mr. Finzer, does that list continue on to the next page of

3    this agreement?

4    A.  Yes.

5    Q.  Now, does this agreement spell out each and every way that

6    an employee could misappropriate the company's information?

7    A.  No, it doesn't.  It gives some examples, but it doesn't

8    explain every single way.

9    Q.  Why not?

10   A.  I think explaining every single possible way -- or type of

11   confidential information would be difficult, given that there's

12   lots of different types of information.

13          MS. NICHOLS:  We can take that down, Mr. Bianco.

14   Q.  Mr. Finzer, did there come a time when OpenSea began

15   featuring NFTs prominently on its home page?

16   A.  Yes.

17   Q.  What involvement, if any, did you have in that effort?

18   A.  I was involved in some of the planning around it, I worked

19   with one of our designers, Nate, and some of our engineers on

20   it.

21   Q.  By "Nate," do you mean Nate Chastain?

22   A.  Yes.

23          MS. NICHOLS:  Can we please pull up Government

24   Exhibit 202, just for the witness.  And just scroll to the

25   second page, please.

1   Q.  Do you recognize this, Mr. Finzer?

2   A.  Yes.

3           MS. NICHOLS:  Can we go back to the first page,

4   Mr. Bianco.

5   Q.  What is it?

6   A.  This is a Slack conversation with myself and Nate.

7           MS. NICHOLS:  The government offers Exhibit 202.

8           MR. MILLER:  No objection.

9           THE COURT:  All right.  Mr. Miller, can you put the

10  microphone closer.

11          MR. MILLER:  Sorry about that, your Honor.

12          No objection.

13          THE COURT:  Thank you.

14          Admitted.

15          (Government's Exhibit 202 received in evidence)

16          MS. NICHOLS:  May it be published?

17          THE COURT:  It may.

18  BY MS. NICHOLS:

19  Q.  Mr. Finzer, now that everyone can see it, what is the date

20  of this conversation?

21  A.  The date is May 8, 2021.

22  Q.  And who are the participants to the conversation?

23  A.  Myself and Nate Chastain.

24  Q.  Can we just read some of the messages in this chat?  And

25  can you just read your own messages, and I'll read

1    Mr. Chastain's.  So start with the first one, please.

2    A.   Sorry if I missed this, but how often do we rotate the home

3    page NFTs?

4    Q.   Mr. Chastain:  No problem — we haven't set that in stone,

5    but I'm going to be overseeing this until we automate the

6    process.  My initial impression was that we can rotate this out

7    every three days or so, but we may play with that cadence.

8              Mr. Finzer, can we then skip down to your next line in

9    this conversation.

10   A.   Cool.  I don't see any favorites there.  Is that expected?

11             Should I continue?

12   Q.   Yes, please.

13   A.   And is this system already automated?

14             So if I add a favorite, will it automatically appear

15   on the home page?

16             MS. NICHOLS:  Next page of this exhibit, please,

17   Mr. Bianco.

18   Q.   Mr. Chastain drops a link to a screenshot, and then says:

19   They should be showing up.  The system isn't already automated,

20   but we're going to target a strategy around automation soon.

21   Items won't automatically show up on the home page if added

22   there.  This is just sort of the 'pool' that we'll be adding to

23   to select them, at least to start.

24   A.   Oh, weird.  It worked when I hit it again.

25   Q.   And then in this next message, Mr. Finzer, what is

1    indicated by the little arrow at the beginning of your message?

2    A.  The little arrow indicates that I'm quoting the previous

3    message that he sent so that I can respond specifically to that

4    message.

5    Q.  Can you read, starting with your response, the part of this

6    that are your words?

7    A.  Sure.

8              SG — which means sounds good — just wanted to

9    highlight that (whether automated or not) I feel strongly about

10   it not getting stale.  That was a big issue with our promo

11   cards that a lot of people complained about before we had

12   resources to refresh them, and these assets are even more

13   salient, so I think keeping it fresh is even more paramount.

14   But sounds like there's a good plan in place.

15             THE COURT:  Mr. Finzer, just if you can make sure you

16   read slowly enough so that the court reporter can keep up --

17             THE WITNESS:  Sure.

18             THE COURT:  -- that would be great.

19             THE WITNESS:  Yep.

20   BY MS. NICHOLS:

21   Q.  Mr. Finzer, why did you feel strongly about the featured

22   NFT not getting stale?

23   A.  I wanted the home page to feel fresh for people who were

24   coming back to the site regularly.  So, if someone came to the

25   site, you know, a week later, and it was the same exact NFT,

1   then it wasn't very engaging for people for using the website.

2   Q.  From a business perspective, why was it important to you

3   that the site feel fresh to users?

4   A.  I think it's around sort of polish and delightfulness for

5   users.  If users are coming back, and it's always the same

6   thing, then it's not as exciting or full of an experience.

7             MS. NICHOLS:  We can take that down, Mr. Bianco.

8             And can you please pull up, for the witness,

9   Government Exhibit 218.

10  Q.  Do you recognize this, Mr. Finzer?

11  A.  Yes.

12  Q.  What is it?

13  A.  This is a message that I sent in response to -- or in the

14  random channel of our Slack group.

15            MS. NICHOLS:  The government offers Exhibit 218.

16            THE COURT:  Any objection?

17            MR. MILLER:  Objection.

18            THE COURT:  Overruled.

19            Admitted.

20            (Government's Exhibit 218 received in evidence)

21            MS. NICHOLS:  May we publish, your Honor?

22            THE COURT:  You may.

23  BY MS. NICHOLS:

24  Q.  Mr. Finzer, now that everyone can see it, can you please

25  tell us the date of this conversation?

1    A.   August 6, 2021.

2    Q.   Do you see the list of names underneath the channel title,

3    #random?

4    A.   Yes.

5    Q.   Just at a general level, who are all of those folks?

6    A.   These are people who were working at OpenSea at the time.

7    Q.   Can you read your communication in this message?

8    A.   "I really like it when the home page NFTs are semifungible,

9    so lots of folks can buy them.  Also looks awesome.  Props to

10   Nate Chastain for the great selection."

11           MS. NICHOLS:  We can take that down, Mr. Bianco.

12   Q.   Mr. Finzer, who -- during the time period that Mr. Chastain

13   worked at OpenSea, who controlled which work got featured on

14   the home page?

15   A.   I believe it was Nate, and it may have involved some other

16   people as well, but I know Nate was involved.

17   Q.   Other than the two conversations that we just looked at,

18   did you offer input onto the NFTs that should be selected?

19   A.   Other than those two conversations, it's possible that I

20   provided input here and there.  Though I don't recall another

21   specific instance, but it's quite possible that I commented on

22   whether a particular NFT looked visually appealing or not.

23   Q.   And, to your knowledge, did other employees at OpenSea have

24   an opportunity to give input to Mr. Chastain on which NFTs

25   should be featured?

1  A.  I believe so.  So, through the system that was described on

2  the -- in one of the previous exhibits, there was a system

3  where people could favorite NFTs, such that they would be

4  eligible for featuring on the home page.  And then it's quite

5  possible that people kind of gave their own thoughts on which

6  NFTs looked good or not.

7  Q.  So now focusing outside of the company, was information

8  about which NFTs would be featured on the home page publicized

9  outside of the company in advance?

10  A.  Not to my knowledge, no.

11  Q.  Speaking generally, what effect, if any, did being featured

12  on the home page have on the particular NFT's price?

13  A.  We noticed that when an NFT was featured on the home page,

14  more people would visit that NFT because it's more salient, so

15  people would click into it, and that if the NFT was on sale, it

16  might sell faster than a normal NFT.

17  Q.  What about with respect to the price of that NFT?

18  A.  The price could potentially go up in that maybe one person

19  buys the NFT when it's featured and then resells it at a higher

20  price.

21  Q.  Prior to mid-September of 2021, did Mr. Chastain ever tell

22  you that he was purchasing the featured NFTs?

23  A.  No.

24  Q.  Did he ever ask you for permission to do that?

25  A.  No.

1   Q.  Did he ever tell you that he was planning to purchase them?

2   A.  No.

3   Q.  Did there come a time when you asked for Mr. Chastain's

4   resignation?

5   A.  Yes.

6   Q.  Why did you ask for his resignation?

7   A.  We asked for his resignation because of the behavior that

8   had occurred in -- and had come to light in previous days.

9   Q.  What behavior was that?

10  A.  The behavior was purchasing NFTs prior to them being

11  featured on the home page, and then reselling those NFTs.

12  Q.  How did you first hear of allegations that Mr. Chastain was

13  doing that?

14  A.  There was a tweet from a member of the NFT community.  I

15  don't remember exactly when I first saw the tweet.  I know that

16  one of our investors sent us a tweet over email, and that was

17  likely the first time that I saw the tweet.

18  Q.  And understanding you don't remember the exact timing, can

19  you give us a sense of the span of time between when you first

20  saw the tweet containing the allegations and when you asked for

21  Mr. Chastain's resignation?

22  A.  It would have been in the course of either one day or

23  two days.

24  Q.  Why did you act so quickly in response to the allegations?

25  A.  Well, we wanted to first -- I guess it was a pretty

1    significant -- there was a lot of chatter about it on social

2    media, it was something that was causing a lot of conversations

3    about the potential of this -- or the potential behavior, so we

4    wanted to ensure that we knew what was going on, and we also

5    updated the people that were talking about this in the NFT

6    community.

7    Q.  So why did the fact that folks were talking about it mean

8    that you wanted to act quickly?

9    A.  Well, part of our company strategy is to be open and

10   communicative with our user base.  So when there are events

11   that occur related to our product, we try to act -- generally

12   act swiftly and generally update our community in response.

13   Q.  So let's go to the day that you asked for Mr. Chastain's

14   resignation.

15            Where did that conversation take place?

16   A.  That conversation was over a call, and I was in the New

17   York office at the time.

18   Q.  So who all were the participants to that conversation?

19   A.  That would have been myself, Alex, my cofounder, and Gina,

20   our general counsel, as well as Nate.

21   Q.  Who spoke during that conversation?

22   A.  I believe me and Nate -- I know that myself and Nate spoke,

23   and perhaps Alex said a few words, but it was mostly myself and

24   Nate.

25   Q.  What did you --

1    A.  Mostly myself.

2    Q.  What did you say?

3    A.  I don't recall exactly how I framed the conversation, but

4    the gist of it was that I asked Nate to resign.

5    Q.  How did he respond?

6    A.  He agreed.

7    Q.  What was the connection, if any, between Mr. Chastain's

8    actions in buying featured NFTs before they were featured and

9    then selling them after and the confidentiality agreement that

10   we just looked at?

11   A.  The connection would be that the knowledge of which NFTs

12   were used or were going to be featured on the home page was

13   information that was privy and specific to the company that was

14   being used to perform those actions.

15   Q.  And so did Mr. Chastain's actions violate that agreement?

16           MR. MILLER:  Objection.

17           THE COURT:  Sustained.

18   Q.  Why did you ask for Mr. Chastain's resignation?

19           MR. MILLER:  Objection; asked and answered.

20           THE COURT:  Sustained.

21           Mr. Miller, louder, please.

22           MR. MILLER:  Sorry.

23   BY MS. NICHOLS:

24   Q.  How, if at all, did Mr. Chastain's actions reflect on

25   OpenSea's values, as you spoke about yesterday?

1    A.  Well, one of our values involves a trusted relationship

2    with the NFT community, so this situation was certainly

3    damaging to that trust at the time.

4    Q.  Did OpenSea publicly announce any company policies around

5    the time that Mr. Chastain resigned?

6    A.  At the time that Mr. Chastain resigned, we added additional

7    policies that specifically outlined what employees could do

8    with regards to buying and selling NFTs, particularly those

9    that were featured on the home page.

10            MS. NICHOLS:  Can we please pull up what's in evidence

11   as Government Exhibit 228.

12   Q.  Do you recognize this, Mr. Finzer?

13   A.  Yes.

14   Q.  And what is it?

15   A.  This is a blog post that was published on September 15,

16   2021.

17            MS. NICHOLS:  Mr. Bianco, let's take that down,

18   please.  No, just the zoom.

19            Great.

20            Can we please zoom in on where it says "Original Post"

21   and then everything after that.

22   Q.  Mr. Finzer, is this what you were just mentioning was

23   published on September the 15th?

24   A.  Yes.

25   Q.  Why, from a business perspective, did OpenSea choose to

1  write this blog post?

2  A.   We wanted to provide an update to our user base about how

3  we were handling the situation that we had just learned about.

4  Q.   Can you just read, beginning with "yesterday," please?

5  A.   "Yesterday we learned that one of our employees purchased

6  items that they knew were set to display on our front page

7  before they appeared there publicly."

8  Q.   Can you read the next paragraph, please?

9  A.   "This is incredibly disappointing.  We want to be clear

10  that this behavior does not represent our values as a team.  We

11  are taking this very seriously and are conducting an immediate

12  and thorough third-party review of this incident so that we

13  have a full understanding of the facts and additional steps we

14  need to take.  We have also implemented the following

15  policies."

16  Q.   Okay.

17          MS. NICHOLS:  Mr. Bianco, can you remove that

18  highlighting for us.

19  Q.   Mr. Finzer, the first bullet point here, could you please

20  read that?

21  A.   "OpenSea team members may not buy or sell from collections

22  or creators while we are featuring or promoting them (e.g. on

23  our home page)."

24  Q.   Was that a new policy that you implemented as of the date

25  of this blog post?

1    A.   Yes.

2    Q.   Why, from a business perspective, did you decide to

3    implement this new policy?

4    A.   We wanted to be very clear so that employees wouldn't --

5    would not be worried about whether or not they could purchase

6    something.  So we had a more -- a broader policy, that

7    basically just informed employees not to purchase anything from

8    the home page, as sort of an additional safeguard.

9    Q.   I just want to understand what this policy that's

10   highlighted applies to.

11           Does it apply to purchases of featured NFTs after they

12   are featured on the home page, like while they are featured on

13   the home page?

14   A.   Yes.

15           MS. NICHOLS:  We can take down that highlighting,

16   please, and then highlight the second bullet point.

17   Q.   Could you read this one, Mr. Finzer?

18   A.   "OpenSea team members are prohibited from using

19   confidential information to purchase or sell any NFTs, whether

20   available on the OpenSea platform or not."

21   Q.   Now, is this a new policy, Mr. Finzer?

22   A.   No.  This is more of a specification of an existing policy

23   that was more general.

24   Q.   What do you mean by that?

25   A.   This second bullet point is talking about not using

1  confidential information to purchase or sell NFTs, which was

2  already covered in the CIIAA, but this is just being more

3  specific that confidential information should not be used for

4  that purpose.

5          THE COURT:  Can you just remind us or explain what you

6  mean by CIIAA?

7          THE WITNESS:  The confidentiality invention -- or,

8  sorry, I can't remember what it stands for, but the agreement

9  that Nate signed with the company.

10          THE COURT:  Government Exhibit 214 that we started

11  this morning talking about?

12          THE WITNESS:  Correct, yes.

13  BY MS. NICHOLS:

14  Q.  Mr. Finzer, why, from a business perspective, did you

15  decide to announce this policy in your blog post, if it wasn't

16  new?

17  A.  We wanted to inform the community that we had clear

18  policies about buying and selling NFTs.

19          MS. NICHOLS:  No further questions, your Honor.

20          THE COURT:  Cross-examination?

21          MR. MILLER:  Yes, Judge.

22          May I inquire?

23          THE COURT:  You may.

24

25

1    CROSS-EXAMINATION

2    BY MR. MILLER:

3    Q.  Good morning, Mr. Finzer.

4    A.  Good morning.

5    Q.  We've never met before, right?

6    A.  Correct.

7    Q.  And while we haven't met, you have been interviewed by the

8    government, I think, five times since last year; is that right?

9    A.  I'm not sure exactly how many times.

10   Q.  You started to meet with them in or about March of 2022?

11   A.  That sounds like around the right time, but I'm not

12   entirely sure when.

13   Q.  Thank you.

14           And then you've met with them a couple of times in the

15   last few weeks, right?

16   A.  Correct.

17   Q.  And you met with them last Thursday, on April 20th?

18   A.  I don't recall the specific date.

19   Q.  Did you meet with them yesterday?

20   A.  No.

21   Q.  Did you speak with them on the phone yesterday?

22   A.  No.

23   Q.  Did you speak with them by video yesterday?

24   A.  No.

25   Q.  Was there any other way that you had any contact with the

1   government yesterday?

2           THE COURT:  Aside from testifying in court?

3           MR. MILLER:  Yes, obviously.

4           THE WITNESS:  No.  I just want to note that I did talk

5   to my lawyers yesterday.

6   BY MR. MILLER:

7   Q.  Okay.

8           You met Mr. Chastain through an investor in OpenSea,

9   correct?

10  A.  Yes.

11  Q.  And you had never met Mr. Chastain prior to that, true?

12  A.  True.

13  Q.  When you were introduced to him, it was to interview him

14  and evaluate his candidacy as a product manager at OpenSea,

15  right?

16  A.  Correct.

17  Q.  And Mr. Chastain, in fact, started in a trial period before

18  being brought on as a full-time employee, right?

19  A.  Correct.

20  Q.  That trial period was in or about January of 2021, right?

21  A.  I'm actually not sure because I do remember -- I seem to

22  recall there being a gap between the trial period and the start

23  date, but my recollection could be wrong.

24  Q.  Okay.

25          MR. MILLER:  Permission, your Honor, to publish

1    GX 215, that's already in evidence?

2            THE COURT:  Granted.

3    BY MR. MILLER:

4    Q.  So this is what was in evidence.

5            MR. MILLER:  If we could scroll down a little bit so

6    the witness can see it and then go back up.  You can go back

7    up, Mr. Berk.

8    Q.  And this was the offer letter to Mr. Chastain, right?

9    A.  It looks like that, yes.

10   Q.  It was dated January 28th?

11   A.  Yes.

12   Q.  And his trial period would have happened before that point,

13   correct?

14   A.  I believe so, yeah.

15   Q.  Now, during Mr. Chastain's --

16           MR. MILLER:  You can take that down.

17   Q.  During Mr. Chastain's employment, he reported directly to

18   you, true?

19   A.  Yes.

20           MR. MILLER:  Let's put back, with your Honor's

21   permission, GX 215, that we just showed.

22           THE COURT:  You may.

23           MR. MILLER:  Thank you.

24           Let's scroll down, if we can, for a little bit,

25   Mr. Berk.  Thank you.

BY MR. MILLER:

Q.  Now, this document set forth his annual compensation,

right?

A.  Yes.

Q.  And it also set forth how he would be eligible for stock

options as part of his compensation plan, correct?

A.  Yes.

Q.  And I think it says, in paragraph 3, that the equity award

involved would cover 49,011 shares.

         Do you see that?

A.  Yes.

Q.  And those options, at the time, constituted about

0.5 percent of the company, correct?

A.  I'm not sure, actually.

Q.  Isn't it true, Mr. Finzer, that as of OpenSea's July 2021

funding raise, the company was valued as being worth

approximately $1.5 billion?

         MS. NICHOLS:  Objection.

         THE COURT:  Sustained.

Q.  Now, when Mr. Chastain resigned in September of 2021, that

was about nine months into his employment, right?

A.  Yes.

Q.  And as a consequence of his resignation, he hadn't met the

12-month anniversary for vesting, true?

A.  True.

1    Q.  So he lost the right to those shares, correct?

2    A.  It depends how you frame it.  There was -- you don't really

3    have the right until you're vested to have the shares.

4    Q.  But he no longer had that right once he left, right?

5    A.  Yes.

6    Q.  And those shares that he would have had, if they vested

7    according to the schedule, those shares went back to the

8    company, true?

9    A.  Yes.

10   Q.  Now, once Mr. Chastain started, you interacted with him

11   pretty frequently at work, right?

12   A.  Yes.

13   Q.  And I believe you testified on direct examination that you

14   and Mr. Chastain had conversations every day over Slack

15   messaging, right?

16   A.  Yes.  Almost every day is my guess.

17   Q.  And you two worked in close proximity if you were

18   ultimately in an office, right?

19   A.  Yes.

20   Q.  And many of your conversations were about issues or topics

21   that somehow related to working at OpenSea, true?

22   A.  Yes.

23   Q.  You also saw Mr. Chastain occasionally outside of work,

24   right?

25   A.  Yes.

1   Q.  You even went to a few NFT community-related events

2   together, true?

3   A.  Yes.

4   Q.  You even went for runs together a couple of times, right?

5   A.  Yes.

6   Q.  Safe to say you and Mr. Chastain were friends?

7   A.  Yes.

8   Q.  In terms of Mr. Chastain's work at OpenSea, it's also fair

9   to say that he came up with a lot of good ideas while he was

10  there, right?

11              MS. NICHOLS:  Objection.

12              THE COURT:  Sustained.

13  Q.  Is it fair to say, sir, that when Mr. Chastain was there

14  and working as a product manager, that he proposed several

15  ideas with respect to the website?

16  A.  Yes.

17  Q.  Did you approve those ideas?

18  A.  We don't have an internal process that is specifically

19  around approving things, but, implicitly, I agreed with some of

20  the changes to the website.

21  Q.  And Mr. Chastain worked hard at OpenSea, right?

22              MS. NICHOLS:  Objection.

23              THE COURT:  Sustained.

24  Q.  How would you characterize Mr. Chastain's work ethic?

25              MS. NICHOLS:  Objection.

1          THE COURT:  Sustained.

2     BY MR. MILLER:

3     Q.  So when you hired Mr. Chastain, OpenSea was a very small

4     company, right?

5     A.  Correct.

6     Q.  It was less than ten employees?

7     A.  I believe so.

8     Q.  Isn't it true that OpenSea didn't have actually an office

9     space when Mr. Chastain was hired?

10    A.  I can't recall when we got our office space.

11    Q.  OpenSea's parent company was Ozone Networks, right?

12    A.  The company itself is called Ozone Networks, but it's not a

13    parent company.

14    Q.  Gotcha.

15          And the address for Ozone Networks was a studio

16    apartment on 24th Street, true?

17    A.  That sounds reasonable.

18    Q.  That was your apartment, right?

19    A.  Potentially, yeah.  It was on 24th Street, yes.

20    Q.  OpenSea didn't have a general counsel when Mr. Chastain was

21    hired, correct?

22    A.  No, but we used outside counsel.

23    Q.  In fact, OpenSea didn't have a general counsel until August

24    of 2021; isn't that true?

25          MS. NICHOLS:  Objection.

1            THE COURT:  Overruled.

2            THE WITNESS:  I'm not sure exactly when the date that

3    our general counsel joined, but you're correct that we did not

4    have a general counsel when Nate joined.

5            THE COURT:  You said earlier you had outside counsel.

6    Can you explain what you mean by that?

7            THE WITNESS:  Yeah.  So outside counsel is a legal

8    team and lawyers that we work with that work for an outside

9    firm.

10   BY MR. MILLER:

11   Q.  In fact, eventually you hired Ms. Moon as your general

12   counsel?

13   A.  Yes.

14   Q.  And she, in fact, only started a few weeks before the

15   incident that we're here to discuss, correct?

16   A.  I'm not sure of the exact timing, but that sounds about

17   right.

18   Q.  OpenSea didn't have a head of human resources when

19   Mr. Chastain was hired, right?

20           MS. NICHOLS:  Objection.

21           THE COURT:  Overruled.

22           THE WITNESS:  Not -- no, we did not.

23   BY MR. MILLER:

24   Q.  And it wasn't until around the time of this incident that

25   OpenSea hired a head of human resources, true?

1   A.  I don't recall when we hired our head of HR.

2   Q.  Now, when employees are hired today, OpenSea discusses its

3   mission statement with each new hire, correct?

4   A.  Yes.

5   Q.  But at the time Mr. Chastain was hired, OpenSea hadn't

6   instituted that practice, right?

7   A.  Correct.

8   Q.  And OpenSea's corporate values were only, in fact,

9   formalized in documents and on the website within the last

10  year, true?

11  A.  We've had corporate values for a while, including ones on

12  the website, I believe, when Nate was at the company, but we

13  did revamp our corporate values in recent years, such that

14  they're more formalized now.

15          MR. MILLER:  With the Court's permission, I'd like to

16  publish GX 214, that's in evidence.

17          THE COURT:  You may.

18  Q.  Mr. Finzer, we've obviously heard some testimony today and

19  at the end of yesterday from you about this document.

20          Do you recall that?

21  A.  Sorry, would you repeat that?

22  Q.  Sure.

23          We've heard some testimony from you about this

24  document today at the end of yesterday, correct?

25  A.  Yes.

Q.   Now, you testified that you obtained this document from a
service, right?

A.   Correct.

Q.   And that service is called Clerky, right?

A.   Yes.

Q.   And this was a template that they provided to people who
subscribed to their service, true?

A.   Yes.

Q.   And you personally didn't modify this template, correct?

A.   No.

Q.   Now, on page 1, the agreement contains a section titled,
"Confidential Information."

          Do you see that?

A.   Yes.

Q.   And 2(a) says, "Protection of information."

          Do you see that?

A.   Yes.

Q.   And let's go to 2(b) under "Confidential Information."

          That states -- and this first sentence I think you
read for the jury, right, that's past (b), confidential
information, do you see that sentence?  It begins I understand.

A.   Yes.

Q.   Thank you.

          Okay.  Well, let's go now to the second sentence,
"Confidential information includes without limitation."

1          Do you see that sentence?

2    A.   Yes.

3    Q.   And then there's a list of things that are included,

4    without limitation, correct?

5    A.   Yes.

6    Q.   And if we go to the top of the next page -- well, first,

7    let's go back to the beginning of that.

8          Do you see how it says, under romanette ii, you see

9    technical data?

10   A.   Yes.

11   Q.   Trade secrets?

12   A.   Yes.

13   Q.   Know-how?

14   A.   Yes.

15   Q.   And if we go to the top of the next page, you see it says,

16   "Biological Materials"?  Do you see that?

17   A.   Yes.

18   Q.   Does OpenSea deal in biological materials?

19   A.   No.

20   Q.   Mask works; do you see that?

21   A.   Yes.

22   Q.   Does OpenSea deal in mask works?

23   A.   No.

24   Q.   And also laboratory notebooks on this line.

25          Does OpenSea deal with laboratory notebooks?

1    A.  No.

2    Q.  And this list doesn't include anything about NFTs, right?

3    A.  No.

4    Q.  And you don't recall having discussions with Mr. Chastain

5    about this agreement during his employment at OpenSea, right?

6    A.  I don't.

7    Q.  And during Mr. Chastain's tenure, OpenSea didn't require

8    employees to take any course regarding employee confidential

9    information, right?

10   A.  Not that I recall, no.

11   Q.  It didn't require employees to watch any videos on the

12   subject, either, during his tenure?

13   A.  No.

14   Q.  And during Mr. Chastain's tenure, OpenSea didn't distribute

15   any training materials as to confidential information, right?

16   A.  Not that I recall, but it is possible that there were more

17   training materials, generally, as the company started to grow,

18   but not that I recall.

19   Q.  Okay.

20          And during Mr. Chastain's employment, OpenSea never

21   conducted an evaluation of employees' knowledge of the

22   confidential information listed here?

23   A.  Not that I recall, no.

24   Q.  You personally, sir, never held any formal training

25   sessions discussing confidential information, right?

1    A.  No.

2    Q.  And, to your knowledge, during Mr. Chastain's tenure, no

3    one that you know of at OpenSea or anyone else provided any

4    such formal training sessions to employees on confidential

5    information, true?

6    A.  Not to my knowledge.  But, again, as we grew, there may

7    have been more general trainings.

8    Q.  You mentioned, as you grew.

9            How many employees did you have in or around

10   January 2021, when Mr. Chastain started?

11   A.  In January of 2021, I believe it was less than ten

12   employees.

13   Q.  So you're familiar with OpenSea's featured artist section

14   on the home page, right?

15   A.  Yes.

16   Q.  That was a spot, as you talked about on direct examination,

17   where OpenSea would display a particular artist's NFTs, right?

18   A.  A single NFT, yes.

19   Q.  And you testified that that featured artist would

20   periodically change, right?

21   A.  Yes.

22   Q.  And OpenSea didn't always have a featured artist section,

23   true?

24   A.  True.

25   Q.  And it was Mr. Chastain that came up with the idea for a

1    featured artist page, right?

2    A.  I believe so, though there were a couple of people that

3    were bouncing around those sorts of ideas, but I believe it was

4    Mr. Chastain.

5    Q.  And that was at some point in or around mid-2021, correct?

6    A.  That sounds right.

7    Q.  And you thought the idea was a good one, right?

8    A.  Yes.

9    Q.  Mr. Chastain was in charge of selecting which artist would

10   be featured, right?

11   A.  Yes.

12   Q.  Mr. Chastain decided when he would feature the artist,

13   correct?

14   A.  Yes.

15   Q.  Now, OpenSea makes money by taking a 2.5 percent fee of

16   each NFT sale completed on the platform, correct?

17   A.  Correct.

18   Q.  That was true in 2021 as well, right?

19   A.  Yes.

20   Q.  That fee, that 2.5 percent fee, it doesn't change based on

21   which NFT is sold, does it?

22   A.  There are a few situations, and there were a few

23   situations, where the fee would be lowered, but for the most

24   part, it was 2-1/2 percent.

25   Q.  And that holds true, the 2.5 percent fee for the featured

1    NFTs, right?

2    A.  Yes.

3    Q.  In 2021, the 2.5 percent fee, that was OpenSea's primary

4    source of revenue stream, right?

5    A.  Yes.

6    Q.  Prior to the incident with Mr. Chastain, you had not

7    thought about whether the selection of the featured artist was

8    confidential, correct?

9    A.  No.

10   Q.  Not correct or you had not?

11   A.  I hadn't thought explicitly about whether it was

12   confidential information.

13   Q.  And in terms of which featured artists were selected by

14   Mr. Chastain, that didn't necessarily make a difference to

15   OpenSea in terms of the fee that it collected, right?

16   A.  Correct.

17   Q.  Now, in 2021, OpenSea didn't prohibit employees from buying

18   NFTs on the platform, right?

19   A.  Correct.

20          I'm sorry, actually, let me clarify.  I mean, the

21   policy that we updated, the blog post, did add prohibitions

22   explicitly against purchasing NFTs on the home page.

23   Q.  Thank you, sir.  I was about to get into that.

24   A.  Yeah.

25   Q.  So that was in September of 2021, right?

1    A.  Correct.

2    Q.  Prior to that, there was no restriction about employees

3    buying NFTs on the platform, right?

4    A.  Right, no specific restrictions, right.

5    Q.  And, in fact, during that time prior to that new policy in

6    September 2021, employees bought and sold NFTs on the platform

7    all the time, right?

8    A.  Yes.

9    Q.  Mr. Finzer, you even bought and sold NFTs on the platform,

10   right?

11   A.  Yeah.  Primarily to test the platform.

12   Q.  Now, you follow Mr. Chastain on Twitter, right?

13   A.  I currently do or I did back then?

14   Q.  Well, let's start with 2021.

15   A.  I'm actually not sure.  It's quite possible.

16   Q.  Well, part of Mr. Chastain's duties and responsibilities

17   were to interact with the public over Twitter, right?

18   A.  Part of his responsibilities were to ensure that the

19   product developed properly, and part of that was interacting

20   with customers, not specifically over Twitter, but over

21   different channels.

22   Q.  Understood.

23          But Twitter was one of the mechanisms by which

24   Mr. Chastain would interact with customers?

25   A.  Yes.

1    Q.  And, in fact, he would also announce new features that were

2    going to be added to the platform over Twitter, right?

3              MS. NICHOLS:  Objection.

4              THE COURT:  Overruled.

5              THE WITNESS:  He would announce new features?  Yes.

6              MR. MILLER:  At this time, your Honor, we'd like to

7    show the witness what's been marked for identification — and

8    we'll do it in a group — Defense Exhibits 1, 2, 4, 5, 6, and 8.

9    They're for identification.

10             And if we could just show that to the witness and the

11   parties here.

12   BY MR. MILLER:

13   Q.  Take a moment so you have an opportunity to read it.  Do

14   not read it out loud, just read it to yourself, please, sir.

15   Thank you.

16             (Pause)

17   A.  Yep, I've read them.

18   Q.  Thank you, sir.

19             Do you recognize Mr. Chastain's Twitter handle on each

20   of these exhibits?

21   A.  Yes.

22   Q.  And these were the types of tweets that Mr. Chastain sent

23   out as part of his duties and responsibilities at OpenSea,

24   correct?

25   A.  Yes.

1          MR. MILLER:  Pursuant to Stipulation 1001, the defense

2     moves Defense Exhibits 1, 2, 4, 5, 6, and 8 into evidence.

3          MS. NICHOLS:  Same objection as yesterday, your Honor.

4          THE COURT:  Overruled and admitted.

5          MR. MILLER:  Thank you, your Honor.

6          (Defendant's Exhibits 1, 2, 4, 5, 6, and 8 received in

7     evidence)

8          MR. MILLER:  Let's now -- with your Honor's

9     permission, can we publish to the jury?

10         THE COURT:  You may.

11         MR. MILLER:  Thank you.

12    BY MR. MILLER:

13    Q.  Defense Exhibit 1, let's start with this.

14         So if we could first start at the top, and if you

15    could read out what the Twitter handle FaZe Banks was saying on

16    September 5, 2021.

17    A.  "@OpenSea:  Guys, is there any way to keep people from

18    sending me stuff?  Every morning I wake up to hundreds of

19    pieces of literal trash linked to purchase options, and I don't

20    want it displayed on my OS account.  I spend so much time

21    clicking and hiding and clicking and hiding.  Please."

22    Q.  And there's a response from Mr. Chastain on his Twitter

23    handle Nate.ETH.

24         Do you see that?

25    A.  Yes.

1    Q.  What does he say?

2    A.  "We are going to be building a feature to address this

3    problem."

4    Q.  Thank you.

5            MR. MILLER:  And if we can go to Defense Exhibit 2, in

6    evidence, with your Honor's permission?

7            THE COURT:  You may.

8            MR. MILLER:  Thank you.

9    BY MR. MILLER:

10   Q.  We see at the top here, dated August 30, 2021, the Twitter

11   posting from Shwaz.

12           Do you see that?

13   A.  Yes.

14   Q.  Can you read that out, please?

15   A.  "Any chance we might be able to sort offers received by

16   price soon?  (Thanks for everything you do man!)."

17   Q.  Was there a response from Mr. Chastain?

18   A.  Yes.

19   Q.  Can you read that, please?

20   A.  "Yes, very soon — actively being worked on."

21           MR. MILLER:  With your Honor's permission, we'd like

22   to publish Defense Exhibit 4?

23           THE COURT:  Standing permission for all these.

24           MR. MILLER:  Thank you, sir.

25           Defense Exhibit 4, please.

BY MR. MILLER:

Q.  Can you read out what Twitter handle Coffee Bean said on August 30th of 2021?

A.  "Hi Nate.  Have you guys considered AWS or Azure as a new infrastructure?  I love OpenSea, but lately the site has been crashing/slow down due to the throughput and may have stabilities issues."

Q.  And on the same date, what did Mr. Chastain respond?

A.  "Yes, we are planning on migrating to AWS."

Q.  What is AWS?

A.  AWS is Amazon Web Service, which is a hosting platform for websites.

Q.  And what's your understanding of what Mr. Chastain was saying by migrating to Amazon services?

A.  Could you repeat the last part?

Q.  Sure.  I'm sorry, I was not near the microphone.  My apologies.

        What's your understanding of what Mr. Chastain was saying in his response here about migrating to Amazon services?

        MS. NICHOLS:  Objection.

        THE COURT:  Sustained.

Q.  Do you have an understanding as to what Mr. Chastain was saying when he said OpenSea would be migrating to Amazon services?

        MS. NICHOLS:  Objection.

1          THE COURT:  Sustained.

2          MR. MILLER:  Let's go now to Defense Exhibit 5.

3    BY MR. MILLER:

4    Q.  On August 18, 2021 — I'm not going to even attempt to try

5    to pronounce that, Dievardump — can you please read what this

6    user was saying?

7    A.  "Can we have royalties shown on collections?  As a buyer, I

8    want to know how much royalties a collection is set to.  As a

9    creator, I want collectors to know at first look how much

10   royalties I requested.  Collectors should not learn royalties

11   amount, only when they sell."

12   Q.  Is there a continuation after the picture here in the

13   middle?

14   A.  Yeah.

15          "CC@OpenSea @dan_OpenSea @natechastain @xanderatallah,

16   that would be really great to have this information before

17   buying anything."

18   Q.  Do you know who the @xanderatallah is?

19   A.  That would be Alex Atallah.

20   Q.  Sorry, my apologies, you read out what was said, "that

21   would be really great"?

22   A.  From Nate?

23   Q.  I'm sorry, yeah, please just go on to what Mr. Chastain

24   said.  Thank you.

25   A.  "We are adding this as we speak — should be in the platform

1    within the next week or so."

2                MR. MILLER:  Can we go to Defense Exhibit 6, please.

3    Q.  And on September 6, 2021, the Twitter handle Cameron

4    Moulene, what did he or she say.

5    A.  "Nate, if I'm repeating the same concept differently, I'm

6    sorry, but a feature that would allow us to simply set an offer

7    minimum would be outstanding.  My inbox thanks you in advance."

8                (Continued on the next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  What, if anything, did Mr. Chastain respond?

2   A.  "This is coming."

3   Q.  Finally, Defense Exhibit 8.  Can you start with what Smitty

4   was saying on August 31, 2021?

5   A.  "Just saw someone accepted a $19 offer in DAI on their

6   Hirst Currency piece.  Sad day for them.  At Nate Chastain has

7   there been any talk of a feature to help prevent this, maybe

8   some sort of indicator in red to show the value difference from

9   the floor of the project or last sale."

10  Q.  Continue, please.

11  A.  So Jonathan Long, "When listing an item, I should be able

12  to select which options you want to select.  Does anyone

13  seriously want DAI."

14  Q.  Do you know what D-A-I is?

15  A.  Yes.

16  Q.  What is it?

17  A.  It is a cryptocurrency.

18  Q.  Then Mr. Chastain's response on August 31, can you read

19  that for the jury, please.

20  A.  "We are working on an offer management feature that will

21  likely include this option."

22  Q.  So, in the exhibits we just looked at, fair to say

23  Mr. Chastain was discussing different features that OpenSea was

24  building on a platform, right?

25  A.  Yes.

1  Q.  These are new features, right?

2  A.  Yes.

3  Q.  OpenSea considers information about new features to be

4  important?

5          MS. NICHOLS:  Objection.

6          THE COURT:  Sustained.

7          MR. MILLER:  So let's now take that down.  Permission

8  to publish GX 705-A.  It's already in evidence, your Honor.

9          THE COURT:  Granted.

10  Q.  Mr. Finzer, can we start with the top here on August 2,

11  2021, tweet posted by Arch.eth.  Do you see that?

12  A.  Yes.

13  Q.  It says "let's go."  And then if you could look at the

14  picture down below, we don't need to necessarily read this all.

15  You can take a read of it and let me know when you're ready.

16          THE COURT:  I am going to ask both of you to make sure

17  you keep your voices up for the question or answer as the case

18  may be.

19          MR. MILLER:  Yes, your Honor.

20  A.  Okay.

21  Q.  And the picture NFT middle is in fact a shot of an OpenSea

22  tweet, right on August 2?

23  A.  Yes.

24  Q.  And a user or excuse me a person named Arya Mularama had

25  been a featured artist on August 2, correct?

1   A.  Yes.

2   Q.  If we can go down below this, there is a posting where it

3   said from Jerseyborn.eth on that date, "Looks like Nate from OS

4   had the jump on everyone else."  Do you see that?

5   A.  Yes.

6   Q.  Below that, there is actually a response from Mr. Chastain

7   at the bottom.  Do you see that?

8   A.  Yes.

9   Q.  What did he say?

10  A.  "I just wanted to secure one of these before they all

11  disappeared TBH."

12  Q.  Do you recall seeing this tweet back in August of 2021?

13  A.  No, I actually don't recall seeing it.

14  Q.  As far as you are aware, no one at the company told

15  Mr. Chastain that he shouldn't be buying featured artists,

16  right?

17  A.  Not that I'm aware.

18  Q.  Now, on September 14, when you found out about

19  Mr. Chastain's actions, you thought that this incident was a

20  relatively small issue; true?

21  A.  When I found out about the -- when I saw the tweet?

22  Q.  Yeah.

23  A.  I wasn't sure about the magnitude of it because I didn't

24  know what had actually happened.

25  Q.  Let's then go to the conversation on September 15 that you

1    testified about on direct examination.  Do you recall that?

2    A.  On -- sorry.  Oh, the conversation on September 15 with

3    Nate?

4    Q.  Yes.  That was a conversation during which he was asked to

5    resign; true?

6    A.  Yes.

7    Q.  During that conversation, isn't it true that you told

8    Mr. Chastain that what you did was a small thing?

9    A.  I actually don't recall.

10   Q.  Isn't it true that you said to him that you never know how

11   big these things are going to get, like on Twitter?

12   A.  I honestly don't recall.

13   Q.  On September 16, so the next day, you went on a walk with

14   Mr. Chastain, right?

15   A.  Yes.

16   Q.  You told Mr. Chastain that asking for his resignation was

17   the hardest decision you ever had to make for the company,

18   right?

19   A.  I don't recall whether I said that or not.  But it was a

20   hard decision.

21   Q.  Mr. Chastain had been a good product manager for the

22   company prior to that, right?

23              MS. NICHOLS:  Objection.

24              THE COURT:  Sustained.

25   Q.  After Mr. Chastain resigned, you wanted to stay in contact,

1    true?

2    A.   Initially, yes.

3    Q.   You thought that you were proud of the work he had done for

4    OpenSea; true?

5              MS. NICHOLS:  Objection.

6              THE COURT:  Sustained.

7              MR. MILLER:  Let's now, if we can show the witness

8    just for identification and just for the witness and the

9    government and the Court, Defense Exhibit 22, please.

10             THE COURT:  Question?

11   Q.   Do you recognize this?

12   A.   Yes.

13   Q.   What is it?

14   A.   This is a text message I believe from me to Nate on the

15   16th.

16             MR. MILLER:  Pursuant to stipulation 1002 and the

17   testimony, we move Defense Exhibit 22 into evidence, your

18   Honor.

19             MS. NICHOLS:  We object, your Honor.  It's not covered

20   by the stipulation.

21             MR. MILLER:  Under authenticity.

22             THE COURT:  Objection is overruled.  Admitted.

23             (Defendant's Exhibit 22 received in evidence)

24             MR. MILLER:  May we publish it, your Honor?

25             THE COURT:  You may.

 1   Q.  Sir, this was --

 2          THE COURT:  Let me also just give a limiting

 3   instruction to the jury, that I'm admitting this not for the

 4   truth of anything that the e-mail you are about to look at

 5   says, but rather as evidence of Mr. Finzer's state of mind.  So

 6   you may consider it for that purpose and that purpose only.

 7          MR. MILLER:  Thank you, your Honor.

 8   Q.  Sir, this is a text that you sent to Mr. Chastain, right?

 9   A.  Yes.

10   Q.  Can you read it, please.

11   A.  "It's just a really shitty situation.  Really proud of the

12   amazing work you did at OpenSea.  Undoubtedly the most

13   difficult call we had to make.  If you're up for it, I really

14   want to stay close friends and keep syncing up."

15   Q.  Thank you, sir.  And at this time in September 2021,

16   OpenSea constitutes approximately 98 percent of the NFT trading

17   in the market, right?

18   A.  I don't remember exactly the percentage.

19   Q.  But it was the driving force, majority in the market,

20   right?

21   A.  Yes.

22          MR. MILLER:  Permission to publish DX 18 which is in

23   evidence, your Honor.

24          THE COURT:  May I see it?  Can you scroll down,

25   please.  Granted.

1          MR. MILLER:  So I believe -- I didn't hear.  Did you

2     grant?

3          THE COURT:  Yes.

4          MR. MILLER:   Thank you so much.

5     Q.  So if we can publish DX 18, thank you.  If we can start at

6     the top, please.  I'm showing you what's been marked as DX 18

7     which is in evidence.

8          Sir, do you see your e-mail at the top?

9     A.  Yes.

10    Q.  And if we could look at the date that this was sent.  Do

11    you see that, September 15, 2021?

12    A.  Yes.

13    Q.  If we can scroll down now, please.  Keep going.  Thank you.

14    Make sure you get the bottom there, great.

15         You see at the bottom it says "join Zoom meeting"?  Do

16    you see that?

17    A.  Yes.

18    Q.  This was in fact a calendar invite that had some

19    information about an upcoming Zoom meeting on September 15;

20    true?

21    A.  Yes.

22    Q.  So if you can, read the top, please.

23    A.  "Hop in any time during the half hour to have your

24    questions answered re our new team policy."

25    Q.  Then, if you could read beginning "there has been."  You

1  see that?

2  A.  "There has been some news circulating regarding employee

3  purchases of items featured on our home page.  If anyone

4  reaches out to you about this issue (press or otherwise),

5  please do not comment.  Also, effective immediately, we would

6  like to announce the following policies."

7  Q.  Keep going.

8  A.  "OpenSea team members may not buy or sell from collections

9  or creators."

10            THE COURT:  Slow down.

11            THE WITNESS:  Sorry.

12  A.  "OpenSea team members may not buy or sell from collections

13  or creators while we are featuring or promoting them, e.g. on

14  our home page; and OpenSea team members are prohibited from

15  using information that is not available to the public to

16  purchase or sell any NFTs, whether available on the OpenSea

17  platform or not.  If you have any questions at all, please

18  reach out to me, Devin, and Alex."

19  Q.  Devin is you, right?

20  A.  Yes.

21  Q.  At the top it says in the first sentence, "our new team

22  policy."  Do you see that?

23  A.  Yes.

24  Q.  Then, down below, the a/c priv it says, "Also, effective

25  immediately, we would like to announce the following policies."

1   Do you see that?

2   A.  Yes.

3   Q.  You read the two policies there, the two bullets, right?

4   A.  Yes.

5   Q.  So, obviously, to be clear, on September 15 of 2021,

6   OpenSea announced employees could no longer buy or sell

7   featured NFTs, right?

8   A.  Yes.

9   Q.  That was effective immediately?

10  A.  Yes.

11  Q.  Great.

12          MR. MILLER:  With your Honor's permission, we would

13  like to publish GX 228 that's in evidence.

14          THE COURT:  Granted.

15  Q.  Let me scroll down a little so Mr. Finzer can see it.  You

16  can stop there.

17          And this was a blog post that was posted on OpenSea's

18  website, right?

19  A.  Correct.

20  Q.  And you see on the paragraph beginning, "This is incredibly

21  disappointing," the end of that paragraph says "we have also

22  implemented the following policies."  Do you see that?

23  A.  Yes.

24  Q.  The two bullets are the two bullets we just saw on Defense

25  Exhibit 18 that you rereviewed; true?

1  A.  I believe so, though I would have to look at them side by

2  side to make sure they match exactly.

3  Q.  Okay.  Let's do that then.  Thank you.

4        MR. MILLER:  With your Honor's permission.

5        THE COURT:  You may.

6  A.  Can you go back to the previous one?

7        There are a few verbal differences, but they are the

8  same in spirit.

9  Q.  Thank you.  So, now, after Mr. Chastain resigned, you felt

10  in fact there was an opportunity to set the standards and

11  policies around what employees are able to use as confidential

12  at OpenSea, right?

13  A.  Would you remind repeating that?

14  Q.  After Mr. Chastain resigned, you felt there was an

15  opportunity to set the standards and policies around what

16  employees are able to use as confidential information when they

17  are at OpenSea, right?

18  A.  Yes, I felt there was an opportunity to clarify and add to

19  the policies.

20  Q.  And by clarifying, we just saw on Defense Exhibit 18 the

21  new policies effective immediately; true?

22  A.  As I said before, the first bullet was a brand new policy,

23  and the second bullet was more of a specification -- a specific

24  instance of an existing policy.

25  Q.  Let's take a look back at Defense Exhibit 18.

1          MR. MILLER:  Your Honor's permission to publish again?

2          THE COURT:  You may.

3     Q.  One thing to clarify at the bottom here, it says, "If you

4     have any questions at all, please reach out to me, Devin and

5     Alex."

6          Do you know "me" to be Gina Moon?

7     A.  That's my guess, yes.

8     Q.  So, again, looking at the top here, talking about new

9     policies that are effective immediately; true?

10         MS. NICHOLS:  Objection.  Asked and answered.

11         THE COURT:  Sustained.

12    Q.  We can take it down.

13         After Mr. Chastain left OpenSea, you in fact tried to

14    help him land a new job, right?

15         MS. NICHOLS:  Objection.

16         THE COURT:  Overruled.

17    A.  I actually -- I don't recall specifically helping him find

18    a new job.  But it's possible, yeah.

19         MR. MILLER:  Well, let's pull up what's marked as

20    Defense Exhibit 23 for identification.  If we can show the

21    witness just that without publishing, and to the government and

22    the Court as well.

23         THE COURT:  Okay.  Question?

24    Q.  Do you recognize this?

25    A.  Yes.

1   Q.  Is this a text?

2   A.  Yes.

3   Q.  From you?

4   A.  Yes.

5   Q.  To Mr. Chastain?

6   A.  Yes.

7           MR. MILLER:  At this time, your Honor, we move it into

8   evidence.

9           MS. NICHOLS:  Objection.

10          THE COURT:  Overruled.  Admitted.

11          (Defendant's Exhibit 23 received in evidence)

12          MR. MILLER:  Can we publish Exhibit 23, your Honor?

13          THE COURT:  You may.

14  Q.  Can you read out this text that you sent to Mr. Chastain on

15  September 16, the day after you had the conversation asking him

16  to resign?

17  A.  "Hey Nate, wanted to intro you to Fred Ersham who I think

18  would be good to chat with about future career moves."

19  Q.  Who is Fred Ersham?

20  A.  Fred Ersham is the co-founder of Coinbase and now a venture

21  capitalist.

22  Q.  Coinbase is one of the largest cryptocurrency exchanges in

23  the world; true?

24          MS. NICHOLS:  Objection.

25          THE COURT:  Overruled.

1   A.  I believe so, yes.

2   Q.  And Mr. Ersham actually led a funding round to OpenSea to

3   the tune of hundreds of millions of dollars, right?

4              MS. NICHOLS:  Objection.

5              THE COURT:  Overruled.

6   A.  Yes.  Though that was later.

7   Q.  Okay.  And by the way, even after the incident that we've

8   been discussing today, Mr. Chastain attended your birthday in

9   October of 2021; true?

10             MS. NICHOLS:  Objection.

11             THE COURT:  Overruled.

12  A.  Yes.

13  Q.  And isn't it true that there were a number of people there?

14  A.  There were -- can you say that again?

15  Q.  Isn't it true at your birthday there was more than just you

16  and Mr. Chastain, right?

17  A.  Yes.

18  Q.  It's true Mr. Atallah was there; true?

19  A.  I believe so, yes.

20  Q.  Let's talk about buying NFTs.

21             You know what a hot wallet is, right?

22  A.  Yes.

23  Q.  What is it?

24  A.  It's a wallet that is used for frequently making purchases

25  or transferring items.

1   Q.  What is a cold wallet?

2   A.  A cold wallet is typically a wallet that is not connected

3   to the internet.

4   Q.  Earlier you recall I asked you some questions about people

5   at OpenSea trading on the platform in NFTs.  Do you recall

6   those questions?

7   A.  Yes.

8   Q.  You, sir, bought and sold NFTs on the platform, right?

9   A.  Yes.

10  Q.  And you did it more than just a test.  Sometimes you made a

11  profit off of it, right?

12          MS. NICHOLS:  Objection.

13          THE COURT:  Sustained.

14  Q.  What were some of the reasons, Mr. Finzer, why you bought

15  and sold NFTs on the platform?

16          MS. NICHOLS:  Objection.

17          THE COURT:  Sustained.

18  Q.  Sir, you own more than one wallet, right?

19          MS. NICHOLS:  Objection.

20          THE COURT:  Sustained.

21  Q.  Let's talk about the OpenSea platform.

22          You are aware that Mr. Chastain had more than one

23  profile on OpenSea, right?

24  A.  I wasn't made explicitly aware of it, but I wouldn't have

25  been surprised if I had found out earlier that he had multiple

1   wallets.  It wasn't a common --

2              THE COURT:  Keep your voice up.

3              THE WITNESS:  Sorry.

4   Q.  In terms is of your addresses, you have an address called

5   Fincho and one called Wanderer 2, right?

6              MS. NICHOLS:  Objection.

7              THE COURT:  Sustained.

8              MR. MILLER:  I'd like to show you what's in evidence

9   with the Court's permission to publish GX 211.

10             THE COURT:  You may.

11  Q.  If we can scroll down, this is a newsletter that would be

12  sent out by OpenSea, right?

13  A.  Yes.

14  Q.  You see where it talks about Polygon trading?  Do you see

15  that?

16  A.  Yes.

17  Q.  What is Polygon?

18             MS. NICHOLS:  Objection.

19             THE COURT:  Overruled.

20  A.  Polygon is a blockchain.

21  Q.  And did there come a time where it was integrated with

22  OpenSea?

23  A.  Yes.

24  Q.  And that was in or around February of 2021, right?

25  A.  I don't recall.  But that's possible.

1   Q.  And the blockchain is publicly viewable, right?

2   A.  Yes.

3   Q.  And the company that developed the Polygon blockchain

4   actually instituted their own cryptocurrency token called

5   MATIC, right?

6           MS. NICHOLS:  Objection.

7           THE COURT:  I'll allow it.  Go ahead.

8   A.  Oh.  Yes.

9   Q.  And we talked earlier -- we should keep this up.  We talked

10  earlier about how Mr. Chastain started as a trial employee

11  before he came on full-time at the end of January of 2021.  Do

12  you recall that?

13  A.  Yes.

14  Q.  And Mr. Chastain in fact was involved with you in the MATIC

15  or Polygon integration on to OpenSea, right?

16  A.  Yes.

17  Q.  And in January, you even approved, Mr. Finzer, some code

18  regarding the Polygon blockchain project for OpenSea?

19          MS. NICHOLS:  Objection.

20          THE COURT:  Very briefly, can you explain where we're

21  going with this?

22          MR. MILLER:  Can we have a sidebar?

23          THE COURT:  Yes.

24          (Continued on next page)

25

1          (At the sidebar)

2          MR. MILLER:  I promise, Judge, I am not on some sort

3     of frolicking detour.

4          We would like to elicit testimony from Mr. Finzer that

5     in early January, he essentially approved the Polygon MATIC

6     blockchain, launching it on to OpenSea, which it did a month

7     later.  And at that time, he bought MATIC tokens, which was the

8     company that actually instituted that blockchain and that

9     OpenSea incorporated, and he bought those tokens before it was

10    integrated.  And as a result of the public announcement in

11    February, when people started to learn about it, the price of

12    those tokens shot up.

13         MR. FILOR:  And he as the founder of the company, he's

14    setting the standards that people were seeing what's happening.

15    He is the one applying the rules and setting the standards.

16         THE COURT:  But he is not on trial here for insider

17    trading or anything of that nature.

18         MR. FILOR:  But the defendant is seeing, he is

19    modeling his behavior so he can understand the rules, so he can

20    behave the way he is behaving under the supervision of his

21    boss.

22         THE COURT:  Is there going to be any suggestion or

23    evidence that Mr. Chastain was aware of this conduct?

24         MR. MILLER:  I mean, it's on the blockchain.

25         THE COURT:  That's not an answer to my question.

1           MR. MILLER:  Understood.  There is, we were planning

2     to use it for impeachment potentially, but there is an e-mail

3     in which Mr. Chastain is on regarding the MATIC incorporation.

4           MS. NICHOLS:  Your Honor, this information, if true,

5     does not bear on the issues at trial here.  OpenSea is not on

6     trial and neither is Mr. Finzer.  And the Court has already

7     ruled in connection with the government's 404(b) motion that

8     the particular issues here with respect to what is confidential

9     and what is not confidential does not have to do with other

10     aspects of OpenSea's business.  The Court has already given the

11     defense a lot of leeway in that regard, with the four or five

12     exhibits that they entered with respect to the defendant's

13     tweets.  But none of those tweets, and this evidence -- and

14     just as this evidence has nothing to do with whether the

15     featured home page information was confidential.

16           MR. MILLER:  If I might, your Honor.  As my colleague

17     Mr. Filor mentioned, Mr. Finzer has spent a lot of time, as did

18     Mr. Atallah, talking about what their intention was about the

19     confidentiality provision.  And they intended certain

20     information to be kept confidential.  At the same time, there's

21     evidence here that Mr. Finzer essentially misused that

22     provision to essentially engage in trading of those tokens

23     prior to their announcement.

24           THE COURT:  The objection is sustained.  I'm not going

25     to allow you to go there.  Number one, to the defendant's

1    knowledge, there is no evidence that's been proffered he was

2    actually aware of this.  The mere fact it was on the public

3    blockchain does not substantiate that.  If there were a proffer

4    made of evidence that would come later to that effect, then it

5    might be different.  But there hasn't been.

6         Otherwise, I think this is akin to my 404(b) ruling.

7    This is totally different information.  OpenSea is not on

8    trial.  Mr. Finzer is not on trial.  I think this is unfair and

9    prejudicial in the sense it will just smear him and make him

10   look bad and doesn't speak to the issues in this case.  It

11   would be a folic and detour as you put it.

12        So the objection is sustained.  We'll move on.

13        (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Sorry for the interruption, ladies and

3    gentlemen.  We will continue.  The objection is sustained.

4    BY MR. MILLER:

5    Q.  Mr. Finzer, OpenSea has the power to suspend users,

6    correct?

7    A.  In the sense that we can prevent users from connecting

8    their wallet to OpenSea, yes.

9    Q.  You can suspend them, for example, if a user violates

10   OpenSea's terms of service?

11   A.  Yes.

12   Q.  Or another policy?

13   A.  Yes.

14   Q.  OpenSea has suspended or banned users from its platforms

15   before, right?

16   A.  Yes.

17   Q.  Mr. Chastain hasn't been banned from the platform at this

18   time; isn't that correct?

19   A.  I'm actually not sure.

20          MR. MILLER:  One moment, your Honor.

21          No further questions.

22          THE COURT:  Any redirect?

23          MS. NICHOLS:  Yes, your Honor.

24   REDIRECT EXAMINATION

25   BY MS. NICHOLS:

1   Q.  Mr. Finzer, why was asking for Mr. Chastain's resignation a

2   difficult decision for you?

3   A.  It was difficult because Nate had contributed a lot to the

4   company.

5   Q.  Was it difficult for you on a personal level?

6   A.  Yes.

7   Q.  Why?

8   A.  Because I considered Nate a friend.

9   Q.  Do you recall being asked on cross-examination about an

10  instant message or a text message that you had sent to

11  Mr. Chastain after he resigned?

12  A.  Yes.

13  Q.  But Mr. Miller didn't show you the text message that you

14  were responding to, did he?

15          MR. MILLER:  Objection.

16          THE COURT:  Sustained.

17  Q.  You were only shown one text message, right?

18  A.  Yes.

19          MS. NICHOLS:  Mr. Bianco, can we please pull up what's

20  been marked for identification as Government Exhibit 613.  Can

21  you please scroll to the second page of this.  Can we zoom in

22  so it's easier to read.

23  Q.  Mr. Finzer, just read that to yourself.

24  A.  It is the same text.

25  Q.  Thank you.

1           MS. NICHOLS:  We can zoom out, Mr. Bianco.  Can we go

2    to the first page, and can we zoom in on the green part.

3    Q.  Do you recognize what's on the first page, Mr. Finzer?

4    A.  Yes.

5    Q.  What is it?

6    A.  This is a text from Nate to me.

7           MS. NICHOLS:  The government offers 613.

8           MR. MILLER:  No objection.

9           THE COURT:  Admitted.

10          (Government's Exhibit 613 received in evidence)

11   Q.  Now that everyone can see it, Mr. Finzer, what did Mr.  --

12          MR. MILLER:  Objection.

13          THE COURT:  Overruled.  You may publish.

14          MS. NICHOLS:  Thank you, your Honor.

15   Q.  What did Mr. Chastain say to you, Mr. Finzer?

16   A.  You want me to read the text message?

17   Q.  Yes, please.

18   A.  "I'm so sorry for putting you through this."

19   Q.  Can we go to the next page, your response.  How would you

20   characterize your response?  Would you say you had your friend

21   hat on or your CEO hat on when you sent this?

22          MR. MILLER:  Objection.

23          THE COURT:  Overruled.

24   A.  Friend hat or CEO hat on?

25   Q.  Yes.

1    A.  I'm not really sure.  I certainly had my friend hat on.

2    Q.  We can take that down.

3         You were asked questions on cross-examination about

4    tweets that Mr. Chastain sent from his personal Twitter

5    account.  Do you recall those questions?

6    A.  Yes.

7    Q.  Just remind us, did OpenSea also have a Twitter account at

8    the time that Mr. Chastain worked at the company?

9    A.  Yes.

10   Q.  How did Mr. Chastain's job as head of product relate to, if

11   at all, interacting with folks on Twitter?

12   A.  Well, part of his job was to set the direction of the

13   product.  So that involved getting feedback from customers and

14   better understanding our customer, and one way that was done

15   was through Twitter.

16   Q.  Can we please pull up what's in evidence as Defense Exhibit

17   2.

18        Mr. Finzer, when Mr. Chastain wrote "Very soon,

19   actively being worked on," was he violating OpenSea's

20   confidentiality agreement?

21        MR. MILLER:  Objection.

22        THE COURT:  I'll allow it.  In your judgment, was he

23   violating the confidentiality agreement when he wrote that

24   tweet?

25        THE WITNESS:  No.

1    Q.  Was he disclosing secret or confidential OpenSea

2    information?

3            MR. MILLER:  Same objection.

4            THE COURT:  Overruled.

5    A.  It's hard for me to say, because -- I'm not sure.

6    Q.  Let me ask you this.  I think you said that interacting

7    with users on Twitter was part of his job.  Is that right?

8    A.  Yes.

9    Q.  So how, if at all, did this tweet relate to his job?

10   A.  He was messaging or responding to a user that was asking

11   when a new feature might be coming.

12   Q.  By feature, you are not saying the same thing as the

13   featured NFTs, just to be clear?

14   A.  Correct.

15   Q.  What do you mean when you say "feature" in this context?

16   A.  I mean a new element of the website that was coming.

17           MS. NICHOLS:  We can take that down.

18   Q.  Mr. Finzer, what is the product at OpenSea?

19   A.  The product is a website that allows you to buy and sell

20   NFTs.

21   Q.  So it's the website itself, not a particular item for sale

22   on the website; is that right?

23   A.  Correct.

24           MS. NICHOLS:  Can we please pull up Government Exhibit

25   214.

1  Q.  Mr. Finzer, do you recall -- can we zoom in, Mr. Bianco, on

2  paragraph 2(b) which breaks over the page, so can we try to get

3  the whole thing.

4        Mr. Finzer, do you recall being asked some questions

5  by Mr. Miller on cross-examination about some of the examples

6  that are in this sentence that begins "Confidential information

7  includes, without limitation," and then there is a number of

8  examples?

9  A.  Yes.

10 Q.  Did Mr. Miller ask you about all the examples in this

11 paragraph?

12 A.  No.

13 Q.  So let's just read a few more, and I am going to see if I

14 can highlight it, maybe.

15        So he asked you about trade secrets and know-how, if

16 I'm remembering right.

17 A.  I actually don't remember if I talked about those specific

18 ones.

19 Q.  Can you read the part that I just highlighted in blue

20 there?

21 A.  "Product or service ideas."

22 Q.  I am going to highlight one more.  Can you read that one?

23 A.  "Marketing plans."

24 Q.  And again, are these all of the types of confidential

25 information that could exist or are these just a list of

1    examples?

2    A.  Just a list of examples.

3         MS. NICHOLS:  Can we clear the highlighting and zoom

4    out, please, Mr. Bianco.

5    Q.  Mr. Finzer, do you recall being asked questions on

6    cross-examination about trainings that OpenSea conducted at

7    various times?

8    A.  Yes.

9    Q.  Do you recall being asked whether OpenSea had ever, during

10   the time that Mr. Chastain was at the company, conducted an

11   evaluation of employees' knowledge of the confidentiality

12   agreement?

13   A.  I recall being asked that question.

14   Q.  Okay.  I just want to focus again on this paragraph, we

15   don't have to zoom in, but just this paragraph 2(b), when it

16   says "I understand," who is that a reference to?

17   A.  That's a reference to the person signing the

18   confidentiality agreement.

19   Q.  Can we scroll down to the signature page, I think it might

20   be page 6 or 8.  I think this isn't the right one.  That's the

21   exhibit.

22        So who signed this confidentiality agreement?

23   A.  Nate.

24   Q.  And by signing it, was he affirming he understood it?

25   A.  Yes.

1          MS. NICHOLS:  We can take that down.

2     Q.  Can we please pull up Government Exhibit 705-A.

3          I think you said on cross-examination, Mr. Finzer,

4     that you're not sure whether you'd ever seen these tweets

5     before; is that right?

6     A.  Yeah, I hadn't seen that tweet at the time that it was

7     tweeted, as far as I recollect.

8     Q.  So I am going to ask you about conversations you had with

9     Mr. Chastain.  Did Mr. Chastain ever tell you that he had

10    bought four copies of this featured NFT in an unnamed crypto

11    wallet?

12         MR. MILLER:  Objection.

13         THE COURT:  Overruled.

14    A.  No.

15    Q.  Did he ever ask for your permission as the CEO to trade in

16    this featured NFT?

17    A.  Not that I recall, no.

18         MS. NICHOLS:  Nothing further, your Honor.

19         THE COURT:  Any recross?

20         MR. MILLER:  No, thank you, your Honor.

21         THE COURT:  Mr. Finzer, you may step down.  You are

22    excused.

23         (Witness excused)

24         THE COURT:  Government, please call your next witness.

25         MR. ROOS:  Thank you, your Honor.  The government

1    calls Dan Viau.

2            While he's coming in, I will attempt to offer the same

3    series I was botching yesterday.  So now, pursuant to

4    government -- pursuant to Government Exhibit 1001, which is a

5    stipulation in evidence, the government offers Exhibits 427 to

6    429 and 431 to 451.

7            THE COURT:  Any objection?  I assume that's correct.

8            MR. MILLER:  No objection, your Honor.

9            THE COURT:  Those are admitted.

10           Ladies and gentlemen, that was just to clean up our

11   little confusion yesterday about which of those were admitted.

12           Mr. Viau, if you can step forward, please.

13           (Government's Exhibit 427 to 429, 431 to 451 received

14   in evidence)

15           (Witness sworn)

16           THE COURT:  Mr. Viau, my apologies for mispronouncing

17   your name.

18           Can you slide your chair forward, please, and adjust

19   the microphone so you are speaking directly into it since you

20   are a bit taller than the last witness.  And just make sure you

21   keep your voice up, loud, clear, into the microphone so

22   everyone can hear you.

23           THE WITNESS:  Will do.

24    DANIEL J. VIAU,

25       called as a witness by the Government,

1          having been duly sworn, testified as follows:

2     DIRECT EXAMINATION

3     BY MR. ROOS:

4     Q.   Where do you work?

5     A.   OpenSea.

6     Q.   How long have you worked at that company?

7     A.   I joined in October 2018.

8     Q.   What's your current role at OpenSea?

9     A.   I'm a software engineer.

10    Q.   What other roles have you had at OpenSea, besides software

11    engineer?

12    A.   Well, when I joined, it was a small company, so we all had

13    a lot of responsibilities.  So I had a mix of responsibilities

14    initially, including software engineering and sort of community

15    support type of things.  Eventually, I joined the OpenSea legal

16    team, and subsequently went back to engineering.

17          THE COURT:  Move the microphone a little closer,

18    please.

19          THE WITNESS:  Sure.

20    Q.   What are some of the types, speaking very generally, what

21    are some of the types of legal work you did at OpenSea?

22    A.   Again, it was a mix of responsibilities, but I did things

23    like contract review, and analysis of different projects for

24    potential terms of service violations and that sort of thing.

25    Q.   So are you familiar with any rules that OpenSea has in

1   place for people using the OpenSea marketplace?

2   A.  Yes.

3   Q.  What are those rules called?  You may have said it already.

4   A.  We called them the terms of service.

5           MR. ROOS:  So now just for the witness, show the

6   witness what's been marked for identification as Government

7   Exhibit 223.

8   Q.  There's a binder in front of you.  It should also be on the

9   screen in front of you.

10          THE COURT:  You can look on the screen or there,

11  whichever.

12  Q.  Do you see it?

13  A.  I do.

14  Q.  Do you recognize that document?

15  A.  I do.

16  Q.  What is it?

17  A.  Those are the OpenSea terms of service from June 2021.

18          MR. ROOS:  The government offers Exhibit 223.

19          MR. FILOR:  No objection, your Honor.

20          THE COURT:  Admitted.

21          (Government's Exhibit 223 received in evidence)

22          MR. ROOS:  May we publish it?

23          THE COURT:  You may.

24  Q.  So starting on the first page.  Do these OpenSea terms of

25  service apply to anyone who uses OpenSea?

1   A.  Yes.

2   Q.  Would that include OpenSea employees using the website?

3   A.  Yes.

4   Q.  Generally speaking, so give us categories.  What types of

5   things do terms of service relate to?

6   A.  Terms of service govern the rights and responsibilities of

7   users of OpenSea, and governs relationships between OpenSea and

8   users and among users.

9   Q.  What, if any, activities on OpenSea's marketplace do the

10  terms of service prohibit?

11  A.  I'm sorry, can you repeat that?

12  Q.  Certainly.  What, if any, activities on OpenSea's

13  marketplace do the terms of service prohibit?

14  A.  We prohibit, among other things, malicious attacks that

15  might disrupt service for other users, we prohibit certain

16  types of behaviors in terms of market participation.

17  Q.  So let's look at one of those.

18          Mr. Bianco, can we go to page 7 and zoom in at the top

19  of page 7, where it says number 8, user conduct.  And the

20  following -- the paragraph just after it.

21          And sir, would you just read under user conduct the

22  first paragraph.

23  A.  Sure.  "You agree that you will not violate any law,

24  contract, intellectual property or other third party right, and

25  that you are solely responsible for your conduct, while

1    accessing or using the service or participating in the auction.

2    You agree that you will abide by these terms and will not."

3    Q.  And then below it is there a list of various types of

4    activities?

5    A.  Yes.

6    Q.  So Mr. Bianco, can we zoom out from here.  And I want to

7    look at one of those things on the list.  Can we turn to page

8    8.

9           At the top, do you see the sentence that says "engage

10   in wash trading"?

11   A.  I do.

12   Q.  Why don't you start by reading that sentence for us.

13   A.  "Engage in wash trading or other deceptive or manipulative

14   trading activities."

15   Q.  And what are some of the types of deceptive or manipulative

16   trading activities that you've observed on OpenSea or other

17   marketplaces?

18   A.  Sometimes people will create an NFT that appears to be an

19   original, but is really a copy.

20   Q.  Okay.  Besides that, have you also observed other types of

21   activities?

22   A.  Yes.

23   Q.  Let's change topics.  We can take this down, Mr. Bianco.

24          Were you working at OpenSea during the period that

25   Mr. Chastain was working there?

1   A.   Yes.

2   Q.   And did you work with him on a day-to-day basis?

3   A.   Yes.

4   Q.   Were you friends?

5   A.   Yes.

6   Q.   Did you interact in your personal lives?

7   A.   We had personal conversations at work.

8   Q.   By the way, do you recognize the name Jen Sherman?

9          I'm sorry.  Liz Sherman?

10  A.   I do not.

11  Q.   Did there come a time in 2021 when OpenSea began featuring

12  NFTs on its home page?

13  A.   To the best of my recollection, yes.

14  Q.   Did you have any involvement in the decision to make that

15  change to the website?

16  A.   The way I recall it, it was discussed in public Slack

17  channels, but I had no material contribution to the decision

18  whether to add that featured NFT slot to the front page.

19  Q.   At a general level, are you familiar with the way or ways

20  in which an NFT was selected to be featured on the front page

21  of the website?

22  A.   I believe so, yes.

23  Q.   Do you know who selected the NFT to be featured on the

24  front page of the website?

25  A.   I believe that it was Nate.

1   Q.   You're referring to Mr. Chastain?

2   A.   That's correct.

3   Q.   Just to be clear, the public Slack channel you're

4   referencing, is that a Slack channel that is public within

5   OpenSea, or a Slack channel open to the general public?

6   A.   Yeah, I should clarify.  That's a Slack channel that was

7   accessible to the entire OpenSea team, but not accessible to

8   the general public.

9   Q.   Where did the ideas for the featured NFT come from, as far

10  as you know?

11  A.   My understanding is that we as a company wanted to feature

12  up and coming NFT artists.

13  Q.   Do you know where ideas for the particular featured NFT

14  came from?

15  A.   I believe that, for the most part, it was sort of an

16  internal process, but we also got suggestions from the general

17  NFT community, and I believe that a colleague of mine named

18  Jonathon Triest may have also contributed suggestions.

19  Q.   Why don't we talk about that.  Can we please show the

20  witness what's been marked for identification as Government

21  Exhibit 219.

22          Do you recognize this document?

23  A.   I do.

24  Q.   What is it?

25  A.   It is an e-mail exchange between me, Mr. Chastain, and

1    Jonathon Triest.

2              MR. ROOS:  The government offers 219.

3              MR. MILLER:  No objection.

4              THE COURT:  Admitted.

5              (Government's Exhibit 219 received in evidence)

6              MR. ROOS:  May we publish it?

7              THE COURT:  You may.

8    Q.  Mr. Bianco, can we go to the first e-mail in the chain so

9    the e-mail at the bottom.  So let's start with this first

10   e-mail.

11             And who is the e-mail from?

12   A.  It's from me.

13   Q.  And it says "Nate, I'm pleased to introduce Jonathon Triest

14   from Ludlow Ventures."

15             Who is Jonathon Triest?

16   A.  Jonathon Triest is a venture capitalist who works at Ludlow

17   Ventures.

18   Q.  Okay.  And could you read the e-mail.

19   A.  Sure.  "Nate:  I'm pleased to introduce Jonathon Triest

20   from Ludlow Ventures.  When he's not managing an incredible

21   portfolio of companies, he spends a lot of time on OpenSea.

22   Jonathon is interested in helping pick artists to feature on

23   the front page.  In his words, he wants to help surface the

24   unknown.  I'll let him give the full version of the pitch, but

25   I figured you'd welcome input from outside sources.  It might

1    even be worth putting together a mini curation board kind of

2    like what Art Blocks has.

3             "Jonathon:  I'm pleased to introduce Nate Chastain.

4    Ostensibly, his job is merely to make OpenSea the best product

5    it can be, but he somehow finds way to catch and complete every

6    stray task that the rest of us would otherwise allow to slip

7    through the cracks.  One of the many responsibilities that

8    landed on his plate this way is picking the artists that go on

9    the front page.  Please let me know what I can do to facilitate

10   the conversation.

11            "Best, Dan."

12   Q.  Thank you.

13            Mr. Bianco, can we now scroll up to see the next

14   e-mail in the chain.  So looking at the bottom of the front

15   page here, sir, do you see there a response from Jonathon

16   Triest?

17   A.  Yes.

18   Q.  And he's thanking you for the introduction?

19   A.  Yes.

20   Q.  And then we can zoom out of that.  Mr. Bianco, can you zoom

21   in on the next.  And do you recognize this as a response from

22   Nate Chastain?

23   A.  Yes.

24   Q.  And I am going to ask you on this one, do you see in the

25   response the sentence beginning "some considerations"?

1    A.  I do.

2    Q.  Would you read that until the end of the e-mail.

3    A.  Sure.  "Some considerations with these:  We try to feature

4    unverified artists, ones that have a clear authorship of the

5    pieces (social media link to work), favor animation, favor

6    semi-fungibles, and favor ones uploaded to OpenSea rather than

7    other marketplaces (Foundation, Rarible, etc.)"

8    Q.  Since I asked you to start reading this e-mail halfway

9    through, just to be clear, is the context of this some

10   considerations for which NFT to be featured?

11   A.  Correct.

12   Q.  Let me ask you about some things in that list.  What's an

13   unverified artist at OpenSea?

14   A.  An unverified artist would be an artist that hadn't done

15   much following yet and hadn't gained much traction.

16   Q.  And another thing in this list is semi-fungibles.  What

17   does that mean in the context of OpenSea?

18   A.  A semi-fungible is a type of NFT that is more like a

19   lithograph than an original one of one painting.  So, it is a

20   non-fungible token where there can be multiple copies of the

21   same token.

22   Q.  Okay.  Then the last part here says "Favor ones uploaded to

23   OpenSea rather than other marketplaces."

24        Why was there favor towards ones uploaded to OpenSea?

25   A.  My understanding is that we preferred to feature NFTs that

1   had been uploaded to OpenSea, because we wanted to promote our

2   own tooling.  We wanted to promote the no code solutions for

3   creating NFTs that OpenSea provided, as opposed to promoting

4   those of our competitors.

5   Q.  By the way, what does uploaded to OpenSea mean?

6   A.  In this context, uploading essentially means creating an

7   NFT.  So you input some information, and you take an action

8   that causes an NFT to come into existence.

9           MR. ROOS:  We can take this down.

10  Q.  Did you have any involvement in the decision of which

11  particular NFT to feature?

12  A.  I had no material input on that.

13  Q.  Besides Mr. Chastain, are you aware of anyone else who made

14  that selection decision?

15  A.  I am aware of no one else who made that selection decision.

16  Q.  Did Mr. Chastain ever tell you what NFT he was going to

17  select before it was featured?

18  A.  I don't recall any instance of that happening.

19  Q.  Was there ever a time that featured NFT was not kept secret

20  prior to being featured?

21  A.  I'm not aware --

22          MR. FILOR:  Objection.

23          THE COURT:  Overruled.

24  A.  I'm not aware of any instance of that happening.

25  Q.  Do you recall any time when the featured NFT leaked out

1  before it was featured?

2          MR. FILOR:  Objection.

3          THE COURT:  Overruled.

4  A.  I'm not aware of any instance of that happening.

5  Q.  When did you first learn which NFT was featured?

6  A.  I became aware of that when it appeared on the OpenSea home

7  page.

8  Q.  Generally speaking, do people at OpenSea talk about their

9  personal buying and selling of NFTs?

10  A.  In general, from time to time, we would discuss our

11  personal purchases, yes.

12  Q.  Did you ever talk to Mr. Chastain about his buying or

13  selling of NFTs?

14  A.  From time to time, yes.

15  Q.  Did he ever tell you he was buying and selling featured

16  NFTs?

17  A.  No.

18  Q.  I want to direct your attention to September 14, 2021.  Do

19  you recall going to a dinner on that day?

20  A.  I do.

21  Q.  Do you remember sort of where it was in terms of the part

22  of the country or the city?

23  A.  My recollection is that it was in Manhattan, southern

24  Manhattan somewhere.  I think perhaps Soho.

25  Q.  Who was at the dinner that you recall?

1    A.  I recall that it was myself, Nate, and our then head of BD,

2    Ryan Foutty.

3    Q.  Go ahead.

4    A.  I recall there were others there, but I can't remember

5    exactly the cast of characters.

6    Q.  What, if anything, was the reason for the dinner?

7    A.  My understanding, I don't think there was any particular

8    reason, except we had gathered together more than a handful of

9    OpenSea employees in one spot, and that was usually enough to

10   justify getting a team dinner together.

11   Q.  Do you remember seeing anything on Twitter that evening

12   about Nate Chastain?

13   A.  I do.

14   Q.  What did you see?

15   A.  So, I -- when I was going to the bathroom, I was scrolling

16   Twitter.  And on the way back, I saw a tweet that alleged that

17   Nate had been purchasing NFTs that would go on to be featured

18   NFTs, and subsequently sell them.

19   Q.  Let me show you what's been marked for identification as

20   Government Exhibit -- is it in?

21         What's in evidence as Government Exhibit 706.

22         MR. ROOS:  May we publish this to everyone?

23         THE COURT:  You may.

24   Q.  Mr. Bianco, can you zoom in on the tweet.

25         Sir, are you familiar with this tweet?

1    A.  Yes.

2    Q.  Can you, Mr. Bianco, fix the highlighting.  I am going to

3    ask you to read just the top tweet.

4    A.  "Hey OpenSea.  Why does it appear Nate Chastain has a few

5    secret wallets that appears to buy your front page drops before

6    they are listed, and then sells them shortly after the front

7    page hype spike for profits, and then tumbles them back to his

8    main wallet with his punk on it?"

9    Q.  Then can you read the one below it.

10   A.  "Here's one TX" transaction "on returning profits to the

11   main 0XA3A45 wallet after flipping the item currently on the

12   front page."

13   Q.  What did you do after you saw this tweet?

14   A.  I had it open on my phone, and I walked over to

15   Mr. Chastain, and I showed him the tweet.

16   Q.  What did he do?

17   A.  I recall that he shook his head from side to side, and said

18   "no."

19   Q.  Side to side.  Can you demonstrate that for us, what you

20   mean by that?

21          MR. ROOS:  So let the record reflect the witness is

22   sort of moving his head back and forth.

23          THE COURT:  I would say shaking his head from side to

24   side.

25          MR. ROOS:  Thank you, your Honor.

1    Q.  What did you understand that to mean?

2    A.  I understood it to be a denial of the truth of the

3    allegation in the tweet.

4    Q.  You said he also said the word "no"?

5    A.  That's correct.

6    Q.  What's do you understand that to mean?

7    A.  Similarly, a denial of the truth of the allegation of the

8    tweet.

9          MR. ROOS:  No further questions.

10         THE COURT:  Cross-examination.

11         MR. FILOR:  Thank you, your Honor.

12   CROSS-EXAMINATION

13   BY MR. FILOR:

14   Q.  Sir, you didn't know what Mr. Chastain meant when he shook

15   his head, right?

16   A.  I'm sorry, would you repeat that?

17   Q.  You did not know what Mr. Chastain was saying when he shook

18   his head, do you?

19   A.  To the extent that it's not possible to know what's in the

20   head of another person.

21   Q.  But they asked you to try to put yourself in his head,

22   right?

23   A.  Yes.

24   Q.  Just now the last question --

25         MR. ROOS:  Objection.

1            THE COURT:  Sustained.

2    Q.  You prepared with the government a few times, right?

3    A.  Yes.

4    Q.  You knew they were going to ask you that question, didn't

5    you?

6    A.  Which question?

7    Q.  To interpret what his head shake was when they asked you

8    the question?

9            MR. ROOS:  Objection.

10            THE COURT:  Overruled.

11    Q.  Right?

12    A.  Sorry.  Would you clarify?

13    Q.  Sure.

14            THE COURT:  One at a time, gentlemen.

15            MR. FILOR:  Certainly, your Honor.

16    Q.  When you prepared multiple times with the government, they

17    told you they were going to ask you to interpret that head

18    shake, didn't they?

19    A.  They didn't tell me that they were going to ask specific

20    questions here.

21    Q.  But when asked the question here, you were willing to

22    interpret the head shake for them, weren't you?

23            MR. ROOS:  Objection.  Argumentative.

24            THE COURT:  Sustained.

25    Q.  When you showed your phone to Mr. Chastain that night, did

1    you think you were showing him that tweet for the first time

2    that he had ever seen it?

3    A.   I suspected yes, at the time.

4    Q.   Because it just came out, right, while you guys were there?

5    A.   I believe so, yes.

6    Q.   You don't know what he was saying when he shook his head

7    when he was reading it on your phone, right?

8    A.   I recall him saying the word "no" and shaking his head no.

9    Q.   That wasn't my question.  You didn't know what he meant

10   when he did that, do you?

11              MR. ROOS:  Objection.  Asked and answered.

12              THE COURT:  Sustained.

13              MR. FILOR:  Can I approach the witness and provide him

14   with Government Exhibits 214 and 223.

15              THE COURT:  Is there a reason we can't show them on

16   the screen?

17              MR. FILOR:  I'd like him to page through a couple of

18   them.

19              THE COURT:  Okay, you may.

20   Q.   Can you look at Government Exhibit 214 first.

21              MR. FILOR:  Can we publish for the jury, your Honor?

22              THE COURT:  You may.

23   Q.   You never spoke with Nate Chastain about this

24   confidentiality agreement that people sign when they join

25   OpenSea, right?

1    A.  May I take a moment to flip through?

2    Q.  Please.

3    A.  It appears there was an Exhibit 223 at the end of this.

4    This is meant to be just 214, correct?

5    Q.  Yes, I handed you both of those.  Right now I am asking you

6    to look at the Exhibit 214.  I'll get to 223 in a moment.

7    A.  Okay.

8              THE COURT:  I think the question is, you never spoke

9    with Nate Chastain about the confidentiality agreement that is

10   Government Exhibit 214, did you?

11             THE WITNESS:  I don't recall speaking with him about

12   this document.

13   Q.  Are you aware that that document was downloaded from a

14   Clerky.com form?

15             MR. ROOS:  Objection.

16             THE COURT:  Sustained.

17   Q.  We can put that one away.

18             If you don't mind picking up Government Exhibit 223.

19             MR. FILOR:  Your Honor, if we can publish that for the

20   jury?

21             THE COURT:  You may.

22   Q.  You were asked about this document on direct, right?

23   A.  Yes.

24   Q.  You can page through it, but you've seen this before,

25   right?

1   A.  Yes.

2   Q.  And this is very detailed, isn't it?

3   A.  I believe so, yes.

4   Q.  It's 20 pages long?

5   A.  It appears that the substance fits on 20 pages, yes.

6   Q.  And it goes through in great detail what you wanted users

7   to know about NFTs or non-fungible tokens, right?

8   A.  I don't think that this document was intended to educate

9   people about what we wanted to know about NFTs.

10  Q.  But it's 20 pages about how users can use the OpenSea

11  platform or should not use the OpenSea platform with respect to

12  buying and selling NFTs, right?

13  A.  Yes.

14  Q.  If you can turn to page 3.  And Mr. Berk, if you can bring

15  up the top of that page.  Just the top paragraph there.

16          You wrote that "We encourage you to review the terms

17  frequently to ensure that you understand the terms and

18  conditions that apply."  Right?

19  A.  I see that text, yes.

20  Q.  We can go to page 7, please, Mr. Berk.  If you don't mind

21  turning to that page.

22          You were shown this on direct, paragraph 8, about the

23  user conduct, right?

24  A.  Yes.

25  Q.  And, Charlie, if you can just scroll down slowly, this goes

1   on and on with information, including on to the next page, with

2   lots and lots of detail about how people should behave when

3   they're buying and selling the NFTs, right?

4   A.  Yes.

5   Q.  And you were asked about one particular paragraph, or one

6   particular line of these pages toward the top, engaging in wash

7   trading or other deceptive or manipulative trading activities.

8   You see that?

9   A.  Yes.

10  Q.  You are familiar with what Mr. Chastain did in buying some

11  of the NFTs and then selling them?

12            MR. ROOS:  Objection.  Vague.  Time frame.

13            THE COURT:  Sustained.

14  Q.  You are familiar with the allegations that we're here today

15  to speak about?

16  A.  Yes.

17            MR. ROOS:  Objection.

18            THE COURT:  Too late.

19            Mr. Filor, how much longer do you think you have on

20  cross?

21            MR. FILOR:  Maybe an hour or two, your Honor.

22            THE COURT:  Okay.  Then we'll definitely take our

23  break now being exactly 11:30.

24            Ladies and gentlemen, you know the drill.  Don't

25  discuss the case with one another or anyone else for that

1    matter.  Don't do any research about the case.  Continue to

2    keep an open mind.  Making good progress, but certainly haven't

3    heard all the evidence, let alone the parties' arguments or my

4    instructions.

5         Keep an open mind, enjoy your break.  Please be ready

6    to go a minute or two before noon.  Thank you.

7         (Jury excused)

8         (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Mr. Viau, you are excused for the moment.

2    Because you are on cross-examination you are not allowed to

3    communicate with anyone on the government's side.  You can

4    speak with your own lawyer, of course, but let's otherwise

5    leave it there.  Please be ready to go a couple minutes before

6    noon.  I'll ask counsel just to make sure that there is nothing

7    we're talking about that he can't be present for because there

8    was a few issues about that.

9          You are excused and enjoy your break.

10          THE WITNESS:  Thank you.

11          (Witness temporarily excused)

12          THE COURT:  Were you serious that you have an hour or

13    two on cross?

14          MR. FILOR:  I promise to be done by the end of the

15    day, but I do have a significant amount to cover, your Honor.

16    I'll try to keep it as short as possible.

17          THE COURT:  I find that --

18          MR. FILOR:  I'll use the break to try to cut as much

19    as possible, but it will be an hour I think.

20          THE COURT:  The direct was I think about 10 minutes.

21    Maybe 20 max.  Recognizing that you are limited to the scope of

22    the direct, I find it a little hard to imagine how you are

23    going to spend two hours with this witness.

24          MR. FILOR:  Your Honor, I apologize, but I thought

25    your Honor's trial practice prefers we ask questions of the

1    witness when they're called, so they don't have to be recalled

2    in our case.

3            THE COURT:  Would you do that?  You were going to call

4    him as a witness in your own case?

5            MR. FILOR:  I thought I was following your Honor's

6    rules to get everything done today.  But I'll keep it as short

7    as possible.

8            MR. ROOS:  A few things on this.  First, he wasn't on

9    the defense witness list.  Second, I think your Honor is

10   absolutely right.  Even if they had an intent to call them,

11   they should be constrained by Rule 611(b).  And therefore given

12   the fact I asked about three topics over a period of 10 or 15

13   minutes, two of them he's already gone through, it seems like

14   the remainder of this cross should be conducted with

15   non-leading open-ended questions.  And probably, to help us

16   move efficiently, it would be useful to hear the topics, since

17   I suspect many of them will be irrelevant or subject to a 403

18   objection, so we can move through this without having to deal

19   with this in front of the jury.

20           THE COURT:  Well, why don't you use the break to pare

21   things down.  And candidly, I'm inclined to limit you to the

22   scope of cross.  And if you want to recall him as part of your

23   case, and you want to make a proffer as to why you would do

24   that, then we can litigate that.  Since he wasn't previously

25   mentioned as being on your list, I am not going to let you

1    abuse that rule, which is intended primarily in civil cases

2    where both parties name a witness and call them to ensure the

3    witness doesn't have to appear twice.

4              MR. FILOR:  I apologize if I misinterpreted, your

5    Honor.

6              THE COURT:  Apology accepted.  Be that as it may,

7    we've got to do this more efficiently than one or two hours.

8              MR. FILOR:  I'll keep it briefer, your Honor.

9              THE COURT:  Mindful that there is some uncertainty as

10   to how long this cross will be, there were a few open items on

11   Dr. Edman.

12             Can the government give me preview of what is still to

13   come?  I think you have a paralegal and also Dr. Taylor.

14   What's your plan?

15             MR. ROOS:  So, I think we need to talk to the defense.

16   Yesterday they sort of indicated that even if we don't call

17   Dr. Taylor, they may still call Professor Skinner.  I think

18   potentially what they were alluding to has been precluded.  But

19   I think if they don't intend to call Professor Skinner, we no

20   longer intend to call Professor Taylor.  Which means that

21   whenever the current witness is off cross, we will call our

22   paralegal, read one more stipulation, I guess two more

23   stipulations, and rest.

24             THE COURT:  Defense on Dr. Skinner?

25             MR. FILOR:  Your Honor, if Professor Taylor is not

1   going to be called, then we won't call Professor Skinner.

2               THE COURT:  Does that mean that Dr. Edman would be

3   your first witness?

4               MR. FILOR:  That's correct, your Honor.

5               THE COURT:  Then we need to address the Edman related

6   issues at least quickly.  Does the defense wish to be heard?

7               MR. MILLER:  Yes, your Honor.  So, a few things

8   regarding the letter we received from the government last

9   night.

10              First, I think the government misunderstands a little

11  bit what Dr. Edman will do.  I'll tart start off by saying we

12  are not going to be offering Exhibits 52 and 53.  So that was

13  part of their application.  That's moot.  That's not an issue.

14              THE COURT:  Great.

15              MR. MILLER:  I'll tell what you Dr. Edman has done and

16  what he is going to do, and then I want to address the issue of

17  the demonstratives and the 26.2, your Honor.

18              So, first, Dr. Edman with respect to the wallets will

19  do the following.  He has relied on and reviewed government

20  exhibits that are now in evidence, including Etherscan records.

21  He is also going to use his expertise in evaluating those

22  records, and from looking at the blockchain, etc., as well as

23  looking at Mr. Chastain's computer and ledger device, to match

24  up that the wallet addresses were either in mostly the Meta

25  Mask wallet, and that one wallet address is in the ledger.

1    Okay.

2         And in fact, I think it was a little surprising that

3    the government said they don't know anything about this,

4    because they seized Mr. Chastain's laptop in September of 2021,

5    where that information is also housed, where they could

6    actually determine that in fact the wallet addresses were

7    primarily from one wallet, namely a Meta Mask wallet, and in

8    fact OpenSea's records indicate that most of these wallet

9    addresses appear to be from Meta Mask.  And there is also on

10   the laptop that they seized and reviewed and produced to us

11   information about the software for the ledger device.

12        So, Dr. Edman, among other things, in his opinion of

13   the testimony, one of the things he'll do is describe exactly

14   what I just proffered to your Honor.  So that's the first

15   thing, just to clear up some of the confusion I think the

16   government has with respect to this.

17        THE COURT:  Just if I understand it correctly, your

18   representation is his opinion is based on a review of the

19   evidence that the government has already admitted during this

20   trial, and his review of the defendant's laptop?

21        MR. MILLER:  That's correct, and I just note the one

22   caveat is the laptop -- the defendant's laptop that he

23   currently has, not the one that was seized, because the

24   software for Meta Mask is something that's housed on the net.

25   And so, all that he did was confirm that the wallet addresses

1    that the government has provided in discovery were housed

2    within one wallet, namely the Meta Mask wallet, and this other

3    wallet address that, again, the government can see from the

4    laptop they've seized, is from a ledger device.  So, that's

5    what he's going to do.

6        And to the extent that there is some kind of hearsay

7    objection that I saw with respect to the videos, respectfully,

8    your Honor, that's a non-issue.  Dr. Edman actually reviewed

9    the evidence that, again, the government has a duplicate part

10   of and they can review.  Not to mention that 703, as your Honor

11   is well aware, need not require that an expert only review and

12   rely upon admissible evidence.

13       THE COURT:  Right.  But, just as a followup, is it

14   your representation his testimony is not based on information

15   that he -- and that he doesn't plan to repeat information that

16   Mr. Chastain told him?  In other words, it's based on an

17   independent review of essentially the evidence already in, as

18   well as the defendant's laptop?  And I'll have a followup

19   question on that score.  Is that correct?

20       MR. MILLER:  Correct.  To describe it a little more

21   fully, I'll tell you exactly what happened.  Both Dr. Edman and

22   Mr. Chastain and I were in our offices.  Mr. Chastain did not

23   speak to Dr. Edman nor did Dr. Edman speak to Mr. Chastain.

24   And confirmed on Mr. Chastain's laptop, again, the information

25   for which is also duplicated that the government and the FBI

1    seized and reviewed, that the wallet addresses are linked to

2    this Meta Mask wallet, and that the other address is linked to

3    a cold storage device.

4         THE COURT:  I want to try to use our time wisely, so I

5    give you some time off and me as well.  And Defense Exhibits 52

6    and 53, I appreciate you are not offering them, but are they

7    reliance materials.

8         MR. MILLER:  I mean, Dr. Edman did look at them at one

9    point.  But he need not rely upon them now, because of what he

10   did in terms of physically being present.

11        THE COURT:  Is he able to and planning to testify that

12   whatever -- I'm not an expert in these matters, but to the

13   extent he looked at Meta Mask or the ledger or whatever the

14   case may be, but it wasn't the laptop that the government

15   seized, is he able to and planning to testify that that

16   reflects, or he can discern from that information at the

17   relevant time period, namely 2021?

18        MR. MILLER:  Yes.  So what he will say, because I'm

19   sure the government will cross him on this and they're free to

20   do so, of course, is that he can identify through looking at

21   the Etherscan records, looking at documents provided by OpenSea

22   to the government who produced it to us, that most of these

23   addresses have links to a Meta Mask wallet.  He will also

24   testify, if asked, that it wouldn't make sense for people to

25   have more than one Meta Mask wallet and create a new Meta Mask

1    wallet. And as a result, these addresses came from the same

2    Meta Mask wallet that he's seen corroborating evidence for.

3          THE COURT: Does the government wish to respond? It

4    sounds like he's not basing his opinion testimony on

5    information from the defendant, and nor on Exhibits 52 and 53

6    which are not being offered. So recognizing you can obviously

7    object if you think there's an objectionable question, is there

8    anything remaining to be said on that particular issue?

9          MR. ROOS: I guess there is still the question of how

10   these, whatever he looked at, he is attributing to the

11   defendant. Like, if it's a little memory stick defense

12   counsel's handed him, how is he able to testify that the

13   defendant's wallet is this memory stick. The attribution is

14   something that relies on hearsay.

15         MR. MILLER: Again, that's not what happened. So, in

16   terms of, it was in our office, Mr. Chastain booted up his

17   computer. They did not speak. Dr. Edman did not speak to

18   Mr. Chastain, neither did Mr. Chastain speak to Dr. Edman. He

19   booted up his system. He took up the Meta Mask wallet, which,

20   again, is on the laptop that the government seized and they

21   have access to. He looked at it on the screen. He looked at

22   the addresses, confirmed that they are the same addresses that

23   the government has identified and used, including with their

24   summary witness.

25         THE COURT: You are repeating yourself.

1          MR. MILLER:  Sorry, your Honor.

2          THE COURT:  I'll have to rule on objections as they

3     come.  Suffice it to say he cannot serve as a conduit for

4     hearsay.  Obviously to the extent that an expert can rely on

5     hearsay, because it's reliance material, that's one thing.  If

6     there is any sort of non-admissible conduct, statement,

7     representation, whether it's from Mr. Chastain -- and I take

8     your representation there was none -- or through counsel,

9     whether it is through spoken word or conduct, he may not say I

10    found this and I know this to be the thing that the defendant

11    used because X, Y or Z.  That's not permissible.

12         If, based on an independent evaluation that the

13    materials that the government has admitted, and other things he

14    can match up with those, he can offer an opinion on those

15    things, that strikes me as probably kosher.

16         MR. ROOS:  The other complication with this, and I

17    appreciate defense counsel said we can object, is, as I

18    understand it, he in the year 2023 looked at something provided

19    to him by the defendant or defense counsel showing a bunch of

20    wallet addresses within a singular Meta Mask wallet, and that

21    is the basis for his opinion.  That seems to me to be an

22    unreliable foundation from which he can testify without the

23    hearsay of, oh, this is how it was set up back in 2021.

24         THE COURT:  I think I am going to have to wait and

25    see.  That was the question that I posed to Mr. Miller, is he

1  going to be able to connect what he viewed in 2023 with conduct

2  in 2021, and Mr. Miller represents that the answer to that is

3  yes.  If I conclude otherwise upon hearing the examination I

4  can always strike it, I can always give the appropriate

5  curative instruction.  And there is also vigorous

6  cross-examination to be had.

7          So, to the extent there is a motion to preclude on

8  that basis, it is denied, but without prejudice to either

9  renewal or specific objections at trial.

10         On the demonstratives, I'm not happy with the late

11  disclosure.  There is a reason that I entered an order

12  governing these things, and in that regard, I'm not happy.

13  Same applies to the Dr. Skinner demonstratives.  But be that as

14  it may, the one, quote unquote, inaccuracy or misleading item

15  that the government identified, I don't think there is a whole

16  lot of weight to it.  Yes, you have to open an account.  That's

17  sort of implicit and obvious.  That doesn't strike me as

18  meaningful.  If you think it is meaningful, you can explore it

19  on cross.

20         Can you point me to anything else that raises a

21  concern on that score?

22         MR. ROOS:  Just that, you know, we might have prepared

23  counter demonstratives for the expert, but we are going to

24  endeavor to do what we can between now and maybe use some of

25  the remaining lunch time to do something.

1          THE COURT:  Well, you know, you wrote me like nine

2     letters last night.  So you could have been working on that

3     simultaneously as well.

4          Defense Exhibit 48.  Do we need to address that now or

5     are we not likely to get there today?  What's your thought?

6          MR. ROOS:  I guess this really depends on the length

7     of this cross that's upcoming.  If there's 10 to 15 more

8     minutes, then it seems like maybe we -- and these two experts

9     are not testifying.

10          THE COURT:  Let's try and deal with it.  Anything

11     defense wants to be heard on this?

12          I think the government's objections are well taken in

13     the sense that, number one, certainly thus far, the evidence is

14     quite clear that the stock options never vested, so in that

15     regard it's inaccurate to say that he had any equity interest.

16     Number two, I think there is plenty on there that's not in

17     evidence.  Number three, it strikes me as a leap of logic and

18     certainly no foundation in the evidence to say that options are

19     to be valued at the fundraising valuation.  That strikes me

20     there are a lot of assumptions baked into that chart that are

21     misleading and inconsistent with the evidence at this trial.

22          MR. FILOR:  Your Honor, we do think the state of mind

23     issue is the same.  Whether he was fully vested already or is

24     about to be vested in three months before he's pushed out of

25     the company, the intention not to hurt the OpenSea brand and

1   not to hurt OpenSea such that he's hurting his own potential

2   equity share, I think is the same whether or not he was fully

3   vested.

4           THE COURT:  If he wants to take the stand and say

5   that, he can do that.  And if you want to argue based on

6   evidence in the record about that, that's also fine.  But

7   that's different than admissibility of the chart, which

8   suggests that that was his equity share at that relevant time.

9           MR. FILOR:  Understood, your Honor.

10          THE COURT:  I am not hearing a vigorous argument in

11  opposition to the government, so that exhibit is precluded.

12          Can we anticipatorily deem the defense to have made a

13  Rule 29 motion.

14          MR. MILLER:  That was what I was going to bring up.

15  We did not realize that we were supposed to have produced the

16  demonstratives days before.

17          I know we are short on time and so I'd like to just

18  say a couple of things, if that's okay, with respect to Rule

19  29.

20          THE COURT:  Well, no.  My question is can I deem you

21  to have made the motion at the close of the government's case.

22          MR. MILLER:  Yes.

23          THE COURT:  And you deem me to have reserved judgment

24  on it.  If you want to make a record of any particular

25  arguments, we can do that at the end of the day.

1          MR. MILLER:  Understood.  Absolutely.

2          THE COURT:  Anything else?  Or I'll give you your 11

3    minutes.

4          MR. FILOR:  Thank you, nothing else.

5          THE COURT:  See you in 10 plus minutes.

6          (Recess)

7          (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N4RKCHA3

1                          AFTERNOON SESSION

2                             12:03 PM

3             (Trial resumed; in open court; jury not present)

4             THE COURT:  Hope you enjoyed your long break.

5             Anything we need to take up before we get the witness

6    back on the stand?

7             MR. FILOR:  Nothing from defense, your Honor.

8             MR. ROOS:  Nothing from us.

9             THE COURT:  Great.

10            Let's get the witness back and get the jury.

11            (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  You may be seated.

3          Welcome back.  Hope you enjoyed your break.  Sorry for

4     starting five minutes late.  We'll continue with the

5     cross-examination of Mr. Viau.

6          Mr. Viau, just a reminder, try and speak right into

7     the microphone, keep your voice up.  Bend it a little toward

8     you if you want to make it a little easier.

9          And with that, Mr. Filor, you may proceed.

10         MR. FILOR:  Thank you, your Honor.

11    DANIEL VIAU,

12    CROSS-EXAMINATION CONTINUED

13    BY MR. FILOR:

14    Q.  Mr. Viau, you have banned people for violating the terms of

15    service, right?

16    A.  Yes.

17    Q.  But Nate has never been banned for violating the terms of

18    service, correct?

19    A.  I'm not sure whether he's been banned or not.

20    Q.  Who would know?

21    A.  I'm not sure.  Perhaps some members of the trust and safety

22    team.

23    Q.  You worked and interacted a lot with Nate when he was at

24    OpenSea, right?

25    A.  Yes.

1    Q.  And you know that Nate loved OpenSea, didn't he?

2              MR. ROOS:  Objection.

3              THE COURT:  Sustained.

4    BY MR. FILOR:

5    Q.  You're aware that Nate was provided with an opportunity for

6    an equity stake in OpenSea, right?

7    A.  I don't know the details of his employment offer.

8    Q.  But you do remember, in July 2021, speaking with Nate

9    because both you and he had stock options, correct?

10             MR. ROOS:  Objection.

11             THE COURT:  Sustained.

12   Q.  Did you have options in OpenSea?

13             MR. ROOS:  Objection.

14             THE COURT:  Sustained.

15   Q.  Do you recall, in July 2021, a round of funding based on

16   which there was a valuation of OpenSea of over a billion

17   dollars?

18             MR. ROOS:  Objection.

19             THE COURT:  Sustained.

20   Q.  You don't believe Nate ever wanted to hurt OpenSea, do you?

21             MR. ROOS:  Objection.

22             THE COURT:  Sustained.

23             Mr. Filor, let's move on.

24             MR. FILOR:  Certainly, your Honor.

25

1  BY MR. FILOR:

2  Q.  One of Nate's responsibilities at OpenSea was to handle

3  problems with OpenSea products and to get them fixed, right?

4  A.  Yes.

5  Q.  And he was often on the front lines, so to speak, in

6  dealing with complaints from OpenSea users when things went

7  wrong?

8  A.  Can you clarify what you mean by "front lines"?

9  Q.  When, for example, the OpenSea platform would have outages,

10  there would be angry Twitter users, right?

11  A.  Yes.

12  Q.  And Nate would be the person that would try to work on that

13  and get it fixed, right?

14  A.  Yes.

15  Q.  And another example — do you recall when CryptoFunk NFTs

16  were delisted because they were mirroring CryptoPunks?

17          MR. ROOS:  Objection.

18          THE COURT:  I'll allow it.  Go ahead.

19          THE WITNESS:  I recall that there was some controversy

20  surrounding CryptoFunks.  I don't remember the details of what

21  happened to that project.

22          MR. FILOR:  Your Honor, may I approach and provide

23  what's been marked for identification as Defendant's

24  Exhibit 100?

25          THE COURT:  You may.

1    BY MR. FILOR:

2    Q.  Mr. Viau, can you look at that, please, and tell me if you

3    recognize that.

4              THE COURT:  Is there a question?

5              MR. FILOR:  Sorry.

6    Q.  Mr. Viau, do you recognize that?

7    A.  Yes.

8    Q.  Is that you liking a tweet from Mr. Chastain?

9              THE COURT:  Sustained.

10   Q.  Did you follow Mr. Chastain's Twitter account?

11   A.  Yes.

12   Q.  Was that @natechastain?

13   A.  I believe so, yes.

14   Q.  And from time to time, would you like -- within Twitter, is

15   it possible to like certain postings?

16   A.  Yes.

17   Q.  And from time to time, would you like some of

18   Nate Chastain's postings?

19   A.  Yes.

20   Q.  Do you recall liking a posting where Nate was having an

21   exchange with the CryptoFunks people who had been delisted for

22   violating the terms of service?

23             MR. ROOS:  Objection.

24             THE COURT:  I'll allow it.  Overruled.

25             THE WITNESS:  Will you please repeat the question?

1    BY MR. FILOR:

2    Q.  I will try.

3            Do you recall liking a tweet from Nate Chastain with

4    respect to his conversations over Twitter with the CryptoFunks

5    people who were angry about being delisted?

6    A.  I don't recall that, no.

7    Q.  Looking at DX 100, does that refresh your recollection?

8            THE COURT:  So the question is:  Looking at that,

9    sitting here today, do you remember liking a posting on the

10   subject Mr. Filor asked you about, not what that document may

11   or may not be?

12           THE WITNESS:  Honestly, I struggle to interpret the --

13           THE COURT:  Don't describe what's in the document.

14   Just does it refresh your memory about that?  The answer is yes

15   or no.

16           THE WITNESS:  No.

17   BY MR. FILOR:

18   Q.  Your Twitter handle is Dan_OpenSea, right?

19   A.  Yes.

20   Q.  Isn't it correct that you even warned Nate that having to

21   deal so directly with OpenSea users over Twitter who are angry

22   about outages and other problems could be detrimental to Nate?

23           MR. ROOS:  Objection.

24           THE COURT:  Sustained.

25   Q.  Did you think that the Crypto Twitter overreacted in

1    September of 2021 when news of Nate's trading was disclosed?

2             MR. ROOS:  Objection.

3             THE COURT:  Sustained.

4    BY MR. FILOR:

5    Q.  Are you familiar with the concept of Crypto Twitter?

6    A.  Yes.

7    Q.  Is that kind of a Twitter version that focuses on crypto

8    issues?

9    A.  I'm sorry, will you please repeat that?

10   Q.  Is that like that a Twitter verse that focuses on crypto

11   issues?

12   A.  Did you say a Twitter verge?

13   Q.  I said Twitter verse.  I'm not sure the jargon is actually

14   correct, but what is Crypto Twitter?

15   A.  People, I believe, use the term Crypto Twitter to describe

16   those users on Twitter who are interested primarily in crypto.

17   Q.  Could Crypto Twitter users observe your OpenSea accounts

18   and your hot wallet addresses?

19            MR. ROOS:  Objection.

20   Q.  By "you," I mean not you, in particular, but anyone,

21   because it's on the open blockchain.

22            MR. ROOS:  Objection; foundation.

23            THE COURT:  Sustained.

24   BY MR. FILOR:

25   Q.  Is the blockchain open for all to be able to view?

1    A.  Yes.

2    Q.  And isn't it correct that Crypto Twitter users could see

3    purchases over OpenSea through the blockchain?

4    A.  Yes.

5    Q.  You are aware that Nate would use his @natechastain Twitter

6    handle to communicate with OpenSea users as part of his job,

7    right?

8    A.  Yes.

9    Q.  And you followed Nate on Twitter, you said?

10            MR. ROOS:  Asked and answered.

11            THE COURT:  Sustained.

12   Q.  Are you aware that in 2021, Nate had between 10 and 20

13   thousand followers on Twitter?

14   A.  I don't recall the number of followers that he had on

15   Twitter.

16   Q.  But you know it was a significant number, right?

17   A.  I believe, yes.

18   Q.  And you knew that almost everybody at OpenSea followed his

19   Twitter, right?

20   A.  I'm unfamiliar with the patterns of open -- I'm sorry.  I'm

21   unfamiliar with patterns of Twitter use by other OpenSea

22   employees.

23   Q.  Did you know that Devin Finzer and Alex Atallah followed

24   Nate Chastain's Twitter?

25   A.  I don't recall whether they followed him or not.

1      MR. FILOR:  Can we show the witness, and only the

2   witness, Defendant's Exhibit 9, Mr. Berk.

3   Q.  Let me know if you can see that, Mr. Viau.

4   A.  I see it.

5   Q.  Can you identify that as the type of tweet that Nate

6   Chastain would interact with OpenSea users about future

7   products?

8   A.  This appears to be a communication from Nate to OpenSea

9   users.

10      MR. FILOR:  And, your Honor, pursuant to GX 1001's

11   authenticity, we would offer DX 9.

12      MR. ROOS:  Objection; 401, 403, 803.

13      THE COURT:  I'll allow it.  Overruled and admitted.

14      (Defendant's Exhibit 9 received in evidence)

15      MR. FILOR:  Thank you, your Honor.

16      Your Honor, can we publish to the jury?

17      THE COURT:  You may.

18      MR. FILOR:  Thank you.

19   BY MR. FILOR:

20   Q.  Mr. Viau, do you mind reading what Nate was sharing with

21   the OpenSea Twitter users in this tweet?

22   A.  Sure.

23      "We're starting in a highly requested feature:  The

24   ability to set offer preferences by item (open to offers,

25   minimum offer, notification settings for items).  I'm

1    interested in lining up some user interviews for this, or

2    capturing feedback async over Twitter.  DM me if interested."

3    Q.  And you're aware this is the type of interactions Nate

4    would have with OpenSea users outside of the company in order

5    to get feedback and exchange ideas, correct?

6              MR. ROOS:  Objection.

7              THE COURT:  Sustained.

8              MR. FILOR:  We can take that down.

9              Mr. Berk, can you bring up Government Exhibit 705A for

10    the witness.

11             And, your Honor, this is in evidence.  If we could

12    publish to the jury, please?

13             THE COURT:  You may.

14    BY MR. FILOR:

15    Q.  Let me know when you see that, Mr. Viau.

16    A.  I see it.

17             MR. FILOR:  Can you scroll to the bottom, Mr. Berk.

18    Thank you.

19    Q.  Do you recall seeing this tweet in or about August of 2021?

20    A.  I do not.

21    Q.  But you're familiar with how Twitter worked because you

22    used that, right?

23    A.  Yes.

24    Q.  And so when Nate sent this tweet out, with respect to

25    buying featured NFTs, all of his users, including you and

1   anyone else at OpenSea who follows Nate, would be able to see

2   that he was purchasing the featured NFT, right?

3            MR. ROOS:  Objection; foundation.

4            THE COURT:  Sustained as to form.

5            MR. FILOR:  I'll move on, your Honor.

6            We can take that down.

7   BY MR. FILOR:

8   Q.  Mr. Viau, you said you were one -- did you tell us that you

9   were one of the first people hired at OpenSea?

10  A.  I don't recall whether I said that here.

11  Q.  But you were, right, one of the first five people?

12  A.  Yes.

13  Q.  When Nate joined, he was within the first ten people?

14  A.  That sounds about right.

15  Q.  And at that time, there was no office, was there, when Nate

16  joined in early 2021?

17  A.  I can't recall the timeline of when Nate joined versus when

18  we got an office.

19  Q.  But before you got an office, the address of OpenSea was

20  Mr. Finzer's studio apartment in New York, right?

21  A.  I believe that's accurate, yes.

22  Q.  And you have been at OpenSea when it went from a fledgling

23  company of five people to a multibillion dollar company,

24  correct?

25  A.  Yes.

1    Q.  Would you agree there were some things along the way that

2    the company couldn't keep up with because the growth was so

3    fast?

4              MR. ROOS:  Objection.

5              THE COURT:  Sustained.

6    BY MR. FILOR:

7    Q.  In 2021, prior to when Nate left on September 15, there had

8    been no policies about which NFTs you could buy and which you

9    couldn't, correct?

10             MR. ROOS:  Objection to scope and form.

11             THE COURT:  Overruled.

12             THE WITNESS:  I'm sorry, can you sharpen or rephrase

13   that for me, please?

14   BY MR. FILOR:

15   Q.  I can try.

16             So prior to September 15, 2021, when Nate left the

17   company -- that's correct, that's when he left, right?

18   A.  I believe that that's correct, yes.

19   Q.  Prior to that, OpenSea had no policies about which NFTs you

20   could purchase and which you couldn't, right?

21   A.  I don't believe that that's accurate.

22   Q.  You believe that there were policies about which NFTs you

23   could purchase and which you couldn't?

24   A.  Yes.

25   Q.  Which NFTs could you purchase -- no, strike that.

1              You're aware that on September 15, 2021, OpenSea

2      enacted policies indicating that you could not purchase NFTs

3      that were being featured on the website, right?

4      A.  Can you clarify who you mean by "you"?

5      Q.  You're aware that there were new policies enacted on

6      September 15, 2021, right?

7      A.  Are you talking about internal policies or terms of service

8      type policies?

9      Q.  Sorry, not terms of service policies for outsiders; I'm

10     talking about within the company, policies that applied to

11     employees.

12     A.  I don't recall the exact date, but I do remember that new

13     policies were implemented.

14     Q.  And that was after Nate Chastain had bought and sold some

15     of the featured NFTs, correct?

16     A.  Yes.

17     Q.  Prior to that, there had been no training about which NFTs

18     you could buy and which you couldn't, right?

19     A.  I didn't go through any training.

20     Q.  There had been no videos that you were required to watch

21     and indicate at the end of the year that you had watched the

22     videos, right?

23     A.  I don't recall that sort of thing.

24     Q.  There was no compliance department back then at OpenSea,

25     correct?

N4RKCHA3                    Viau - Cross

1   A.  We didn't have a department that was officially labeled a

2   compliance department.

3   Q.  You didn't even have a general counsel before August of

4   2021, when Gina Moon started, correct?

5   A.  That's correct.

6   Q.  After September 2021, things changed, including training,

7   policies, and compliance, about NFT trading, correct?

8           MR. ROOS:  Objection; compound.

9           THE COURT:  Sustained.

10  Q.  Have you enacted training since September 2021 with respect

11  to which NFTs you could buy?

12  A.  I believe so, yes.

13  Q.  And policies?

14  A.  Yes.

15  Q.  And you have compliance now?

16  A.  Can you clarify what you mean?

17  Q.  There are people that try to help you decide which NFTs you

18  could buy or what the policies are that are applicable to

19  purchasing NFTs?

20  A.  Yes.

21  Q.  Mr. Viau, you yourself buy and sell NFTs, right?

22          MR. ROOS:  Objection.

23          THE COURT:  Sustained.

24  Q.  Mr. Viau, you recruited users who were buying and selling

25  NFTs to come work for OpenSea, right?

1              MR. ROOS:  Objection.

2              THE COURT:  Sustained.

3              MR. FILOR:  Your Honor, can I show the witness DX 79,

4    which has been marked for identification?

5              THE COURT:  Sure.

6    BY MR. FILOR:

7    Q.   Let me know when you can see that.

8    A.   I see it.

9    Q.   And what is that?

10   A.   It's a tweet.

11   Q.   From you?

12   A.   Yes.

13   Q.   And what was your purpose in sending the tweet?

14             MR. ROOS:  Objection.

15             THE COURT:  Sustained.

16   Q.   Is this a tweet that you sent on or about July 21, 2021?

17   A.   That's the date I see on the document.

18   Q.   When you use the term "degen," d-e-g-e-n --

19             MR. ROOS:  Objection.  It's not in evidence.

20             THE COURT:  Sustained.

21             MR. FILOR:  Your Honor, I'm not seeking to put it in

22   evidence yet.

23             THE COURT:  Then you may not ask about the content of

24   it because it's not in evidence yet.  So, sustained.

25             MR. FILOR:  Understood, your Honor.

1    BY MR. FILOR:

2    Q.  Do you recall trying to recruit people to OpenSea who were

3    trading NFTs on their own?

4            MR. ROOS:  Same objection.

5            THE COURT:  Sustained.

6            Mr. Filor, if you don't get to some proper lines of

7    cross, we're going to end it.  So --

8            MR. FILOR:  Understood, your Honor.  Thank you.

9    BY MR. FILOR:

10   Q.  Mr. Viau, did you send this tweet in the course of your

11   business for OpenSea?

12   A.  Yes.

13   Q.  Was this created at or near the time that you sent it?

14   A.  What do you mean by "created"?

15   Q.  Is this a document that you created on July 21, 2021?

16   A.  Are you asking if that's when I sent the tweet?

17   Q.  That's correct.

18   A.  That's the date that I see on the document.

19           MR. FILOR:  Your Honor, we would offer Defendant's

20   Exhibit 79.

21           MR. ROOS:  The same relevancy objection.

22           THE COURT:  Sustained.

23   Q.  It was your understanding, when you were at OpenSea, that

24   buying and selling of NFTs was something that all OpenSea

25   employees could do, right?

1   A.  I don't know what was in the heads of the other members of

2   OpenSea.  I believe that buying and selling NFTs was something

3   that OpenSea employees were likely to do.

4   Q.  And you all discussed doing that?

5   A.  From time to time, we discussed buying and selling NFTs,

6   yes.

7   Q.  Can you approximate how many NFTs you bought and sold while

8   at OpenSea?

9           MR. ROOS:  Objection.

10          THE COURT:  Sustained.

11  Q.  Mr. Viau, you had dinner with Nate and Devin Finzer days

12  after he left OpenSea, correct?

13          THE COURT:  By "he," you mean Mr. Chastain?

14          MR. FILOR:  That's correct.

15          THE WITNESS:  Yes.

16  BY MR. FILOR:

17  Q.  And you texted with Nate even after that, didn't you?

18  A.  I don't recall the exact timeline, but I do recall that I

19  texted with Nate after he had left OpenSea.

20          MR. FILOR:  Nothing further, your Honor.  Thank you.

21          THE COURT:  Any redirect?

22          MR. ROOS:  No, thank you.

23          THE COURT:  All right.

24          Mr. Viau, however you pronounce your name, you may

25  step down.  My apologies on that.

1          (Witness excused)

2          THE COURT:  Government, please call your next witness.

3          MS. NICHOLS:  Your Honor, our next witness is Julia

4     Gutierrez.

5          And maybe while we're getting her, we could do a

6     stipulation?

7          THE COURT:  Sure.

8          MS. NICHOLS:  Mr. Bianco, can we just pull up, for the

9     Court and the parties, Government Exhibit 1006, please.

10          We'll offer Government Exhibit 1006, your Honor.

11          THE COURT:  All right.  Admitted.

12          (Government's Exhibit 1006 received in evidence)

13          MS. NICHOLS:  I'll just read it.

14          "It is hereby stipulated" --

15          THE COURT:  Why don't we publish it as well.

16          MS. NICHOLS:  Thank you, your Honor.

17          "It is stipulated and agreed between the parties that

18     the interstate wire element of Count One of the indictment is

19     met.

20          "It is further stipulated and agreed that this

21     stipulation is admissible as a government exhibit at trial."

22          THE COURT:  All right.  Thank you.

23          And, Mr. Roos, could I ask you just to retrieve the

24     materials from the witness stand while you're there.

25          MR. ROOS:  Sure, your Honor.

1          (Witness sworn)

2          THE DEPUTY CLERK:  Can you please state and spell your

3     full name for the record.

4          THE WITNESS:  It's Julia Gutierrez, J-u-l-i-a

5     G-u-t-i-e-r-r-e-z.

6          THE COURT:  Ms. Nichols, you may proceed.

7          MS. NICHOLS:  Thank you, your Honor.

8     JULIA GUTIERREZ,

9          called as a witness by the Government,

10         having been duly sworn, testified as follows:

11    DIRECT EXAMINATION

12    BY MS. NICHOLS:

13    Q.  Good afternoon, Ms. Gutierrez.

14    A.  Hello.

15    Q.  Where do you work?

16    A.  The U.S. Attorney's Office for the Southern District of New

17    York.

18         THE COURT:  Ms. Gutierrez, I need you to slide up a

19    little bit and speak right into the microphone --

20         THE WITNESS:  Sorry.

21         THE COURT:  -- loud and clear.

22         Go ahead.

23         THE WITNESS:  The U.S. Attorney's Office for the

24    Southern District of New York.

25    Q.  What is your current position?

1    A.  I'm a paralegal.

2    Q.  What are your duties and responsibilities as a paralegal?

3    A.  We draft legal documents, assist at trial, help hand over

4    evidence to the defense.  Really anything else that the

5    attorneys ask us to do, we'll do.

6    Q.  Have you ever testified before?

7    A.  Yes.

8    Q.  About how many times?

9    A.  Ten times.

10   Q.  Did you have any role in investigating this case?

11   A.  No.

12           MS. NICHOLS:  Can we please pull up, Mr. Bianco, just

13   for the witness and the parties, Government Exhibit 1002.

14           And just flip to the second page there.

15           Pursuant to the stipulation, we would offer this,

16   Government Exhibit 1002, your Honor.

17           THE COURT:  Admitted.

18           (Government's Exhibit 1002 received in evidence)

19           MS. NICHOLS:  May we publish?

20           THE COURT:  You may.

21   BY MS. NICHOLS:

22   Q.  Ms. Gutierrez, could you just, please, read after the part

23   that it is stipulated and agreed between the parties, the

24   paragraph numbered number 1?

25   A.  "Government Exhibits 500 and 501 are true and correct

1    copies of documents recovered from the defendant's laptop."

2    Q.  Okay.

3              MS. NICHOLS:  I don't think we need to zoom,

4    Mr. Bianco.  I think we can see it.

5    Q.  Can you just read the part of paragraph 2 that pertains to

6    the government exhibits?

7    A.  Yes.

8              "Government Exhibits 601 through 611 are true and

9    correct copies of conversations, documents, and/or data that

10   was recovered from the defendant's cell phone."

11   Q.  Thank you.

12             MS. NICHOLS:  You can take that down, Mr. Bianco.

13             Can we please put up, for just the witness, Government

14   Exhibit 500.

15   Q.  Do you recognize this, Ms. Gutierrez?

16   A.  Yes.

17   Q.  Have you seen it before your testimony here today?

18   A.  Yes.

19   Q.  What is it?

20   A.  It's a confidential information and invention assignment

21   agreement for Nate Chastain.

22   Q.  Based on the stipulation that we just read, where did this

23   document come from?

24   A.  Nate Chastain's laptop.

25             MS. NICHOLS:  The government offers Exhibit 500.

1              THE COURT:  Any objection?

2              MR. FILOR:  No objection, your Honor.

3              THE COURT:  Admitted.

4              (Government's Exhibit 500 received in evidence)

5              MS. NICHOLS:  May we publish, your Honor?

6              THE COURT:  You may.

7              MS. NICHOLS:  Mr. Bianco, can we pull up, side by side

8    with this exhibit, Government Exhibit 214, please.

9    BY MS. NICHOLS:

10   Q.  Ms. Gutierrez, did you have a chance to compare these two

11   documents before your testimony?

12   A.  Yes.

13   Q.  How did they compare?

14   A.  They're the same document.

15             MS. NICHOLS:  We can take that down, Mr. Bianco.

16             And please pull up Government Exhibit 605, just for

17   the witness.

18   Q.  So, Ms. Gutierrez, again, based on the stipulation that we

19   just read, where did this document come from?

20   A.  Nate Chastain's cell phone.

21   Q.  And what is it?

22   A.  It's the confidential information and invention assignment

23   agreement for Nate Chastain.

24             MS. NICHOLS:  The government offers 605.

25             MR. FILOR:  No objection.

1              THE COURT:  Admitted.

2              (Government's Exhibit 605 received in evidence)

3              MS. NICHOLS:  May we publish, your Honor?

4              THE COURT:  You may.

5              MS. NICHOLS:  Now, Mr. Bianco, if we can, is it

6    possible to pull up three documents — Government Exhibit 214,

7    500, and 605 — all side by side?

8              (Pause)

9              MS. NICHOLS:  I'll just move on.

10   BY MS. NICHOLS:

11   Q.  Ms. Gutierrez, were you able to review Government

12   Exhibit 605 before your testimony here today?

13   A.  Yes.

14   Q.  Were you able to compare it to Government Exhibits 500 and

15   214?

16   A.  Yes.

17   Q.  And how did those three documents compare?

18   A.  They're all the same document.

19             MS. NICHOLS:  Can we please pull up, Mr. Bianco, just

20   for the witness and the parties, Government Exhibit 501.

21   Q.  Do you recognize that?

22   A.  Yes.

23   Q.  What is it?

24   A.  It's a nondisclosure agreement.

25             MS. NICHOLS:  Can we flip to the signature page,

1    please.  Second page.

2    Q.  Who signed this document?

3    A.  Nate Chastain.

4    Q.  Based on the stipulation, where did this document come

5    from?

6    A.  If it's -- the laptop.

7              MS. NICHOLS:  The government offers 501.

8              MR. FILOR:  No objection.

9              THE COURT:  Admitted.

10             (Government's Exhibit 501 received in evidence)

11             MS. NICHOLS:  May we publish, your Honor?

12             THE COURT:  You may.

13             MS. NICHOLS:  Mr. Bianco, can you please go back to

14   the first page.  Thank you.

15             Can we please pull up, next to this document, what's

16   already in evidence as Government Exhibit 609.

17   BY MS. NICHOLS:

18   Q.  Ms. Gutierrez, did you compare these documents before your

19   testimony?

20   A.  Yes.

21   Q.  How did they compare?

22   A.  They're the same.

23             MS. NICHOLS:  We can take that down.

24             Can we please pull up, for everyone, what's in

25   evidence as Government Exhibit 217.

1   Q.  Ms. Gutierrez, did you review this document prior to your

2   testimony?

3   A.  Yes.

4   Q.  We see here one page.  Does the document have more than one

5   page?

6   A.  Yes.  It's 30 pages long.

7   Q.  What, in general, is this document -- what is being

8   discussed in this document?

9   A.  The people in the Slack chat are discussing certain NFTs

10  that they might want to put on the home page of OpenSea to

11  feature.

12  Q.  Do you see how, at the bottom there, there is a line of

13  text in blue font?

14  A.  Yes.

15          MS. NICHOLS:  Mr. Bianco, can we scroll just a

16  couple -- just flip through the pages.

17          We can stop there.

18  Q.  What does the blue font represent in this document?

19  A.  Those are hyperlinks.

20  Q.  What's a hyperlink?

21  A.  It's a link that when you click on it, it takes you to a

22  web page.

23  Q.  Were you able to click on some of the links in this

24  document before your testimony here today?

25  A.  Yes.

1   Q.  Do all of them work?

2   A.  No.

3   Q.  Do some of them work?

4   A.  Yes.

5   Q.  So let's go back to page 1, please.

6           Did you have a chance, before your testimony, to click

7   the hyperlink that's at the bottom of page 1 here?

8   A.  Yes.

9   Q.  Just to be clear, that is -- can you just read the message

10  that corresponds to that hyperlink?

11  A.  Yes.

12          It says, "Current favorites gallery that I've set up

13  is this one," and then the link.

14  Q.  What happens when you put that link into a web browser?

15  A.  It takes you to an OpenSea page that is a gallery of

16  favorites.

17  Q.  Within that gallery, what did you find?

18  A.  NFTs.

19  Q.  Were you able to compare some of the NFTs in that gallery

20  to some of the NFTs that OpenSea has featured on its website?

21  A.  Yes.

22  Q.  What was the result of that comparison?

23  A.  Some of the NFTs that were discussed in this Slack channel

24  were then featured on their website, on the home page.

25  Q.  What about specifically in the favorites gallery that's

1    highlighted there, were --

2    A.  Oh, yes.  Sorry, I didn't answer the question.

3    Specifically in the favorites gallery, some of those were on

4    the home page.

5         MS. NICHOLS:  Can we please pull up what's in evidence

6    as Government Exhibit 2A, 3A, and 4A.  And if we can't do them

7    all at the same time, let's just flip through them quickly,

8    please.

9    Q.  Do you recognize these exhibits, Ms. Gutierrez?

10   A.  Yes.

11   Q.  And what are they?

12   A.  They're screen grabs of the home page of OpenSea.

13   Q.  How, if at all, did the NFTs that we see here featured on

14   these home -- on these screen grabs compare to the ones in the

15   favorites gallery that you were just talking about?

16   A.  These were all in the favorites gallery.

17        MS. NICHOLS:  Okay.  We can take that down,

18   Mr. Bianco.

19        And can we please go back to Government Exhibit 217

20   and look at page 16 of that document.

21   Q.  Ms. Gutierrez, did you have a chance, before your testimony

22   here today, to click the hyperlink that's towards the bottom of

23   the page that was posted by a person named Pascal Marsolais?

24   A.  Yes.

25   Q.  What happens when you click that hyperlink?

1   A.  It takes you to an OpenSea page for that artist, EarlyWorm.

2   Q.  Were you able to compare the NFTs in that EarlyWorm

3   collection to any that were featured on OpenSea's home page?

4   A.  Yes.

5   Q.  And what was the result of that comparison?

6   A.  It was featured.

7           MS. NICHOLS:  Can we please pull up Government

8   Exhibit 16A, which is in evidence.

9   Q.  What are we looking at here, Ms. Gutierrez?

10  A.  The home page of OpenSea, with one of EarlyWorm's NFTs

11  featured.

12          MS. NICHOLS:  We can take that down.

13          And please go back to Government Exhibit 217.  And

14  let's look at page 24.

15  Q.  I want to focus you, Ms. Gutierrez, on the second

16  hyperlink, the one posted by a person called Hamish Barnes.

17          Did you have a chance to navigate to that hyperlink

18  before your testimony?

19  A.  Yes.

20  Q.  And what did you find there?

21  A.  It opens to an OpenSea page for another artist called

22  Showdeer, like deer the animal.

23  Q.  Were you able to identify any instances where an NFT by the

24  artist Showdeer was featured on OpenSea's home page?

25  A.  I scrolled through Showdeer's works.  I didn't see that

1   specific NFT on the gallery.

2   Q.  When you say "that specific NFT," what NFT are you talking

3   about?

4   A.  The one that was featured eventually on the home page, that

5   one was not in this gallery.

6   Q.  Okay.  So I think my question, though, was:  Was an NFT by

7   Showdeer ever featured on OpenSea's web page?

8   A.  Oh.  Yes, it was.

9           MS. NICHOLS:  Let's pull up Government Exhibit 22B, as

10  in boy.

11  Q.  What is this, Ms. Gutierrez?

12  A.  A tweet.

13  Q.  What is being discussed in this tweet?

14  A.  That the artist Showdeer had an NFT that was going to be

15  featured on the OpenSea home page.

16  Q.  Just to explain what you were talking about a moment ago,

17  were you able to find this particular NFT on the Showdeer

18  collection when you navigated to the hyperlink?

19  A.  I wasn't able to find it.

20  Q.  When did you look for that?  When did you do the navigation

21  to that hyperlink, approximately?

22  A.  A week ago.

23  Q.  Is it the same artist, though?

24  A.  It's the same artist.

25          MS. NICHOLS:  We could take that down.

1          Can we please pull up, just for the witness and the

2     parties, Government Exhibit 204.

3     Q.   Do you recognize this, Ms. Gutierrez?

4     A.   Yes.

5     Q.   What is it?

6     A.   It's an email from Nate Chastain to someone named Bernat.

7          MS. NICHOLS:  The government offers Government

8     Exhibit 204.

9          MR. FILOR:  No objection.

10         THE COURT:  Admitted.

11         (Government's Exhibit 204 received in evidence)

12         MS. NICHOLS:  May we publish, your Honor?

13         THE COURT:  You may.

14         MS. NICHOLS:  Can we please make it just a tiny bit

15    bigger, Mr. Bianco.

16         Great.  Thank you.

17    BY MS. NICHOLS:

18    Q.   What is this email about, Ms. Gutierrez?

19    A.   Nate is telling Bernat that one of his NFTs is going to be

20    featured on the OpenSea home page.

21    Q.   Is going to be featured or has been featured?

22         MR. FILOR:  Objection, your Honor.

23         THE COURT:  I'll allow it.

24         Overruled.

25         THE WITNESS:  Apologies.  It says has selected, so

1  past tense.

2  BY MS. NICHOLS:

3  Q.  What's the timestamp of this email?

4  A.  2:43 a.m. on May 11, 2021.

5          MS. NICHOLS:  Mr. Bianco, can we please pull up next

6  to this what's in evidence as Government Exhibit 3B, as in boy.

7  Q.  What's being shown in 3B, Ms. Gutierrez?

8  A.  It's a tweet.

9  Q.  And who tweeted -- who wrote the tweet?

10  A.  OpenSea.

11  Q.  What is the subject of the tweet?

12  A.  That Bernat's work will be featured on the home page of

13  OpenSea.

14  Q.  Do you see the same NFT in the tweet that you see in the

15  email?

16  A.  Yes.

17  Q.  What is the timestamp of the tweet?

18  A.  It's 9:32 p.m. on May 10th, 2021.

19  Q.  So, just to be clear, which of these happened first?

20  A.  The tweet happened first.

21          MS. NICHOLS:  We can take that down.

22          Can we please pull up, just for the witness,

23  Government Exhibit 607.

24  Q.  Do you recognize this, Ms. Gutierrez?

25  A.  Yes.

1    Q.   What is it?

2    A.   It is a document about Mr. Chastain's employment with Ozone

3    Networks.

4            MS. NICHOLS:  The government offers Exhibit 607.

5            MR. FILOR:  This may be in already, but no objection

6    either way.

7            THE COURT:  All right.  Well, it's admitted either for

8    the first time or the second time, but it's admitted in either

9    case.

10           MS. NICHOLS:  Thank you, your Honor.

11           May we publish?

12           THE COURT:  You may.

13           (Government's Exhibit 607 received in evidence)

14   BY MS. NICHOLS:

15   Q.   Ms. Gutierrez, can you please --

16           MS. NICHOLS:  Or, actually, Mr. Bianco, can you zoom

17   in on the second numbered paragraph, please.

18   Q.   Can you please read this paragraph, Ms. Gutierrez?

19   A.   Yes.

20           "Compensation and Employee Benefits:  You will be paid

21   as compensation for your services at a gross rate of $135,000

22   per year, payable on the company's regular payroll dates.  As a

23   regular employee of the company, you will be eligible to

24   participate in those company-sponsored benefits generally made

25   available to all employees."

1            MS. NICHOLS:  Okay.  We can take that down.

2            Can we please pull up Government Exhibit 611 for the

3     witness.

4     Q.  Do you recognize this, Ms. Gutierrez?

5     A.  Yes.

6     Q.  Just to be clear, was this mentioned in the stipulation

7     that we read at the beginning of your testimony?

8     A.  Yes.

9     Q.  And so where did this document come from?

10    A.  It is a page from a Cellebrite extraction report for an

11    iPhone.

12           MS. NICHOLS:  Can we just pull back up, then,

13    Government Exhibit 1002, please.

14    Q.  Can you please read, Ms. Gutierrez, just the beginning --

15    or just paragraph 2 again?

16    A.  All right.

17           "Government Exhibit 601 through 611 are true and

18    correct copies of conversations, documents, and/or data that

19    were recovered from the defendant's cell phone."

20           MS. NICHOLS:  So let's go back to 611, just for the

21    witness, Mr. Bianco.

22           THE COURT:  Can I interrupt?

23           Do you know what Cellebrite is?

24           THE WITNESS:  Yes.

25           THE COURT:  Can you explain briefly?

1          THE WITNESS:  It's a platform that we use to review

2   cell phones and other devices easily in the office.

3          THE COURT:  So it's a program or platform that enables

4   you to take data off of a cell phone and review it; is that

5   accurate?

6          THE WITNESS:  Yes.

7   BY MS. NICHOLS:

8   Q.  So, a particular iPhone here -- which iPhone is that?

9   A.  Sorry, that's a good question, incorrectly at first.  It is

10  Nate Chastain's cell phone.

11         MS. NICHOLS:  The government offers 611.

12         MR. FILOR:  No objection.

13         THE COURT:  Admitted.

14         (Government's Exhibit 611 received in evidence)

15         MS. NICHOLS:  May we publish, your Honor?

16         THE COURT:  You may.

17  BY MS. NICHOLS:

18  Q.  So, Ms. Gutierrez, now that everyone can see it, what is

19  the type of information or the category of information that's

20  depicted on this page of the extraction report?

21  A.  Searched items.

22  Q.  What does that indicate?

23  A.  Like a Google search.

24  Q.  From this phone?

25  A.  From this phone.

1    Q.  Can you please read what's in the value of the searched

2    items for each of these rows?

3    A.  It says, for all three, "Living on 160K in NYC."

4    Q.  What were the dates of those searches?

5    A.  September 8, 2021, and September 7, 2021.

6            MS. NICHOLS:  We can that down, Mr. Bianco.

7            Let's pull up, just for the witness, Government

8    Exhibit 610.

9    Q.  Do you recognize this, Ms. Gutierrez?

10   A.  Yes.

11   Q.  What is it?

12   A.  It's a document that came from Mr. Chastain's phone.  It

13   appears to be some sort of notes that he wrote.

14           MS. NICHOLS:  The government offers 610.

15           MR. FILOR:  No objection.

16           THE COURT:  Admitted.

17           (Government's Exhibit 610 received in evidence)

18           MS. NICHOLS:  May we publish, your Honor?

19           THE COURT:  You may.

20   BY MS. NICHOLS:

21   Q.  Ms. Gutierrez, now that everyone can see it, can you please

22   read the top of this document?

23   A.  Yes.

24           It says, "What do I want to do?

25           "1 million from NFTs, 10 million (minimum) from

1    OpenSea."

2              Do you want me to keep going?

3    Q.  No, that's fine.

4              MS. NICHOLS:  We can pull that down.

5              Can we please pull up what's already in evidence as

6    Government Exhibit 207.

7    Q.  Do you recognize this, Ms. Gutierrez?

8    A.  Yes.

9    Q.  What is it?

10   A.  It's a Slack channel.

11   Q.  What's the date of this Slack channel communication?

12   A.  May 22nd, 2021.

13   Q.  Who are the participants to the conversation?

14   A.  Nate Chastain and Pascal Marsolais.

15             MS. NICHOLS:  We don't need any highlighting,

16   Mr. Bianco.

17   Q.  Let's read this, Ms. Gutierrez.  You be Mr. Chastain, and I

18   will be Pascal Marsolais.

19   A.  Okay.

20             "I almost FOMO'd into Dario's collection (featured

21   home page artist) for $400 today."

22   Q.  "Oh!!"

23   A.  "It's so funny because I am directly responsible for

24   creating the FOMO-able situation."

25             I think --

1          THE WITNESS:  Can you just move your cursor?

2          "Yeah, LOL."

3          "I could have easily bought one yesterday before I

4     selected him for the home page feature."

5     Q.  "You need to buy before featuring."  Winky face.

6     A.  "I know, I failed."  Sad face.

7     Q.  "Hee hee."

8     A.  "I realize this is a strange way to operate as an employee

9     of OpenSea, but I still have such a hard time spending hundreds

10    of dollars on an NFT."

11         MS. NICHOLS:  Let's pull up Government Exhibit 208.

12    Q.  What is this, Ms. Gutierrez?

13    A.  It's another Slack channel.

14    Q.  And what's the date of it?

15    A.  May 23rd, 2021.

16    Q.  Who are the participants?

17    A.  It's Pascal Marsolais and Nate Chastain.

18    Q.  So let's do the same thing.  This is four pages.  I'll be

19    Pascal.

20         "When do we plan to replace the featured artist on

21    home page?  At this point I'm considering jumping on the hype

22    train."  Smiley face.

23    A.  "I switch them out every Monday and Thursday."

24    Q.  "Okay!"

25    A.  "I'm definitely open to considering any artists you have in

1    mind — I usually try to pick something outside of pixel art."

2    Q.   "Yup, okay."

3    A.   "Artists that are not super popular already.  My ideal

4    artist to feature is someone like Dario, who doesn't have a

5    mainstream fan base, but has a couple of thousand followers on

6    Twitter."

7    Q.   "Okay."

8    A.   "But open to any size following as long as it's not a major

9    project."

10   Q.   And then Pascal Marsolais puts a hyperlink to assets/Ugly

11   Kitties by Sabet.

12   A.   "I think I saw those and wondered if they were meant to be

13   too close an approximation of Uglydolls by David Horvath."

14   Q.   "Seems to be there to compete with them, yeah.  Mmm, I'll

15   try to find some suggestions tonight.  I'm taking the risk to

16   buy Dario at .44" --

17            MS. NICHOLS:  Can we go to the next page, please,

18   Mr. Bianco.  Thank you.

19   Q.   -- "and flip nervously."

20            Then there's another link, 19K on Instagram and

21   another link.

22   A.   "LOL.  Did you just buy this one?"

23   Q.   "Hell yeah."

24   A.   "Only because initially I thought you were proposing it for

25   a feature.  Ha-ha.  I think our community will take us to task

1    if we feature something we own."

2    Q.  "Oh, for sure.  I don't want to be in conflict of interest

3    (is it something we say in English?)"

4    A.  "Yeah, 'don't want it to be a conflict of interest.'"

5            MS. NICHOLS:  We can take that down.

6    Q.  Ms. Gutierrez, do you have an understanding of what the

7    expression F-O-M-O means, FOMO?

8    A.  Yes.

9    Q.  What is that?

10   A.  Fear of missing out.

11           MS. NICHOLS:  Can we please pull up Government

12   Exhibit 209.

13   Q.  What's the date of this conversation?

14   A.  May 25, 2021.

15   Q.  And who are the participants?

16   A.  Again, it's Nate Chastain and Pascal Marsolais.

17           MS. NICHOLS:  Okay.  We don't need to highlight,

18   Mr. Bianco.

19   Q.  I'm just going to read Marsolais, and you read Nate

20   Chastain.

21           "Nate, I will safelist Tank Art.  It wasn't."

22   A.  "Ooh, thank you!"

23   Q.  "I bought one and noticed."  Winky face.

24   A.  "Sorry, will add that to the launch checklist for featuring

25   new artists.  I reached out.  He better start listing these.

1   LOL." And then it appears a file is attached.

2   Q.  "I was also chatting with Dario, the artist that was

3   featured just before.  I asked him if he has some

4   recommendations/suggestions."

5   A.  "Oh, sweet.  Feel free to pass him my congrats and let him

6   know I selected him.  I wanted to give him congratulations, but

7   couldn't connect with him on Twitter."

8           MS. NICHOLS:  Go to the next page, please.

9           We're just looking for the hard copy, your Honor.

10  Just one moment, please.

11          May I hand this up to Ms. Gutierrez?

12          THE COURT:  You may.  There's also an ELMO in the

13  podium there, if you want to do that.

14          MS. NICHOLS:  It's really short.  We're almost done

15  with it.

16          THE COURT:  All right.  Even better.  You may

17  approach.

18  BY MS. NICHOLS:

19  Q.  Do you wanted to read the last one that you read?

20  A.  Sure.

21          "Oh, sweet.  Feel free to pass him my congrats and let

22  him know I selected him.  I wanted to give him congratulations,

23  but couldn't connect with him on Twitter."

24  Q.  Smiley face.  "Awesome.  Will do.  He recommended this

25  collection.  I agreed, it looks amazing," and then there's a

1    hyperlink to a collection for "Art by Gabe Weis."

2    A.   "I feel like I am destined to FOMO every one of these

3    promotional features, LOL.  If you are successful in flipping

4    this for one ETH," E-T-H, "I will feel like I am very bad with

5    money for not doing the same, LOL."

6    Q.   "Oh, yeah, for sure."  That's a life-changing opportunity

7    for those artists.  Yeah, I wasn't sure if it was ethical to do

8    so...but...I bought it after it was already featured...no

9    privilege."

10              MS. NICHOLS:  We can take that down, Mr. Bianco.

11              Can we please pull up, just for the witness and the

12   parties, Government Exhibit 604.

13   Q.   Do you recognize this, Ms. Gutierrez?

14   A.   Yes.

15   Q.   What is it?

16   A.   It's a Cellebrite extraction report.

17   Q.   From what?

18   A.   From Nate Chastain's cell phone.

19              MS. NICHOLS:  The government offers Exhibit 604.

20              THE COURT:  Any objection?

21              MR. FILOR:  No objection.

22              THE COURT:  Admitted.

23              (Government's Exhibit 604 received in evidence)

24              MS. NICHOLS:  May we publish, your Honor?

25              THE COURT:  You may.

1          MS. NICHOLS:  Mr. Bianco, can we just zoom in on the

2    top, the participants there.

3    BY MS. NICHOLS:

4    Q.  So, who are the participants to this conversation?

5    A.  Liz Sherman and Nate Chastain.

6          MS. NICHOLS:  Let's zoom out now, please.

7    Q.  So who is depicted using the blue bubbles?

8    A.  Liz Sherman.

9    Q.  And who is depicted in green?

10   A.  Nate Chastain.

11   Q.  And how do you know that?

12   A.  Because it says on the top Nate Chastain is the owner, and

13   the owner's messages go on the right, as if it was a text

14   message conversation.  It also says "from owner" in the green

15   text message and then "from Ms. Sherman" in the blue.

16         MS. NICHOLS:  Mr. Bianco, can we just make the two

17   bubbles, if we can, bigger, both of them?  Thank you.

18   Q.  So I'll be Liz Sherman, and can you please read for

19   Mr. Chastain?

20   A.  Yes.

21   Q.  "When did this start and then blow up?"

22   A.  "Monday night, I got a sense that something was wrong from

23   a strange message from a Twitter user, and then Tuesday night,

24   I was at a dinner with OpenSea, and Dan showed me a public

25   tweet with the accusation that was going viral."

1   Q.  Can you please read the date of these messages?

2   A.  Yes.  It's September 15, 2021.

3           MS. NICHOLS:  Okay.  We can take that down.

4           And then pull up, for just the witness and the

5   parties, Government Exhibit 603.

6   Q.  Do you recognize this?

7   A.  Yes.

8   Q.  What is it?

9   A.  It's another Cellebrite extraction report from

10  Nate Chastain's cell phone.

11          MS. NICHOLS:  The government offers 603.

12          MR. FILOR:  No objection.

13          THE COURT:  Admitted.

14          (Government's Exhibit 603 received in evidence)

15          MS. NICHOLS:  Can we please zoom in on the messages

16  just on the first page here.

17  BY MS. NICHOLS:

18  Q.  What is the date of the messages in this conversation?

19  A.  September 15, 2021.

20  Q.  Is that the same date that you just -- from the previous

21  messages?

22  A.  Yes.

23  Q.  So I'll read for Liz Sherman.

24          "One last question:  How much profit are we talking

25  about here?  I just want a full picture, and I will not judge

1  you on this, I hope you know."

2  A.  "19 ETH, which is about 65K."

3          MS. NICHOLS:  Can we go, please, Mr. Bianco, to the

4  second page of this exhibit?  Can we just make it a little

5  bigger so we can read it a little easier?

6  Q.  "On how many NFTs?"

7  A.  "I'm not sure.  Maybe 15 or so total."

8  Q.  "But all of them weren't as straightforward as you knowing

9  something would be featured/'go up' and then buying it, right?"

10         MS. NICHOLS:  Go to the next page, Mr. Bianco.

11         I think maybe we'll just transition to the ELMO, your

12  Honor.  I'm sorry for the difficulties.  It requires me to know

13  how to work the ELMO, which is questionable.

14         THE COURT:  It's true.  And Ms. Smallman stepped out,

15  but hang on.  Hopefully, I can figure it out as well.

16         MS. NICHOLS:  I think I have it on.

17         THE COURT:  We figured it out without you,

18  Ms. Smallman.

19         MS. NICHOLS:  The only problem is the glare is fierce

20  here.

21         Okay.

22  BY MS. NICHOLS:

23  Q.  I'm going to try to keep going, Ms. Gutierrez, but if you

24  can't read it, just tell me.

25         I'm just going to back up so that we remember where we

1    are.

2         Again, Ms. Sherman said:  "On how many NFTs?"

3    A.  "I'm not sure.  Maybe 15 or so total."

4    Q.  "But all of them weren't as straightforward as you knowing

5    that something would be featured/'go up' and then buying it,

6    right?"

7         "You liked artists.  Everyone wants things that they

8    like to be liked by others and to succeed."

9         "I saw how much you helped people and how much they

10   appreciated it."

11   A.  "I did buy NFTs ahead of them being featured on the home

12   page knowing full well that the increased exposure would

13   increase their price.  Somehow I deluded myself into thinking

14   that because I was introducing them to a larger audience, it

15   was okay that I was capturing some upside."

16        MS. NICHOLS:  I think we only have one more exhibit,

17   your Honor, which is Government Exhibit 601.

18        The government offers Exhibit 601.

19        MR. FILOR:  No objection.

20        THE COURT:  Admitted.

21        (Government's Exhibit 601 received in evidence)

22        MS. NICHOLS:  May we publish, your Honor?

23        THE COURT:  You may.

24        MS. NICHOLS:  I think this one, you maybe have.

25

1  BY MS. NICHOLS:

2  Q.  Is this from the same conversation -- is this a message

3  with the same participants as the other messages that we've

4  been looking at?

5  A.  Yes.

6  Q.  And what's the date of this message?

7  A.  Also September 15, 2021.

8  Q.  Who is the speaker in this message?

9  A.  Nate Chastain.

10 Q.  Can you please read the message?

11 A.  "If it's at .1, and you want to buy it, you can list it at

12 1 ETH.  The home page feature brings people out who want to

13 flip it from 1 ETH to 2 ETH, et cetera."

14          MS. NICHOLS:  No further questions, your Honor.

15          THE COURT:  Cross-examination?

16          MR. FILOR:  No cross, your Honor.

17          THE COURT:  All right.  Ms. Gutierrez, you may step

18 down.  Why don't you hand that document to counsel.

19          (Witness excused)

20          THE COURT:  Next witness for the government?

21          MS. NICHOLS:  Could we just have one moment, your

22 Honor?

23          THE COURT:  You may.

24          (Pause)

25          MS. NICHOLS:  The government rests.

1          THE COURT:  All right.

2          So, ladies and gentlemen, you just heard some magic

3   words, namely, that the government rests; that is to say that

4   its case in chief is over.

5          My understanding is that the defense does intend to

6   present a case, and we're going to proceed directly into that.

7   I do want to remind you, though, that as I've told you before,

8   and will tell you again, that the government bears the burden

9   of proof at all times in a criminal trial, which is to say that

10  the defense has no obligation to present any evidence, call any

11  witnesses, do anything because the government bears the burden

12  at all times.

13         That being said, as I told you at the outset of the

14  case, the defense may put on a case if it wishes to do so, and

15  my understanding is that the defendant does intend to do so.

16         So, with that, I'll ask the defense to call its first

17  witness.

18         MR. MILLER:  Thank you, your Honor.

19         The defense calls Dr. Matthew Edman to the stand.

20         (Witness sworn)

21         THE DEPUTY CLERK:  Can you please state and spell your

22  full name for the record.

23         THE WITNESS:  Sure.

24         My name is Matthew Edman, M-a-t-t-h-e-w E-d-m-a-n.

25         THE COURT:  You may proceed.

1          MR. MILLER:  Thank you, your Honor.

2    MATTHEW EDMAN,

3         called as a witness by the Defendant,

4         having been duly sworn, testified as follows:

5    DIRECT EXAMINATION

6    BY MR. MILLER:

7    Q.  Good afternoon, sir.

8    A.  Good afternoon.

9    Q.  How old are you?

10   A.  I'm 40 years old.

11   Q.  What do you do for a living?

12   A.  I'm a partner and cofounder of NAXO Labs.  We are a

13   cybersecurity investigations firm located in New York

14   specializing in cryptocurrency and digital forensic

15   investigations.

16   Q.  Let's unpack that a little bit.

17          When you say you're a partner and cofounder, what do

18   you mean by that?

19   A.  I mean I started the firm with colleagues of mine, most of

20   whom are former law enforcement.  My responsibilities, in

21   addition to managing the firm, include working with

22   individuals, companies, law firms, and law enforcement agencies

23   on matters related to hacking, theft, and illicit uses of

24   cryptocurrency.

25   Q.  How long have you been doing this?

1   A.  Our firm has been in existence for about a year now, but

2   I've been working in this field for over ten years at this

3   point.

4   Q.  Can you describe your education for the Court and jury?

5   A.  Sure.

6          So I have a Bachelor of Science in computer science

7   from Baylor University; I have a Master of Science, also in

8   computer science, from Rensselaer Polytechnic Institute; and I

9   have a Ph.D. in computer science, also from Rensselaer

10  Polytechnic Institute, where my graduate research focused on

11  security and applied cryptography, in particular, anonymous

12  communication systems on the internet.

13         THE COURT:  Doctor, I'm going to ask you to raise your

14  voice a little bit and try to articulate a little more clearly

15  and loudly.

16         Go ahead.

17         MR. MILLER:  Thank you, Judge.

18  BY MR. MILLER:

19  Q.  Doctor, have you done any relevant academic research?

20  A.  I have.

21  Q.  What have you done?

22  A.  I have published a number of papers in the field of

23  anonymous communication systems.

24  Q.  What does that mean, anonymous communication systems?

25  A.  That generally refers to tools and techniques that

individuals use to hide their identity on the internet.

Q.  Now, can you walk us through your relevant career

experience, please, sir?

A.  Sure.

          While I was still in grad school, and also after I

completed my graduate studies, I was a cybersecurity engineer

for a federally funded research and development center called

The MITRE Corporation.  MITRE supports a number of different

aspects of the federal government, but I, in particular,

supported the Federal Bureau of Investigation's Remote

Operations Unit.  I was based down in Quantico, Virginia.

Given my academic background, most of my work there focused on

supporting law enforcement in investigations involving

anonymous communication systems.  And this was in the 2009 to

2013 time range, where cryptocurrencies were becoming much more

prevalent in law enforcement investigations.  So a lot of my

work focused on that.

Q.  What did you do after that?

A.  After MITRE, I worked for a consulting firm called

FTI Consulting based here in New York.  I was a member of the

cybersecurity and investigations group, where I worked with,

you know, individuals, companies, law firms, and, again, with

law enforcement on matters related to cybersecurity,

cybersecurity assessments, investigations, and incident

response.

1    Q.   What did you do after FTI?

2    A.   After FTI, my team and I, we moved to another consulting

3    firm called Berkeley Research Group.  We started the cyber

4    operations and incident response practice there, continuing the

5    same sort of work in cybersecurity investigations.

6    Q.   How about after that?

7    A.   So we were there for about six and a half years, and then

8    my team and I, we left there to start NAXO in May of last year.

9    Q.   That's where you currently are, right?

10   A.   Correct.

11   Q.   Do you have any relevant certifications?

12   A.   I do.

13   Q.   What are those?

14   A.   So I hold a number of certifications related to

15   cryptocurrency investigations, including a Chainalysis Reactor

16   Certification, which is a tool often used in cryptocurrency

17   investigations.

18            I have a Chainalysis Ethereum Investigations

19   Certification, as well as a Chainalysis Investigative

20   Specialist Certification.

21   Q.   Do you have any relevant professional affiliations?

22   A.   I do.

23   Q.   What are those?

24   A.   I am a member of the Association for Computing Machinery,

25   which is a computer science organization.  I'm a member of the

1    Institute for Electronics and Electrical Engineers, which is an

2    academic organization.  And I'm also a member of the

3    institute -- of the International Association for Cryptologic

4    Research.

5    Q.  Have you ever testified as an expert witness, either in

6    court or depositions?

7    A.  I have.

8    Q.  How many times?

9    A.  Approximately ten to twelve.

10   Q.  Where?

11   A.  In numerous districts.  I've submitted written testimony in

12   the Southern District of New York, I've testified in court in

13   California, most recently in the Southern District of Florida.

14   Q.  Have you ever served as an expert in a case involving

15   cryptocurrency?

16   A.  I have.

17   Q.  Where?

18   A.  That was the case I mentioned in the Southern District of

19   Florida.

20   Q.  Have you ever assisted the United States Attorney's Office

21   for the Southern District of New York in their investigations?

22   A.  I have on several occasions.

23   Q.  Any particular examples?

24   A.  There are a few examples.  Probably the most well-known

25   example, when I was working for MITRE, I supported the FBI in

1    the Southern District of New York on an investigation into a

2    darknet drug marketplace called Silk Road, which is a

3    billion-dollar marketplace that people could go to, they could

4    buy drugs in exchange for cryptocurrency.

5         My work focused on identifying where this particular

6    website was hosted and developing tools and techniques for

7    seizing the website.

8         Later, while I was at FTI, I worked with S.D.N.Y.

9    again to analyze various cryptocurrency wallets that were

10   seized from the Silk Road website, as well as seized from the

11   defendant in that case, Ross Ulbricht, analyzed the wallets,

12   the wallet addresses contained therein, the transactions

13   between them, and established substantial links between the

14   defendant's personal wallets, as well as the cryptocurrency

15   wallets associated with the website.

16        And this analysis was later used in the defendant's

17   trial.

18   Q.  When you say "S.D.N.Y.," do you mean the U.S. Attorney's

19   Office for the Southern District of New York?

20   A.  Correct.

21        MR. MILLER:  Your Honor, the defense would like to

22   certify Dr. Edman as an expert in cryptocurrency blockchain

23   analysis and cybersecurity investigations.

24        THE COURT:  Any objection?

25        MS. NICHOLS:  No objection.

1          THE COURT:  All right.  He is so received.

2          One moment.  Sorry.

3          (Pause)

4          THE COURT:  Let me just briefly explain, ladies and

5     gentlemen, that an expert witness is someone who, by education

6     or experience, has acquired learning or experience in a

7     specialized area of knowledge.  Such a witness is permitted to

8     express his opinions on matters about which he has specialized

9     knowledge or training, and the parties are permitted to present

10    expert testimony to you on the theory that someone who is

11    experienced in a relevant field can assist you in understanding

12    the evidence or in reaching an independent decision on the

13    facts.

14          I will give you instructions at the close of the case

15    about how to assess the credibility of witnesses generally, and

16    those instructions apply to experts as well as other witnesses.

17    In weighing an expert's opinion, you may consider the expert's

18    qualifications, education, and reasons for testifying, as well

19    as all of the other considerations that ordinarily apply,

20    including all of the other evidence in this case.

21          If you find that the opinion of an expert is based on

22    sufficient data, education, and experience and the other

23    evidence does not give you reason to doubt his conclusions, you

24    would be justified in placing reliance upon his testimony.

25    However, you should not accept the witness' testimony simply

1    because the witness has been received as an expert.  The

2    determination of the facts, as you know, rests solely with you

3    in this case.

4              With that, you may proceed, Mr. Miller.

5              MR. MILLER:  Thank you, your Honor.

6    BY MR. MILLER:

7    Q.  In preparation for your testimony today, have you reviewed

8    any materials for this case?

9    A.  I have.

10   Q.  What have you reviewed?

11   A.  I reviewed documents produced by OpenSea regarding

12   Mr. Chastain's OpenSea activity identified by the government as

13   being at issue in this case.

14             I also reviewed documents produced by ConsenSys, who

15   is a company that develops cryptocurrency wallet software used

16   by Mr. Chastain and many others.

17             I've also reviewed records associated with

18   Mr. Chastain's home Verizon FiOS internet connection.

19   Q.  Have you relied on the materials you just discussed?

20   A.  I have.

21   Q.  What kind of methods have you used to form the opinions

22   that you will be testifying about today?

23   A.  So the methods that I used to form my opinions, generally,

24   I relied on tools commonly used by professionals in my field,

25   including Etherscan, which is a blockchain explorer website

1   commonly used in Ethereum-related investigations, as well as

2   Chainalysis Reactor, which is a blockchain forensics tool that

3   is often used by investigators, as well as law enforcement

4   agencies.

5   Q.  Are there --

6          THE COURT:  Try to articulate a little more clearly

7   and loudly.

8          Go ahead.

9          MR. MILLER:  Thank you, Judge.

10  BY MR. MILLER:

11  Q.  Are the methods that you just described widely used in your

12  industry?

13  A.  They are.

14  Q.  Did you prepare any disclosures that you provided to the

15  government in this case?

16  A.  I did.

17  Q.  Now, prior to your testimony today, have you ever spoken

18  with Mr. Chastain?

19  A.  No.  I saw him outside the courtroom, saw him at your

20  office yesterday, but I've never spoken to him.

21  Q.  And you hadn't spoken with him, he didn't speak with you,

22  correct?

23  A.  Correct.

24  Q.  Are you being paid for your work in this case?

25  A.  I am.

1    Q.  How are you being paid?

2    A.  My time is billed in this matter at 850 an hour.

3    Q.  Are your fees in this case contingent upon the outcome of

4    this case or any opinions that you're providing?

5    A.  No, they're not.

6    Q.  Based on your review of materials and the analyses that you

7    performed regarding this case, have you formed any opinions as

8    a result?

9    A.  I have.

10   Q.  What are your opinions?  If you can go a little bit slower,

11   please.  Thank you.

12   A.  Sure.

13        So at a high level, I formed three opinions after

14   reviewing the documents available to me.

15        The first is that the evidence that I reviewed does

16   not indicate that Mr. Chastain used a VPN or other anonymizing

17   technology to hide his identity conducting his OpenSea

18   activity.

19        MS. NICHOLS:  Objection to foundation.

20        THE COURT:  All right.  I trust, Mr. Miller, you're

21   going to develop a foundation.

22        MR. MILLER:  Absolutely, yes.

23        THE COURT:  I'll allow the witness to state his

24   opinions upfront, and then I'm sure we will go back and circle

25   around.

NARKCHA3                    Edman - Direct

 1              MR. MILLER:  Yes.

 2              THE COURT:  Go ahead.

 3              Second?

 4    A.   My second opinion was that after reviewing Mr. Chastain's

 5    cryptocurrency transactions, the evidence does not indicate

 6    that he used a mixer or tumbler or non-KYC exchange to

 7    obfuscate his cryptocurrency transactions.

 8    Q.   Was there a third opinion?

 9    A.   My third opinion is, again, after reviewing Mr. Chastain's

10    cryptocurrency transactions, his transactions appeared to me to

11    be consistent with the sophisticated cryptocurrency user who

12    keeps most of his crypto assets --

13              MS. NICHOLS:  Objection.

14              THE COURT:  Sustained.

15    Q.   So we'll get back to your opinions in a moment, but let's

16    walk through some examples of some of the items that you just

17    sort of referenced.  Okay?

18    A.   Okay.

19    Q.   So, first, what are some examples of cryptocurrency?

20    A.   So some of the most well-known examples of cryptocurrency

21    include Bitcoin and Ethereum.

22    Q.   Why are they called cryptocurrencies?

23    A.   They're called cryptocurrency because they rely on

24    cryptography to secure and facilitate the transfer of value

25    between users of cryptocurrency.

1   Q.   What is cryptography?

2   A.   Cryptography is high-level mathematical techniques for

3   encrypting, authenticating, and verifying information.

4   Q.   What's a blockchain?

5   A.   A blockchain is essentially how cryptocurrency transactions

6   are recorded and distributed to other users.  You can think of

7   it sort of as like a ledger in your checkbook, where each entry

8   records a transfer, a value, except everybody on the blockchain

9   network is sharing the same ledger.  So anyone can look at this

10  blockchain and see the balance of anyone else's account at any

11  point in time, for example, or see who they sent funds to or

12  received funds from.

13  Q.   Where is it located?

14  A.   So a blockchain is distributed, meaning that anyone can

15  access, download, view, a blockchain.

16  Q.   Does it live on people's computers?

17  A.   It certainly can, yes.

18  Q.   Can you describe how, if at all, cryptocurrency works on a

19  blockchain?

20  A.   So, again, cryptocurrency relies on a blockchain to record

21  transfers of value from one user to another.

22  Q.   Is there more than one blockchain?

23  A.   There are many.

24  Q.   Like what?

25  A.   So, generally, each cryptocurrency can have its own

1   blockchain; so, for example, Bitcoin has its own blockchain,

2   Ethereum has its own blockchain.  There are many other

3   examples.

4   Q.  What is Ether?

5   A.  So each blockchain cryptocurrency tends to have its own

6   sort of native form of currency.  So in Bitcoin, its native

7   currency is a Bitcoin; on Ethereum, the native currency is

8   called Ether.

9   Q.  How does one make a transfer on the blockchain?

10  A.  So there are a number of different ways of making a

11  transfer on a blockchain.  Typically, someone would use what's

12  called a wallet software, which is a tool for creating,

13  distributing cryptocurrency transactions to a blockchain.

14  Q.  Are blockchain transactions public or private?

15  A.  They are public.

16  Q.  And how would one look and see what's happening on a

17  blockchain?

18  A.  So there are several ways of viewing contents of a

19  blockchain.  Perhaps the most complex is to run the blockchain

20  software yourself.  You download the blockchain to your

21  computer, and you can inspect it on your computer.

22      More commonly, someone would use what's called a

23  blockchain explorer website, which is a website that lets you

24  view a blockchain just like you're looking at any other

25  website.  You can view addresses on the blockchain,

1    transactions that have occurred, transactions associated with

2    particular addresses on a blockchain and their balance or

3    whatever you want.

4    Q.  Can anyone look at a blockchain?

5    A.  Yes.

6    Q.  You referenced this a little earlier.  What is a wallet?

7    A.  So a wallet, generally, refers to software used to manage

8    your cryptocurrency addresses.  There are examples of wallets,

9    including MetaMask for one.  Another common wallet is called a

10   ledger, but, in general, the wallet is responsible for managing

11   the cryptocurrency assets associated with whatever addresses

12   are within your wallet.

13   Q.  So can you describe a little more what MetaMask is, that

14   you referenced?

15   A.  So MetaMask is a software cryptocurrency wallet that you

16   run on your computer, and it basically runs in your web

17   browser, and it handles the complexity of creating wallet

18   addresses and sending funds either to other addresses within

19   your own wallet or to other people who have their own

20   cryptocurrency wallets.

21   Q.  You referenced a ledger.

22            What is that?

23   A.  So a ledger is what's called a cold storage wallet.  A cold

24   storage wallet is a cryptocurrency wallet that's not connected

25   to internet.  Since it's not connected to the internet, you

1    can't create a cryptocurrency transaction and send it to a

2    blockchain directly from a cold storage wallet, but since it's

3    not connected to the internet, it reduces the risk of hacking

4    and theft, like you might have with a wallet that's running on

5    your computer.

6    Q.  Does each wallet have its own address?

7    A.  Each wallet can have many addresses with it.

8    Q.  What are some of the reasons why a wallet might have more

9    than one address?

10   A.  There can be any number of reasons why you would have

11   multiple addresses within your wallets.  For example, we have

12   clients who have a business wallet address within their

13   cryptocurrency wallet and then they have another --

14           MS. NICHOLS:  Objection.

15           THE COURT:  Overruled.

16   A.  So we have clients who have a business wallet address

17   within their cryptocurrency wallet and then have a personal

18   wallet address for personal cryptocurrency transactions.

19           You may have one wallet address for each service that

20   you interact with.  So, for example, if you have accounts of

21   multiple cryptocurrency exchanges — like Gemini or Coinbase

22   might be names you've heard of — you may have one wallet

23   address for interacting with each of those exchanges or with

24   websites like OpenSea, for example.

25           You may also create a new wallet address for each

1   purchase of cryptocurrency.

2   Q.  And you can have multiple cryptocurrencies in one wallet

3   address, right?

4   A.  You can, yes.

5   Q.  In your experience and the investigations you've conducted,

6   have you ever seen users create multiple wallet addresses to

7   organize their cryptocurrency?

8   A.  Yes.

9   Q.  Have you seen, in the context of your investigations, users

10  do so for even tax purposes?

11  A.  I would say it's less frequent, but, yes, I believe I have

12  seen that.

13  Q.  What is a private key?

14  A.  So a private key is a cryptographic secret key that

15  controls your cryptocurrency.  You use this key to create and

16  cryptographically sign transactions, for example, to send

17  cryptocurrency from your wallet to another user.  However, if

18  somebody gains access to your private key or steals your

19  private key, then they can steal all of your cryptocurrency.

20  Q.  So if someone has multiple wallet addresses, is that the

21  same thing as having multiple wallets?

22  A.  No.

23  Q.  What's the difference?

24  A.  So, again, a wallet can have multiple addresses within it,

25  each one of them called a wallet address.

1   Q.  Have you created some demonstratives to help explain your

2   testimony today?

3   A.  I have.

4           MR. MILLER:  At this time, your Honor, we'd like to

5   put up one of those demonstratives.

6           THE COURT:  All right.

7           Any objection?

8           MS. NICHOLS:  I don't know which one they want to put

9   up, your Honor.

10          MR. MILLER:  Number 1, the file.

11          MS. NICHOLS:  No objection.

12          THE COURT:  All right.  You may.

13          And, ladies and gentlemen, let me explain what that

14  means.

15          A demonstrative is something that is used to

16  demonstrate.  The parties are permitted to show a demonstrative

17  to you to assist you in understanding the testimony of a

18  witness, where appropriate, and it's not uncommon with respect

19  to expert witnesses.  The bottom line is, because it may help

20  you in evaluating and understanding the opinions that Dr. Edman

21  is offering you, I'm going to allow Mr. Miller to show this to

22  you and Dr. Edman to explain it to you.

23          But let me stress one thing:  A demonstrative is not

24  evidence, it's not coming into evidence, it's not going to be

25  with you in the jury room; this is merely to help you

1    understand the testimony that Dr. Edman is giving, which is

2    what the evidence is.

3              So, with that understanding, Mr. Miller, you may

4    proceed.

5              MR. MILLER:  Thank you.

6    BY MR. MILLER:

7    Q.  Dr. Edman, can you explain this demonstrative that you

8    created and why it's helpful in your testimony?

9    A.  I don't have it in front of me.

10   Q.  Oh.  It's not published?

11             THE COURT:  You may.

12             MR. MILLER:  Thank you, Judge.

13   A.  So this demonstrative sort of provides an analogy between a

14   cryptocurrency wallet on the left — in particular, that's a

15   screenshot of a MetaMask cryptocurrency wallet — and a

16   traditional wallet on the right.

17             Each account within a MetaMask wallet corresponds to a

18   wallet address, sort of like in a traditional wallet how you

19   might have multiple slots, and then a card in each slot

20   corresponds to an account like a credit card.

21   Q.  What is on the left-hand side of the screen here?

22   A.  So the left-hand side of the screen is a screenshot of a

23   MetaMask showing multiple cryptocurrency accounts within that

24   MetaMask wallet, where each account is identified by a wallet

25   address.

Q.  And what does that mean, account 1, account 2, account 3,

that you have there on your screen?

A.  So, those are just friendly names that MetaMask shows you.

The wallet addresses — I put some examples on the cards on the

right — as you can see, they're not easy to read out verbally,

they look kind of like a long string of random letters and

numbers.  So you can give them names like account 1, account 2,

or whatever you want to name them within MetaMask.

Q.  That's within the MetaMask software, right?

A.  Correct.

Q.  Now, MetaMask accounts are identified by these account

numbers like for traditional account numbers, right?

A.  Correct.

Q.  What is a hot wallet?

A.  So a hot wallet generally refers to a wallet — typically, a

software wallet like MetaMask — that is connected to the

internet, usually runs on your computer, and lets you conduct

transactions easily and quickly from your computer.  Since it's

connected to the internet, you can connect to a block chain and

send transactions to the blockchain.

        However, since it's on your computer and connected to

the internet, your wallet, your hot wallet, can be vulnerable

to hacking, theft, if somebody gains access to your computer.

Q.  What's a cold wallet?

A.  So a cold wallet, or a cold storage wallet, again, is a

1   wallet that is not connected to the internet, it's generally

2   considered more secure than a hot wallet.  You can think of it

3   kind of like a safety deposit box for your cryptocurrency.

4   Q.  Does a cold wallet have an account address that's assigned?

5   A.  A cold storage wallet can have multiple wallet addresses

6   just like a software wallet can.

7   Q.  Is having a hot wallet better than a cold wallet or

8   vice versa?

9   A.  There are tradeoffs between the two.  Like I mentioned, a

10  cold storage wallet is generally considered more secure, but

11  they can be kind of cumbersome to use if you're going to create

12  several transactions.  A software hot wallet connected to the

13  internet is easy and user-friendly, but it carries with it

14  security risks of running on your computer.

15  Q.  And a software hot wallet is like MetaMask?

16  A.  Correct.

17  Q.  In your experience and in your investigations, do people

18  commonly have both hot and cold wallets?

19  A.  Yes.  It's generally considered a best practice to keep at

20  least most of your crypto assets in a cold storage wallet.  If

21  you prefer to use a hot wallet, then you can transfer some

22  assets to your hot wallet, and not put every transaction if you

23  want to, and then move funds back into your cold storage

24  wallet.

25  Q.  And we're talking about individuals.  What about entities

1   like cryptocurrency exchanges, do they use similar hot wallets

2   and cold wallets?

3   A.  Yes, absolutely.  For sophisticated cryptocurrency

4   companies — like exchanges, like Gemini or Coinbase — it's

5   industry standard to basically not lump all of the customers'

6   cryptocurrency into one hot wallet.  They typically have a

7   number of addresses associated with customers and customer

8   deposits in a hot wallet, where they will periodically move

9   funds into a cold storage wallet for safekeeping.  And if they

10  at a later time need to move funds from a cold storage wallet

11  back into a hot wallet to facilitate customer withdrawals or

12  transactions or something like that, then they can.  But,

13  generally, the principle of not keeping all of your eggs in one

14  basket certainly applies to cryptocurrency.

15  Q.  I think you testified about this already, but having a cold

16  wallet is almost like having a safety deposit box at a bank?

17  A.  Correct.

18  Q.  Now let's discuss how a user creates an address on

19  MetaMask.

20          And I think you created some demonstratives to help

21  explain this for the jury as well, right?

22  A.  Yes, I did.

23  Q.  So I'd like to show -- the file numbers are 2 and 3 of the

24  demonstratives.

25          THE COURT:  All right.  Any objection?

1              MS. NICHOLS:  No objection.

2              THE COURT:  All right.  That's subject to the same

3    instructions that apply to all the demonstratives you'll see

4    during Dr. Edman's testimony.

5              You may proceed and you may publish.

6              MR. MILLER:  Thank you, your Honor.  Let's put up

7    number 2 first.

8    Q.   Can you explain this demonstrative?

9    A.   So this demonstrative is just a series of screenshots

10   showing how easy it is to create a new account or new wallet

11   address within MetaMask.  So you can see all of your accounts,

12   there's a button for creating an account, you can optionally

13   give it a friendly name; by default, it will just cycle through

14   account 1, 2, 3, 4, and so on.  You can click Create, and once

15   that's done, you have a new wallet, identified by whatever name

16   you gave it, and a wallet address, a portion of which is shown

17   to you in the MetaMask software at the top, the wallet address

18   highlighted in the third picture at the top.

19             MR. MILLER:  Now if we could go to the third

20   demonstrative.

21   Q.   Can you explain this one to the jury?

22   A.   Yes.  So MetaMask includes functionality to transfer funds,

23   basically, within addresses within your own wallet.  For

24   example, say you're going to make a purchase and you don't have

25   enough cryptocurrency in one of your accounts within your

1    MetaMask wallet to make that purchase; you can combine funds

2    from other accounts into one and then use that account to make

3    your purchase.

4    Q.   How much of a process is it to move any kind of

5    cryptocurrency from one of the accounts on your MetaMask wallet

6    to the other?

7    A.   It's very simple.  It's just a couple of buttons.

8    Q.   How long does it take?

9    A.   Creating the transaction within MetaMask certainly takes

10   less time than it takes a blockchain to receive it, process it,

11   and distribute it, but on the order of maybe minutes, maximum.

12   Q.   What about transferring between wallet addresses for a

13   MetaMask wallet?

14   A.   My apologies.  So it takes only seconds to create a wallet

15   address, but transferring between MetaMask wallet addresses

16   could take maybe a couple of minutes, total.

17   Q.   Now, are wallet addresses on the blockchain anonymous?

18   A.   It's a common misconception, but wallet addresses on a

19   blockchain are not anonymous.  They're actually what's called

20   pseudonymous.

21   Q.   What is that?

22   A.   So anonymous formally means not being identifiable within a

23   set of subjects, called anonymity in a sense.  What that means

24   for cryptocurrency, what that would mean, if it were true, is

25   that for a given transaction you couldn't identify or

1    distinguish between wallet addresses, you couldn't identify

2    which wallet address created a particular transaction or maybe

3    to whom that transaction was sent.

4            What's actually true, though, is that on Ethereum, for

5    example, a wallet address sort of acts as like a pseudonym,

6    kind of like how you might have a pseudonym on Twitter or, you

7    know, an email account connect as a pseudonym of which you

8    might have many.  On a blockchain, your wallet address is a

9    pseudonym.  So you can look at any transaction on a blockchain,

10   see the address of the sender of that transaction, and you can

11   see the address of the recipient of that transaction.  Each

12   wallet address is distinct and identifiable from one another.

13           MR. MILLER:  So, sorry, maybe we could look at

14   demonstratives number 4 and 5.  Show that to the Court and the

15   government.

16           THE COURT:  Any objection?

17           MS. NICHOLS:  No, your Honor.

18           THE COURT:  All right.  You may proceed.  Subject to

19   the same instructions, you may publish.

20           MR. MILLER:  Thank you, your Honor.

21           So let's look at slide 4, if we can publish that up.

22   Q.  You just described sort of the difference between something

23   being anonymous or pseudonymous on the blockchain.

24           How does demonstrative number 4 help explain that?

25   A.  So anonymity means that users are indistinguishable from

1    one another.  So in this demonstrative, on the left you have a

2    set of senders, indistinguishable from one another, and on the

3    right you have a set of recipients, again, indistinguishable

4    from another.  Anonymity would mean that you can identify which

5    of the senders sent which transaction to which recipient.

6             (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N4R3CHA4                    Edman - Direct

1    Q.   Okay.  So let's look at number five then.

2    A.   So on Ethereum, the wallet addresses are pseudonyms, so

3    pseudonymity means that each of the actors is uniquely

4    identified by an address.  You can look at the transaction on

5    the blockchain, you can see the address of the sender, and you

6    can see the address of the recipient.  Using a blockchain

7    explorer website, you can see details of the transactions such

8    as whether they sent cryptocurrency or transferred an NFT for

9    example.

10   Q.   So, what other things on the internet are pseudonymous?

11   A.   I think I gave a few examples earlier.  But you can think

12   of an e-mail address sort of as a pseudonym.  If some people

13   create an e-mail account with their real name, not everybody

14   does.  Twitter would be another example, Instagram.  People

15   often use pseudonyms or funding names for something for their

16   accounts, rather than necessarily their own name.

17   Q.   Is there any importance in sort of making this distinction

18   between pseudonymous and anonymous as it refers to blockchain

19   transactions?

20   A.   Yes.  Since the transactions are pseudonymous, it means you

21   can look at the transactions, look at a wallet address, and the

22   pseudonym, and see all of the activity reflected with that

23   pseudonym or that wallet address.

24   Q.   We've heard testimony at this trial about NFTs or

25   non-fungible tokens.  Are NFTs uniquely identified?

1  A.  They are.

2  Q.  How?

3  A.  So each NFT has its own unique identifier that

4  distinguishes one NFT from another.  This differs from

5  cryptocurrency, where if I have one Ether and you have one

6  Ether, our Ether are indistinguishable.  They are the same as

7  one another.

8          Whereas if I have one NFT and you have one NFT, those

9  NFTs are by definition distinct and distinguishable.

10  Q.  How does it compare -- well, withdrawn.

11          When you said earlier about cryptocurrency not being

12  distinguishable.  Is that the same as being fungible?

13  A.  Yes.

14  Q.  How do NFTs relate to cryptocurrency?

15  A.  So similar to cryptocurrency, NFTs rely on blockchain to

16  facilitate the transfer of an NFT from one user to another.

17  Q.  So are you familiar, sir, with the OpenSea platform?

18  A.  I am.

19  Q.  How, if at all, does the OpenSea platform interact with the

20  blockchain?

21  A.  So OpenSea relies on a blockchain to facilitate the

22  transfer of cryptocurrency from, say, the buyer of an NFT to

23  the seller, as well as transferring the NFT from the seller to

24  the buyer.

25  Q.  Does a person need an OpenSea account to use OpenSea?

1  A.  Not in the traditional sense.  So, on many websites, if you

2  go to sign up, you need to give your e-mail address, put in a

3  password, maybe a user name to create an account before you can

4  use the website.  Think of eBay, for example.

5          On OpenSea, your wallet address basically acts as your

6  account.  You connect your cryptocurrency wallet, like Meta

7  Mask, to the OpenSea website, and then you can choose which of

8  the accounts within your Meta Mask wallet you want to use in

9  connection with your OpenSea activity.

10  Q.  So, when a person makes an OpenSea account, does OpenSea

11  give them their own OpenSea wallet?

12  A.  No.

13  Q.  How does one buy NFTs on OpenSea?

14  A.  So, buying an NFT on OpenSea is not all that different than

15  buying an item on eBay, for example.  You can browse the

16  website, look at different NFTs for sale, and how much they

17  cost.  You can search for NFTs that have certain properties

18  that you are interested in.  You can add them to a shopping

19  cart, like on any other website, and then complete the checkout

20  process where you connect your wallets to OpenSea, pay for the

21  items that you put into your cart as cryptocurrency, complete

22  the checkout, and you receive your NFT.

23          There is also an option to have the NFTs that you

24  purchased sent to a different wallet address.  Sort of like on

25  eBay maybe you put in one address for payment and another

1    address for shipping.  Similarly, on OpenSea, you can pay with

2    one address and have your NFT delivered to a different address.

3    Q.  What are some common types of NFTs?

4    A.  So NFTs are -- they can really be anything.  But they are

5    most commonly used to represent digital artwork.  Often,

6    cartoon characters where the cartoon figures have different

7    properties like additional facial features, different clothing,

8    facial expressions, and so on.

9    Q.  So I'd like to walk through, sir, the process of buying an

10   NFT on the OpenSea website.  And did you create some

11   demonstratives for the Court and the jury to explain that

12   process?

13   A.  I did.

14          MR. MILLER:  So at this time we'd like to show file

15   number 7, actually instead of 6.  Can you bring it up for the

16   Court and the government.  There is two pages to it.

17          THE COURT:  Any objection?

18          MS. NICHOLS:  No objection.

19          THE COURT:  You may proceed.

20   Q.  If we can publish that for the jury, please.

21          Dr. Edman, can you walk the jury through this

22   demonstrative which has two pages.

23   A.  Sure.  So this first page is just sort of a screenshot of

24   OpenSea showing a set of NFTs that are listed for sale.  You

25   can see the ID number of the NFT, the collection, certain

1    properties about, it how much the NFT costs, you can filter

2    based on show me all the cats wearing a top hat, for example.

3    If you identify an NFT you like, there is a button there that

4    you can add it to your cart.

5    Q.  So let's go to page two, assuming we've now added it to our

6    cart.

7    A.  So in order to complete the purchase, you need to connect

8    your wallet, in this case we're using Meta Mask, you need to

9    connect your wallet to the OpenSea platform.  When you do so,

10   you can select which accounts within your Meta Mask wallet that

11   you want to use in connection with OpenSea.  You don't have to

12   select them all.  You can choose one, and you can also change

13   it later.

14        You add the NFT to your cart, and then you can

15   complete checkout when you've identified the NFTs that you want

16   to purchase, and then you complete purchase.

17        Like I mentioned earlier, as part of that, you can

18   have the NFT sent to a different wallet address than the one

19   that you are using for payments.

20   Q.  So, whichever wallet address you send to, that's where the

21   NFT is going to be stored?

22   A.  Correct.

23   Q.  That's on the blockchain?

24   A.  Correct.

25   Q.  Can OpenSea users see other people's activity on OpenSea?

1   A.  Yes, you can look at the blockchain and see previous

2   transactions that have occurred.

3   Q.  Can anyone from the public see trades on OpenSea?

4   A.  Yes, anyone from the public can go look at a blockchain

5   explorer and view trades that have occurred on OpenSea.

6   Q.  Dr. Edman, I want to go back to your opinions in this case

7   that you sort of outlined earlier on.  Let's start with the

8   first opinion.

9            What was that again?

10  A.  So my first opinion was that, after viewing the evidence

11  available to me, there was no indication that Mr. Chastain used

12  a VPN or another anonymizer in connection with the OpenSea

13  activity identified by the government in this case.

14  Q.  What's the basis for that opinion?

15  A.  The basis for that opinion is I reviewed records produced

16  by OpenSea, I reviewed records produced by ConsenSys, the

17  developer of Meta Mask, as well as records produced by

18  Mr. Chastain's home internet service provider, Verizon Fios.

19  And in almost every single case, the transactions were

20  conducted from an IP address associated with Mr. Chastain's

21  home internet connection.

22  Q.  All those records were produced by the government, right?

23  A.  I'm sorry?

24  Q.  All those records were produced by the government in this

25  case?

1          MS. NICHOLS:  Objection.

2          THE COURT:  Sustained.

3    Q.  You mentioned VPN.  What's a VPN?

4    A.  So a VPN is a tool that can be used to hide your IP address

5    on the internet.  When you connect to a website directly, you

6    are on your home internet connection, you open a web browser,

7    you connect to a website.  That website can see your IP

8    address, and based on that IP address, they can infer some

9    things about you, like maybe the region or the town that you

10   live in, whether it's a home or a business.  If it is a

11   business, sometimes what business.  Maybe what other websites

12   you visited.

13          When you use a VPN instead of connecting directly to a

14   website, you connect to a VPN server operated by a VPN

15   provider.  And then from there, your web traffic goes to the

16   website.  From the perspective of the website, they see the IP

17   address of the VPN address as opposed to your home IP address.

18   Similarly your ISP sees you are connected to a VPN service, but

19   since the traffic is encrypted, they don't know what type.

20   Q.  What does VPN stand for?

21   A.  Virtual private network.

22   Q.  What's IP address?

23   A.  An IP address is sort of like a phone number for a computer

24   or a network of computers on the internet.

25   Q.  Are all IP addresses unique?

1    A.  So on the internet, IP addresses are unique, but multiple

2    computers or multiple networks can share an IP address.

3    Q.  If you could explain for the Court and the jury how that

4    would work in your home, for example?

5    A.  So, on your home internet connection, whether you have

6    Spectrum or Fios or whatever, your ISP assigns you an IP

7    address.  But, there may be multiple devices at your home.

8    Like your cell phone, laptop computers, whatever devices you

9    have.  They're all sharing that same IP address.

10   Q.  So can anybody use a VPN?

11   A.  Yes.

12   Q.  How?

13   A.  There are free and paid VPN service providers.  You can

14   basically Google VPN provider, and find any number to choose

15   from.

16   Q.  Does using a VPN require any kind of specialized knowledge?

17          MS. NICHOLS:  Objection.

18          THE COURT:  Overruled.

19   A.  Not particularly, no.

20   Q.  How can you tell if somebody tried to use a VPN?

21   A.  So there are a number of well-known VPN providers as well

22   as databases that categorize IP addresses and associate them

23   with a VPN service provider.

24   Q.  In this case, with the records that you reviewed, did you

25   see any evidence of VPN usage here?

1    A.  No.

2    Q.  How do you know?

3    A.  Because again, I reviewed OpenSea records, ConsenSys

4    records, as well as records produced by Verizon Fios which

5    identified Mr. Chastain's home IP address as being associated

6    with his OpenSea activity.

7    Q.  That was with respect to the computers that were in his

8    home?

9    A.  Correct.

10   Q.  Let's now move on to your second opinion.  What was it?

11   A.  My second opinion was that, based on my review of

12   Mr. Chastain's cryptocurrency transactions, there is no

13   indication that he used a mixer, tumbler, or a non-KYC exchange

14   to obfuscate his cryptocurrency transactions.

15   Q.  There was a lot of terminology in there.  What's a mixer?

16   A.  A mixer is a way of obfuscating a cryptocurrency

17   transaction.  Think of sort of a box that a number of different

18   users throw their cryptocurrency into it.  It mixes the

19   cryptocurrency up and sends it to recipients on the other side.

20   The idea is that somebody watching this box sees some funds

21   going into it, see some cryptocurrency going out.  They can't

22   link a sender to a particular recipient.

23   Q.  That's a kind of technology or software?

24   A.  It is.

25   Q.  What is a tumbler?  You referenced that.

N4R3CHA4                    Edman - Direct

1    A.  Tumbler is essentially the same thing.  Two different terms

2    for the same concept.

3    Q.  Finally you referred to a non-KYC exchange.  What is that?

4    A.  So exchange refers to cryptocurrency exchange that lets you

5    swap U.S. dollars for cryptocurrency or one type of

6    cryptocurrency for another.

7             KYC stands for know your customer.  Particularly in

8    the U.S., if you sign up for a cryptocurrency exchange,

9    typically you are expected to provide some identifying

10   information about yourself.  You may have to provide a Social

11   Security number, a driver's license, some sort of information

12   proving your identity to the exchange.

13            A non-KYC exchange, typically located overseas, they

14   do not require any sort of identifying information.

15   Cryptocurrency swaps to another cryptocurrency, and lets users

16   withdraw it or transfer it automatically, and don't require any

17   sort of identifying information from users.

18            So from an investigative perspective, non-KYC

19   exchanges can be somewhat of a challenge.

20   Q.  So, I believe you prepared another demonstrative to aid the

21   Court and the jury in your testimony today regarding the

22   subjects.  This is file number 6, if we can show it to the

23   Court and the government, please.

24            THE COURT:  Any objection?

25            MS. NICHOLS:  No, your Honor.

N4R3CHA4                    Edman – Direct

1            THE COURT:  All right.  You may proceed.

2            MR. MILLER:  Thank you, Judge.  If we can please

3    publish this demonstrative.

4    A.  So this demonstrative gives an example of a mixer.  You can

5    see on the left there are three different users, each

6    identified by a wallet address.  They send the transaction to

7    the mixer.  And then at some points, following the

8    transactions, you see three transactions going out.  You can

9    see the wallet addresses of the recipients, but you don't know

10   which input transaction corresponds to which output

11   transaction.  So it makes it more difficult to follow the flow

12   of funds from one user to the next through a mixer.

13   Q.  Can anybody use a mixer?

14   A.  Anybody can use a mixer.  There are a number of options

15   available, and instruction for using them.

16   Q.  Did you see any evidence of use of a mixer in this case?

17   A.  I did not.

18   Q.  What makes you say that?

19   A.  I reviewed the cryptocurrency transactions identified by

20   the government associated with Mr. Chastain's OpenSea activity,

21   both in Etherscan as well as in chainalysis reactor, which is a

22   chain forensics tool.  And I did not see any of the

23   transactions involving a mixer.

24   Q.  Dr. Edman, if you can try to keep your voice up a little

25   bit, please.

N4R3CHA4                    Edman - Direct

1          Now, can people on the blockchain see if a person is

2     using a mixer or a tumbler?

3     A.   So there are a number of well-known mixers and tumblers.

4     Sites like Etherscan and tools like chainalysis reactor

5     identify mixers and tumblers, mainly for compliance purposes,

6     so that exchanges can detect high-risk transactions.  But you

7     can also, as you are looking at these transactions, see if any

8     of them involved a mixer or tumbler or non-KYC exchange.

9     Q.   You referenced the non-KYC exchange and you testified about

10    that.  Why might somebody use a KYC exchange versus a non-KYC

11    exchange?

12         MS. NICHOLS:  Objection.

13         THE COURT:  Overruled.

14    A.   So, a non-KYC exchange can be useful if you are trying to

15    obfuscate the flow of funds.  The KYC exchange is what most

16    people think of when they think of a cryptocurrency exchange,

17    at least here in the U.S.

18    Q.   In this case, did you see any evidence or usage from your

19    analysis of a non-KYC exchange?

20    A.   I did not.

21    Q.   Now, turning to the transactions in this case.  Did you

22    analyze them?

23    A.   I did.

24    Q.   How did you go about doing that?

25    A.   I used Etherscan, which again is a blockchain explorer

1  website.  Chainalysis reactor to review the transactions and

2  associated wallet addresses.

3  Q.  Let's start with the Etherscan.  Can you explain a little

4  bit more about how somebody can use Etherscan to look at the

5  blockchain?  Kind of break it down for us.

6  A.  So, Etherscan, you can use it like you use any other

7  website.  You can search for particular wallet addresses or

8  particular entities, you can search for certain transactions.

9  You can view all transactions associated with a wallet address,

10  or for a given transaction, you can view the wallet addresses

11  associated with that transaction.

12  Q.  In this case, you used Etherscan?

13  A.  I did.

14  Q.  Now, turning your attention to your third opinion.  Please

15  provide that for the Court and jury, but please don't discuss

16  anything about sophisticated users.

17        MS. NICHOLS:  Objection.

18        THE COURT:  Well, why don't you try to articulate your

19  third opinion again, since Mr. Miller has given you some

20  guidance on how to do it.  And I'll rule on any objection, if

21  there is one.

22  A.  My third opinion is, after reviewing Mr. Chastain's

23  cryptocurrency transactions, his transactions in my opinion

24  were consistent with a user who keeps most of his

25  cryptocurrency funds in a cold storage wallet, moves them to a

1    hot wallet to conduct various transactions, and then moves

2    funds back into a cold storage wallet for safekeeping.

3    Q.  Is that common?

4    A.  That is common.

5    Q.  Why?

6    A.  Again, it goes back to the principle of don't keep all of

7    your eggs in one basket.  A cold storage wallet is generally

8    considered more secure than a hot wallet, so it makes sense you

9    would keep funds in a cold storage wallet when possible.

10   Q.  Can you explain again, obviously we've gone through a lot

11   of terminology here today.  Can you please explain for the

12   Court and jury how you used Etherscan to review the NFT

13   transactions at issue in this case?

14   A.  So, I reviewed each of the transactions identified by the

15   government, I entered them into Etherscan, which lets me view

16   details about the transaction, like when it occurred, who the

17   sender was, who the recipient was, how the NFT was transferred.

18   And then I reviewed each of those within Etherscan.

19   Q.  What specifically did you do with this application called

20   chainalysis?

21   A.  So chainalysis lets you sort of visualize wallet addresses

22   and links between them as a graph.  Where a wallet address or a

23   group of wallet addresses, like a node or a dot on that graph.

24   And transfers of crypto assets between them are arrows between

25   nodes on that graph.

1   Q.  Did you review any government exhibits in conducting that

2   analysis?

3   A.  I did.

4   Q.  What kind of exhibits?

5   A.  They were exhibits produced by the government which were

6   also from Etherscan.

7   Q.  From Etherscan you said?

8   A.  Correct.

9   Q.  Did you also review the defendant's wallet activity in this

10  case?

11          MS. NICHOLS:  Objection.

12          THE COURT:  You may answer yes or no.

13  A.  Yes.

14  Q.  How did you do so?

15  A.  I used again Etherscan as well as chainalysis reactor to

16  view and visualize Mr. Chastain's cryptocurrency wallet

17  activity.

18  Q.  Did there come a time where you actually looked on

19  Mr. Chastain's computer?

20  A.  Yes.

21  Q.  How did that happen?

22  A.  This was in the presence of counsel.  I reviewed

23  Mr. Chastain's Meta Mask hot wallet.  I reviewed each of the

24  accounts within that hot wallet and the addresses associated

25  with them, and verified that those addresses were associated

1    with transactions identified by the government.

2              MS. NICHOLS:  Objection.  Move to strike.

3              THE COURT:  Let me ask you to clarify.  You reviewed a

4    laptop in the presence of counsel.  But how did you know or

5    were you able to, by analyzing content on the laptop, match

6    that with transactions that you said had been identified by the

7    government?

8              In other words, independent of anyone telling you this

9    is Mr. Chastain's laptop, you would be able to connect that to

10   evidence related to this case?

11             THE WITNESS:  So, from the OpenSea records, and also

12   from the government's, I could identify the wallet addresses

13   and transactions attributed to Mr. Chastain.  And then on the

14   Meta Mask wallet, I viewed the addresses contained within that

15   wallet and verified that those addresses matched the activity

16   attributed to Mr. Chastain.

17             MS. NICHOLS:  Objection to time frame.

18             THE COURT:  Overruled.

19   Q.  Did you happen to also review any cold wallets?

20   A.  I did.

21   Q.  How did you do that?

22   A.  I viewed Mr. Chastain's ledger, cold storage wallet.

23             MS. NICHOLS:  Objection.

24             THE COURT:  Can you explain, when you say it was his,

25   how do you know that?

1        THE WITNESS:  It was represented to me by counsel that

2   it belonged to him.

3        THE COURT:  So sustained and the jury will disregard

4   that testimony.

5   Q.  Let me rephrase the question.

6        In terms of the other wallet address, other than the

7   ones that you looked at within Meta Mask, were you able -- did

8   you recognize that from any of the review of the materials in

9   this case?

10       MS. NICHOLS:  Objection.

11       THE COURT:  I'll allow it.

12       Yes or no.

13  A.  I'm sorry.  Could you restate the question?

14  Q.  Sure.

15       MR. MILLER:  Actually, would you mind if the court

16  reporter read that back, please.

17       THE COURT:  I'll read it back.

18       "In terms of the other wallet addresses, other than

19  the ones you looked at within Meta Mask, were you able -- did

20  you recognize any of that from any of the review of the

21  materials in this case?"

22  A.  Yes.

23  Q.  And how?

24  A.  Based on my analysis in Etherscan as well as chainalysis

25  reactor identified the address associated with this cold

1    storage wallet device being -- exchanging funds with addresses

2    associated with Mr. Chastain's Meta Mask wallet.

3              MS. NICHOLS:  Objection and move to strike.

4              THE COURT:  Overruled.

5    Q.  This was in the year 2023, correct?

6    A.  Correct.

7    Q.  In your expert opinion, are you able to determine whether

8    there were, as you just described, two wallets back in 2021?

9    A.  So based on the records produced by OpenSea, which were

10   from the time period of 2021, identifying Mr. Chastain's

11   OpenSea activity, within those records, they attribute a wallet

12   address to wallet software.  I reviewed these records, and

13   wallet addresses were attributed to Meta Mask at the time.

14   Also based on the way that wallet addresses are created by Meta

15   Mask and also by cold storage wallets like ledger, all of the

16   addresses within that wallet are related.  So rather than

17   randomly generating one new cryptographic private key for every

18   account that you create within Meta Mask, when you create the

19   wallet, you actually create what's called a seed or a recovery

20   phrase.  And then all of your private keys are derived from

21   that seed.  So if one address is within the wallet, you know

22   that the other addresses are related and derived from the same

23   seed.

24   Q.  So, based on your review and analysis and your expert

25   opinion in this case, you were able to determine that there

1    were two wallets back in 2021?

2              MS. NICHOLS:  Objection.

3              THE COURT:  Sustained as to form.

4    Q.  So, what conclusion, based on your experience and expert

5    opinion in this case, what opinion did you draw, what

6    conclusion did you draw based on your review of this

7    information as to how many wallets there were in 2021?

8    A.  So based on my review and analysis, my conclusion is that

9    there were two separate wallets.  One of which was a Meta Mask

10   wallet, and the other was most likely a cold storage wallet.

11   Q.  Now, I'd like to show you what's been marked for

12   identification as Defense Exhibit 49, please.  If we could just

13   show that to the witness, the Court and the government.

14             Do you recognize this document?

15   A.  I do.

16   Q.  How?

17   A.  I created this.

18   Q.  Did you rely on the government exhibits to create it?

19   A.  I did.

20   Q.  Which ones?

21   A.  The government exhibits identified at the bottom which

22   include records from ConsenSys, records from Etherscan, I don't

23   recall exactly what 455 is.  I believe that's a Verizon record.

24   Q.  And did you also rely on your analysis and testimony that

25   you just described for how you determined there were two

1    wallets?

2    A.  I did.

3    Q.  Did you use your knowledge and experience as an expert in

4    cryptocurrency and blockchain in creating this exhibit?

5    A.  I did.

6    Q.  Does this exhibit fairly and accurately reflect the source

7    materials that you reviewed for this exhibit?

8    A.  It does.

9              MR. MILLER:  Pursuant to the stipulations 1001 and

10   1005 and this testimony, we move for the admission of DX 49.

11             MS. NICHOLS:  No objection.

12             THE COURT:  All right.  Admitted.

13             (Defendant's Exhibit 49 received in evidence)

14             MR. MILLER:  Can we publish it?

15             THE COURT:  You may.

16             And ladies and gentlemen, I would describe this as a

17   chart or summary in that sense it's very similar to the charts

18   and summaries that were admitted the other day pursuant to the

19   rule that I described that allows a party, where there is

20   voluminous evidence or information to, for your convenience,

21   put it into chart or summary form.

22             But I remind you, same instructions apply here, which

23   is to say what weight, if any, you give this evidence, as all

24   evidence, is up to you.  And obviously it's only as valuable as

25   the underlying evidence as well.

1              You may proceed.

2              MR. MILLER:  Thank you, Judge.  Publish this for the

3    jury with the permission of the Court?

4              THE COURT:  It's already done.

5              MR. MILLER:  My apologies.  Getting tired.

6    Q.  Can you explain what this chart shows, please?

7    A.  So this chart is a graph that I created in chainalysis

8    reactor that shows Mr. Chastain's cryptocurrency activity

9    associated with his OpenSea transactions.  So on the left we

10   have one wallet, which in my opinion is the ledger cold storage

11   wallet.  The addresses in the middle correspond to a second

12   wallet, the Meta Mask hot wallet, which is used to interact

13   with OpenSea.  On the right we have transactions with OpenSea.

14   Q.  What are all these dots?

15   A.  Each of the dots, at least the dot on the left and all of

16   the dots in the middle, represent cryptocurrency wallet

17   addresses.  One on the left associated with the cold storage

18   wallet, the addresses in the middle associated with hot wallet,

19   and the dot on the right associates -- identifies addresses

20   associated with OpenSea.

21   Q.  In the middle, I think we see that on some occasions where

22   there's transfers between OpenSea and a cold wallet, there

23   might be multiple jumps, right?

24   A.  Correct.

25   Q.  What are those?

1    A.   Those are intermediary addresses.  Funds were transferred

2    from one address within the Meta Mask wallets to another

3    address within the Meta Mask wallet, and then used to make

4    purchase, or in some instances transferred to another address

5    within the same Meta Mask wallet.

6    Q.   In terms of creating additional addresses within the Meta

7    Mask wallet, that's what you testified about earlier with those

8    demonstratives?

9    A.   Correct.

10   Q.   Now, looking at Defense Exhibit 49, did you form any

11   opinions with respect to this chart?

12   A.   I did.

13   Q.   What were they?

14   A.   My opinion is, based on a review of the evidence cited in

15   Mr. Chastain's cryptocurrency transactions, that his

16   transactions are consistent with a user with two wallets, one

17   of which is a cold storage wallet and another is a hot wallet,

18   and moves funds from cold storage to the hot wallet to conduct

19   transactions and then moves funds back into the cold storage

20   wallet.

21   Q.   And my apologies if you testified about this before.  But

22   is it a fairly simple process to move within one of these dots,

23   within the hot wallet?

24   A.   Yes, there is essentially a button in Meta Mask that lets

25   you move funds from one account in your wallet to another.

1          MR. MILLER:  The Court's indulgence, your Honor.  One

2     moment.

3          No further questions at this time, your Honor.

4          THE COURT:  Cross-examination.

5          MS. NICHOLS:  Thank you, your Honor.

6     CROSS-EXAMINATION

7     BY MS. NICHOLS:

8     Q.  Good afternoon, Dr. Edman.

9     A.  Good afternoon.

10    Q.  So you've been a paid consultant for at least 10 years; is

11    that right?

12    A.  That sounds right.

13    Q.  And you said some of your partners are former law

14    enforcement, correct?

15    A.  Correct.

16    Q.  But you're not former law enforcement, correct?

17    A.  I was a contractor supporting federal law enforcement.

18    Q.  Okay.  So you were a paid contractor?

19    A.  I received a salary, correct.

20    Q.  And you're paid for your work for Mr. Chastain here, right?

21    A.  I am.

22    Q.  You are being paid at the rate of 850 an hour you said?

23    A.  That's what my time is billed at.  That's not what I

24    receive personally.

25    Q.  Your time is billed at 850 an hour?

1    A.  Correct.

2    Q.  And you received an upfront retainer of $12,000, correct?

3    A.  I did not, no.

4    Q.  How much have you been paid so far for your work in this

5    case?

6    A.  I think the total amount received so far is about 15,000.

7    Q.  And you planned your testimony with the defense, correct?

8              MR. MILLER:  Objection.

9              THE COURT:  Overruled.  You can answer.

10   A.  We discussed my testimony.

11   Q.  And you had several calls to discuss your testimony, right?

12   A.  We did, yes.

13   Q.  At least one in-person meeting, correct?

14   A.  Yes.

15   Q.  And you reviewed documents that they sent you, right?

16   A.  I did.

17   Q.  And they explained to you what those documents were, right?

18   A.  They did.  They also provided additional documents from I

19   believe it was Wilmer Hale, counsel for OpenSea, that described

20   the nature of the documents and what was contained in them.

21   Some of the documents, for example, the Verizon Fios documents

22   included additional information, attesting to the documents.

23   Q.  My question was just they gave you documents, right?

24             THE COURT:  Counsel, I think you also asked whether

25   they explained what the documents were.

1          MS. NICHOLS:  You're right, your Honor.  I'm sorry.

2     Q.   You produced draft exhibits to them, correct?

3     A.   I did.

4     Q.   And they provided you feedback on those drafts, right?

5     A.   We discussed them.  I don't recall whether there were any

6     revisions, but there were additional demonstratives that we

7     thought would be helpful for my testimony.

8          THE COURT:  "Them" being counsel?  Defense counsel?

9          THE WITNESS:  Apologies.  Yes, correct, defense

10    counsel.

11    Q.   So you talked in your direct testimony about the difference

12    between anonymity and pseudonymity.  Do you remember that?

13    A.   I do.

14    Q.   And a pseudonym, you testified, could be like an e-mail

15    address, right?

16    A.   It can be, yes.

17    Q.   And an e-mail address could be in someone's real name or it

18    could be in a fake name, right?

19    A.   Correct.

20    Q.   Or it could be sort of like a string of letters and numbers

21    that don't appear to be a name at all, right?

22    A.   Correct, like a wallet address, perhaps.

23    Q.   And you gave the example of a Twitter handle, right?

24    A.   I did.

25    Q.   And so a Twitter handle similarly could have someone's real

1   name, correct?

2   A.  It could.

3   Q.  Or it could have a nickname, right?

4   A.  It could.

5   Q.  And you would agree that the writer Mark Twain, that's a

6   pseudonym, that's a pen name, correct, for the person named

7   Samuel Clemens?

8   A.  That is my understanding.

9   Q.  So, Samuel Clemens could have written a book in his real

10  name if he had wanted to, presumably?

11           MR. MILLER:  Objection.

12           THE COURT:  Sustained.

13  Q.  And a person could write a book under the name Anonymous,

14  correct?

15           MR. MILLER:  Same objection.

16           THE COURT:  Overruled.  But Mr. Miller, microphone,

17  please.

18           MR. MILLER:  Sorry.

19  A.  I don't see any reason why they couldn't.

20  Q.  And they could use a pen name like Mark Twain, right?

21  A.  I'm sorry.  Can you restate the question?

22  Q.  A person can write a book using a pen name or a pseudonym,

23  right?

24  A.  Correct.

25  Q.  Can we please pull up for everyone what's in evidence as

1    Government Exhibit 304.

2            And we're looking at a screenshot from OpenSea's

3    website, right?

4    A.  I believe so, yes.

5    Q.  And do you see how there's a green circle on the left side

6    of the page?

7    A.  My apologies.  I'm red green color blind.

8    Q.  I'm sorry.  It wasn't meant to be a trick question.

9            Do you see a circle on the left side of the page?

10   A.  I do see a circle on the left side of the page.

11   Q.  This is a place on OpenSea where a person can personalize

12   the page, correct?

13   A.  Correct.

14   Q.  They can add a picture of themselves, right?

15   A.  They can.  However, in this screenshot, it does not appear

16   that a wallet is connected.

17           THE COURT:  Hold on.  Just answer counsel's question.

18           So the answer is yes, you can add a picture of

19   yourself on your OpenSea account.

20           THE WITNESS:  If certain conditions are met, yes.

21           MS. NICHOLS:  Let's take that down, Mr. Bianco, and

22   pull up Government Exhibit 312.  Let's try 311, please.  Let's

23   zoom in there.

24   Q.  So there's also a circle on this page, right?

25   A.  There is.

1    Q.  And the --

2            THE COURT:  Would you like to publish?

3            MS. NICHOLS:  I'm sorry, your Honor.  I thought it was

4    published.  We would, thank you.

5            THE COURT:  You may.

6    Q.  This is a screenshot from OpenSea's page, OpenSea's

7    website, right, Dr. Edman?

8    A.  It appears so, yes.

9    Q.  There is a circle on the left side, correct?

10   A.  There is.

11   Q.  And that's a place where a person could put a profile

12   picture if they wanted to, correct?

13   A.  Again, if certain conditions are met they could.

14   Q.  And there's a word right under the circle, right?

15   A.  There is.

16   Q.  That word is Unnamed, correct?

17   A.  Correct.

18   Q.  And right under Unnamed, there is a string of letters and

19   numbers; true?

20   A.  True.

21           MS. NICHOLS:  Can we pull up side by side Government

22   Exhibit 300 with this exhibit.  Could we zoom in so it is a

23   little bit bigger.

24   Q.  Government Exhibit 300 is also from OpenSea's website,

25   correct?

1    A.  It appears so.

2    Q.  And in the circle where a profile picture can be, do you

3    see there is an image there?

4    A.  I do.

5    Q.  And do you see that there is a name under the image?

6    A.  I do.

7    Q.  Would you read that name.

8    A.  Nate Chastain.

9    Q.  Under the name Nate Chastain, there is also a string of

10   letters and numbers, correct?

11   A.  Correct.

12   Q.  Do you see on the right side of this screen, Government

13   Exhibit 300, there is a little icon of a bird?

14   A.  I see it.

15   Q.  And that's a link to Twitter, correct?

16   A.  That would be my assumption.

17   Q.  You're familiar with Twitter, right?

18   A.  I am.

19   Q.  And Twitter's icon is a little bird, right?

20   A.  Yes.

21   Q.  So, you would agree with me that Government Exhibit 311 and

22   Government Exhibit 300 have different degrees of anonymity,

23   wouldn't you?

24              MR. MILLER:  Objection.

25              THE COURT:  Overruled.

N4R3CHA4                    Edman - Cross

1    A.  I wouldn't agree that these are anonymous.  They are

2    pseudonymous.  These different profiles are identified via

3    wallet address.  On the right, the user has chosen to attribute

4    additional information to that pseudonym.  But, both of these

5    are screenshots of pseudonyms.

6    Q.  Government Exhibit 300 bears a name associated with this

7    exhibit, correct?

8    A.  There is.

9    Q.  And that name is Nate Chastain, correct?

10   A.  Correct.

11   Q.  And Government Exhibit 311, there is no name associated

12   with it, correct?

13   A.  It says Unnamed.  In theory, I can't see why you couldn't

14   put Unnamed as your pseudonym.

15   Q.  Is it your testimony that the -- you are an expert in -- I

16   think you said you have experience in anonymous communication

17   systems; is that right?

18   A.  Correct.

19   Q.  And you testified that you never talked to the defendant

20   Nate Chastain, correct?

21   A.  Correct.

22   Q.  And so, you don't know whether he uses terms like anonymous

23   or not to describe activity on the blockchain, correct?

24   A.  Correct.

25   Q.  And you haven't been in court during prior testimony,

1  right?

2  A.  I have not.

3  Q.  And you haven't reviewed all of the exhibits that have been

4  admitted at this trial, right?

5  A.  I don't know the universe of what's been admitted.  But, I

6  would imagine I haven't reviewed them all.

7       MS. NICHOLS:  Can we please pull up Government Exhibit

8  201, your Honor?

9       THE COURT:  Actually, no, because it's 2:30 on the dot

10  so we'll stop there for the day.

11       Ladies and gentlemen, I told you I'd try to give you

12  an estimate where things are.  I do think we're moving at a

13  relatively fast clip.  The government has rested as you know,

14  so I think that puts us in a pretty good spot.

15       I will have more information for you tomorrow.  I am

16  going to talk to the lawyers to get a better sense of things,

17  but it would not surprise me, let me put it that way, if we

18  reached summations on Monday.  I don't expect we will tomorrow.

19  I think tomorrow will either -- well, we'll sit our regular

20  day, and may even end sooner than that, depending on how things

21  play out.

22       It is a little hard to predict these things, but

23  wouldn't surprise me if we get to summations on Monday.  I tell

24  you that in part because you may recall that I had told you

25  that when we get to summations, I may ask you to stay a longer

1  day, basically 9 to 5, with longer breaks, I promise.  That's

2  just because it becomes a little bit harder to manage, given

3  the length of summations, my instructions, etc., and then with

4  respect to your deliberations, the same.

5          So, all that is to say, so you can plan accordingly, I

6  would be prepared for the possibility that Monday I ask you to

7  be here for a full day.  I will certainly have a better sense

8  of that tomorrow, but just wanted to give you a heads up today

9  so you can plan your lives accordingly.

10         Aside from that, my usual instructions apply.  You've

11 heard the government's case but you haven't heard all the

12 evidence.  So keep an open mind, don't discuss the case with

13 each other or with anyone else, don't do any research about the

14 case.

15         Please be in the jury room tomorrow morning no later

16 than 8:45.  And with that, I wish you a pleasant afternoon and

17 evening.  Thank you, and get to work or home safely.

18         (Jury excused)

19         (Continued on next page)

20

21

22

23

24

25

1          THE COURT:  Be seated.  Dr. Edman, you are on

2     cross-examination, so you may not communicate with the defense

3     team, anyone associated with the defense team about the

4     substance of your testimony.  Logistics are fine.  But the main

5     thing you need to know is please be back here shortly before 9

6     tomorrow ready to go at or as close to 9 as possible.  All

7     right?

8          THE WITNESS:  Yes.

9          THE COURT:  You may step down.  You are excused for

10    the day.

11          (Witness temporarily excused)

12          THE COURT:  Ms. Nichols, any estimate how much more

13    cross you have?

14          MS. NICHOLS:  I'm not good at estimating in general,

15    your Honor, but I think probably an hour.

16          THE COURT:  All right.  I would urge you to use the

17    afternoon and evening to pare it down if you can.

18          MS. NICHOLS:  Yes, your Honor.

19          THE COURT:  Less is usually more on cross.

20          And defense witnesses after Dr. Edman, are we still

21    looking at Ms. Sheffield and then Mr. Thakrar?

22          MR. MILLER:  I think we are just looking at

23    Ms. Sheffield.

24          THE COURT:  And you would anticipate you would then

25    rest?

1           MR. MILLER:  Yes, your Honor.

2           THE COURT:  Should I speak with your client now about

3   his decision to testify or should I wait until tomorrow on that

4   so you can talk to him one last time about it?

5           MR. MILLER:  I think we should wait until tomorrow

6   morning.

7           THE COURT:  How long do you think Ms. Sheffield's

8   testimony would be?

9           MR. MILLER:  Very short, your Honor.  Maybe 10

10  minutes.

11          THE COURT:  All right.  So sounds like we'll have a

12  short day tomorrow, or at least a short day of testimony, and

13  we'll have the charge conference later in the day.  Does that

14  seem right to everyone?  All right.  Seems right to me.  That's

15  helpful.

16          One thing just for the record, I did refresh my

17  recollection about my own rules, and looked at the rule that

18  Mr. Filor was pointing to or relying on.  It states very

19  clearly, if both sides intend to call a particular witness, the

20  parties shall confer in an effort to ensure that the witness

21  does not need to be called twice.

22          First of all, that generally applies more in the civil

23  context where parties actually submit a joint pretrial order

24  and list the witnesses they intend to call.  But be that as it

25  may, it's quite clear that it is mandatory to confer where

1    parties anticipate that that circumstance will arise.  And as

2    Mr. Roos' comment makes clear, that did not happen here.  So,

3    given that, that rule did not apply.

4         And to the extent the defense wished to call Mr. Viau

5    to go beyond the scope of the direct examination that the

6    government did, perhaps they would be allowed.  But in any

7    event, I wasn't going to permit going beyond the scope in

8    cross.

9         I think for what it's worth, I did permit a little bit

10   more latitude than I might have otherwise, but that is the last

11   I will say on that subject.

12        Mr. Miller, did you want to make any record on the

13   Rule 29 front?

14        MR. MILLER:  Yes, your Honor.  Thank you.

15        The defense would move at this time pursuant to Rule

16   29 for a judgment of acquittal on both counts.  If I may just

17   take a minute, your Honor.

18        First, with respect to the wire fraud count, the

19   defense submits respectfully that the government has not

20   provided evidence that any rational trier of fact could find

21   Count One beyond a reasonable doubt.  Not only in terms of

22   whether or not OpenSea considered the information confidential

23   at issue, but did not in fact treat the information as

24   confidential at issue.

25        And obviously that's with respect to Count One.  Count

1    Two I have a little bit more to say.

2           THE COURT:  All right.  That motion is denied.

3    Certainly I think there are arguments that you have and can and

4    will make to the jury.  But I think there is sufficient

5    evidence for the jury to find that it qualifies as confidential

6    business information and property, which is not to say they

7    will so find, but that's not the standard here.

8           MR. MILLER:  Yes, your Honor.  Thank you.

9           As to Count Two, the money laundering count, I'll get

10   a little bit more into this, but we actually think that the

11   government has not provided evidence sufficient for a rational

12   trier of fact to find money laundering elements beyond a

13   reasonable doubt on all elements, but I would, however, mention

14   with respect to the use of interstate wires, that there has not

15   been evidence that's been submitted, as far as we know, on

16   whether or not the transactions at issue in any way affected

17   interstate commerce involving the movement of funds by wire.

18          And as your Honor is aware, under 18 U.S.C. 1956, in

19   addition, of course, to the government having to prove intent

20   to conceal the proceeds of a specified unlawful activity, the

21   government must prove beyond a reasonable doubt that the

22   defendant's conduct was a financial transaction involving

23   proceeds of a SUA, in this case the wire fraud.

24          And financial transaction is defined in 18 U.S.C.

25   1956(c)(4) as a transaction that in any way affects interstate

commerce involving movement of funds by wire. We have not had

any testimony, and as far as we know, there are no documents

that have been submitted, that demonstrate that whether it is

the movement of Ether or if it is the movement of NFTs on the

blockchain, that there has been any interstate transfer among

the nodes involved to demonstrate there has been a transaction,

a financial transaction that represents the proceeds of the

SUA.

We stipulated to interstate nexus under Count One for

very different reasons. And we actually think that the

interstate wire element has not been proven, and that a

rational trier of fact cannot find those essential elements

beyond a reasonable doubt with respect to Count Two, your

Honor.

THE COURT: And I don't entirely understand. There

was testimony that Mr. Chastain engaged in transactions on the

OpenSea platform, that is to say, buying and using NFTs, while

using Ethers. There was testimony that the servers at the

relevant time were located in Virginia. Does that not suffice?

MR. MILLER: We respectfully submit that the proceeds

of the SUA is actually the ETH, and that's what they needed to

prove on the movement. That there was an interstate nexus,

which they have not.

It is not that the buying of the NFT was the proceeds

of the SUA. That's why we respectfully submit, we stipulated

1    to interstate nexus on Count One for that reason.  But not as

2    with respect to Count Two.

3              THE COURT:  Government wish to be heard?

4              MR. BURNETT:  Yes, your Honor.  For starters, I think

5    Mr. Miller is not articulating that right legal language.

6              So the definition of financial transaction means any

7    transaction which in any way or degree affects interstate or

8    foreign commerce involving the movement of funds by wire or

9    other means, involving one or more monetary instruments or

10   involving the transfer, title of any real property, vehicle,

11   vessel or aircraft or involving a financial institution.

12             Here, I think there are a few ways that the

13   transactions involved affected interstate commerce.  All of the

14   transactions here occurred over OpenSea, which is a platform

15   where people post NFTs and make transactions with other users

16   across the country.

17             The jury heard evidence that there were users from

18   Canada, like Ms. Idowu, and other states like Mr. Salmon, who

19   are on the OpenSea platform.  The jury also heard that the

20   underlying plumbing on which these transactions take place is

21   the blockchain, and Mr. Atallah testified that the blockchain

22   involves a decentralized network of computers that exist all

23   over the world.  And any time a transaction occurs on the

24   blockchain, there is the information about that transaction is

25   coded on the different nodes and stored on those computers.

1      So every one of these financial -- every one of these

2   transactions that Mr. Chastain engaged in, in the course of

3   buying and selling the NFTs using misappropriated confidential

4   information, involved interacting with that international

5   distributed ledger of the blockchain we've heard so much about.

6      And then finally, interacting with OpenSea itself to

7   do these transactions involved interacting with OpenSea's

8   servers to accomplish the financial transactions, and the

9   servers at the time were located in Virginia, whereas

10  Mr. Chastain was located in New York.

11      THE COURT:  All right.  Mr. Miller.

12      MR. MILLER:  I'll just note in terms of the node

13  argument, which I think is actually what's at issue here, while

14  the blockchain itself may be a distributed ledger across the

15  world, there has been no testimony, no evidence, that the

16  transactions in this case, the Ether that was transferred that

17  was the proceeds of the alleged SUA in this case went on a

18  blockchain that somehow went from wherever to New York or vice

19  versa, because there has been plenty of testimony --

20      THE COURT:  I think Mr. Burnett's point is all that is

21  required is it be in or affecting interstate commerce, and the

22  affect can be minimal.  Any involvement at all can satisfy this

23  element, I think is the relevant language.

24      So it strikes me that for all the reasons Mr. Burnett

25  articulated, that a rational jury can find these were

transferred funds, which, in part, because it was on OpenSea,

which we heard was the largest platform for basically buying

and selling things across the globe, that it therefore

qualifies.

MR. MILLER:  I hear what your Honor is saying.  I'll

just note that I think this is maybe the first time this is

coming up in this context.  Again, with respect to OpenSea,

just saying OpenSea has servers in Virginia and people around

the country and the world who interact with it, fine.  Again,

we stipulated to Count One on the interstate wire element.

But, since I know -- I don't mean to repeat myself.  But you

know my arguments with respect to the proceeds here.  So I'll

sit down.

THE COURT:  I'm not sure there is a meaningful

difference between me reserving judgment and denying it for the

reasons there is sufficient evidence for the jury.  You have

preserved it to the extent there might be some novel issue that

I'm missing.  Whether it's reserved or denied, it's going to

the jury on that issue.

Anything else on Count Two?

MR. MILLER:  No, your Honor.

THE COURT:  Very good.  Reminder to get an updated

exhibit list.  And also, I will reinforce this at the charge

conference tomorrow, but everybody should be on same page about

the plan with respect to submitting evidence to the jury.  If

1    that's going to be done on a laptop, assembling it, getting all

2    that done and squared away.

3            Anything else that the government needs to raise?  And

4    sorry.  To the extent that you anticipate -- well, do you

5    anticipate filing anything further on the jury instruction

6    front or is the universe on that closed?  Both of you I think

7    have intimated you might have things to file, but not sure when

8    and what.

9            MR. ROOS:  We will and tell us when you want them.

10           THE COURT:  Five minutes.

11           Sooner rather than later.  We're working on the

12   instructions and I want to think about it.  So, when can you do

13   it?  How soon can you do it?  And also what is it?

14           MR. ROOS:  There are a few that I think your Honor, if

15   they're not already in the request to charge, and we are going

16   to check, your Honor I'm sure has standard instructions on them

17   for those.  If it's okay, we'll just say -- I am just using an

18   example since there was cross about it -- preparation of

19   witnesses.

20           THE COURT:  That's in there.

21           MR. ROOS:  Okay.

22           THE COURT:  Next?

23           MR. ROOS:  There are maybe a few relating to things in

24   the opening that we view as something the jury shouldn't

25   consider.  Attempt at nullification.  And so, that was

something we were thinking of putting an instruction or a
request for instruction in on.

And then, there are two issues, legal issues relating
to original requests that the defense put in.  One is we
disagree with sort of the articulation of the mens rea
requirement, the willfulness instruction, and I think your
Honor is like fairly well attuned to the issues around wire
fraud and willfulness and sort of the debate.  But we're happy
to give you cases on that.  And we can probably do that pretty
quickly.

And second is the defense cites *Cuellar* for a
proposition that merely hiding something is not an act of
concealment.  We disagree with that reading of the Supreme
Court case there and its application here.  So, if your Honor
was considering that instruction, we would put in something on
that as well.

THE COURT:  All right.  You should put it in on both.
On willfulness, I think I did include it in *Avenatti*, but I
think that was in part because the government had included the
word in the indictment and therefore didn't stand on the
argument.

I would look at an address in your submission Judge
Oetken's decision in *Middendorf*, which I think takes the
position that willfulness should be included, but doesn't adopt
the language that the defense is requesting here.  It's not

1    clear to me that the government would object if willfulness

2    were defined in that way, but why don't you make that clear.

3            Yes, Mr. Miller.

4            MR. MILLER:  We also will be submitting something to

5    your Honor on willfulness on the money laundering proposition.

6            There is no reason for an attempted nullification

7    instruction.  I did not in my opening attempt to nullify, and I

8    said nothing of the sort.  If Mr. Roos is referring to his

9    objection, because after talking about what the government has

10   to prove beyond a reasonable doubt, multiple times, throughout

11   my opening, I said the government should never have charged

12   this case.  He objected.  My point was that there is no crime.

13   That's not an attempt at nullification.  Especially in the

14   context of me saying over and over again, the government cannot

15   prove the charges beyond a reasonable doubt.

16           MR. ROOS:  I tried not to object during the defense

17   opening.  Ultimately I did at the end.  What I'm thinking of is

18   the sort of non-equivalency arguments the defendants made about

19   this is not a case where somebody stole M&A information or they

20   inside traded in stocks.  The arguments how it was only $50,000

21   or less, in order to diminish the value or the gravity of the

22   defendant's conduct.  Those are the things we're worried about,

23   where we get to a place where the jury is basically told, he

24   did it, but, like, doesn't really matter because it's not a lot

25   of money, and it is certainly not like what they do on Wall

1  Street.

2          THE COURT:  I'll consider the government's request.  I

3  would say I'm disinclined to include anything explicitly about

4  nullification or an anti-nullification instruction.  I also

5  think for the government's purposes, that calling attention to

6  that may not be in your interest.  But be that as it may, I am

7  not sure there was any argument that was made that justifies

8  it.

9          I think there might be an argument, and I'll think

10 about it, for the instruction regarding property, to make clear

11 that it doesn't have to be a lot of property.  It doesn't have

12 to be a lot of money.  That any amount of money or property

13 would suffice to satisfy that element.  But I'll leave you to

14 propose something on that score.  We can discuss it.

15         MR. MILLER:  One quick point on that, Judge.  I never

16 said, oh, this is only $50,000.  I specifically did not go

17 there.

18         THE COURT:  You did draw contrast with insider trading

19 type cases involving millions of dollars of stock.  I think

20 even if you didn't articulate it explicitly, the comparison and

21 the contrast was clear.

22         MR. MILLER:  Mr. Roos talked about that, talking about

23 inside information in stock and stock exchange, etc.

24         THE COURT:  Not the millions of dollars.  I don't

25 think he opened on that.  That would have been a strange thing

1     for the government to have done.

2          I am not saying I am going to do that.  I am just

3     saying that I can see an argument for it, and if the government

4     requests it, we'll discuss it and we'll go from there.  And

5     this isn't the charge conference.

6          Mr. Miller, anything else that you anticipate your

7     submission will address just so I can plan?

8          MR. MILLER:  You know, I apologize, your Honor, I'm

9     not sure I'm prepared to say.  I don't think we have -- sorry.

10    One moment, your Honor.

11         I think our focus, I am going to clearly respond to

12    this point, your Honor, but I think our focus is going to be on

13    willfulness and money laundering.  Obviously the rest of the

14    request to charge we've submitted.

15         One question, your Honor.  I cannot recall if we had a

16    request for the standard instruction about law enforcement

17    witnesses.

18         THE COURT:  It's in there, so whether you did or not.

19         MR. MILLER:  And then my last question, your Honor, is

20    if, for example, the testimony ends tomorrow, between the cross

21    and redirect and then our paralegal essentially, let's say the

22    testimony ends at 10.  Is it fair to assume we're still not

23    going to engage in summations tomorrow and that's Monday?

24         THE COURT:  Yes.

25         MR. MILLER:  Thank you.

1          THE COURT:  We need to have the charge conference and

2     that ends up making it impossible to proceed with summations.

3     All right.

4          Is it realistic to -- well, would 6 p.m. be realistic

5     or is that overly ambitious?

6          MR. ROOS:  I was going to suggest 7 but we could do 6.

7          MR. MILLER:  Can I request 8.?  We have to actually

8     travel back we are not over here.

9          THE COURT:  Fair point.  Sure.  I'll say 8 o'clock.

10    Here is the problem.  I have a full evening of commitments.

11    There is a gala dinner honoring Judge Cabranes on his 43rd

12    anniversary on the bench that I'm hosting upstairs.  I am not

13    going to have a lot of time tonight to devote to this.  So the

14    cost of that is we'll probably have a lengthier break after the

15    close of the evidence tomorrow, and you are not going to get

16    the charge the draft immediately at the close of evidence, and

17    you'll therefore have a shorter time to review it.  But that's

18    the price you'll pay.

19         MR. MILLER:  Thank you, Judge.

20         THE COURT:  Not going to be a super long charge, so

21    that shouldn't be too difficult.  And I think it is obvious the

22    few things that are likely to be the subject of our

23    discussions.

24         Anything else from the government?

25         MR. ROOS:  No, your Honor.

1          MR. MILLER:  No, your Honor.  Thank you.

2          THE COURT:  All right.  See you same time, same place

3   tomorrow morning.  Have a good afternoon and evening.

4          (Adjourned until April 28, 2023, at 9 a.m.)

1        INDEX OF EXAMINATION

2   Examination of:                              Page

3   DEVIN FINZER

4   Direct By Ms. Nichols . . . . . . . . . . . 461

5   Cross By Mr. Miller . . . . . . . . . . . . 477

6   Redirect By Ms. Nichols . . . . . . . . . . 518

7    DANIEL J. VIAU

8   Direct By Mr. Roos . . . . . . . . . . . . . 527

9   Cross By Mr. Filor . . . . . . . . . . . . . 540

10  DANIEL VIAU

11  Cross By Mr. Filor . . . . . . . . . . . . . 561

12  JULIA GUTIERREZ

13  Direct By Ms. Nichols . . . . . . . . . . . 578

14  MATTHEW EDMAN

15  Direct By Mr. Miller . . . . . . . . . . . . 607

16  Cross By Ms. Nichols . . . . . . . . . . . . 654

17        GOVERNMENT EXHIBITS

18  Exhibit No.                              Received

19   202  . . . . . . . . . . . . . . . . . . . 464

20   218  . . . . . . . . . . . . . . . . . . . 467

21   613  . . . . . . . . . . . . . . . . . . . 520

22   427 to 429, 431 to 451  . . . . . . . . . 526

23   223  . . . . . . . . . . . . . . . . . . . 528

24   219  . . . . . . . . . . . . . . . . . . . 533

25   1006  . . . . . . . . . . . . . . . . . . . 577

1002 . . . . . . . . . . . . . . . . . . . . . 579

500 . . . . . . . . . . . . . . . . . . . . . 581

605 . . . . . . . . . . . . . . . . . . . . . 582

501 . . . . . . . . . . . . . . . . . . . . . 583

204 . . . . . . . . . . . . . . . . . . . . . 589

607 . . . . . . . . . . . . . . . . . . . . . 591

611 . . . . . . . . . . . . . . . . . . . . . 593

610 . . . . . . . . . . . . . . . . . . . . . 594

604 . . . . . . . . . . . . . . . . . . . . . 600

603 . . . . . . . . . . . . . . . . . . . . . 602

601 . . . . . . . . . . . . . . . . . . . . . 604

DEFENDANT EXHIBITS

Exhibit No.                                    Received

1, 2, 4, 5, 6, and 8   . . . . . . . . . . 494

22 . . . . . . . . . . . . . . . . . . . . 503

23 . . . . . . . . . . . . . . . . . . . . 510

9 . . . . . . . . . . . . . . . . . . . . 568

49 . . . . . . . . . . . . . . . . . . . . 651