n4s3cha1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

          v.                      22 CR 305 (JMF)

NATHANIEL CHASTAIN,

                                   Trial

          Defendant.

------------------------------x

                               New York, N.Y.
                               April 28, 2023
                               8:55 a.m.

Before:

                      HON. JESSE M. FURMAN,

                                   District Judge

                        APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
NICOLAS ROOS
THOMAS S. BURNETT
ALLISON C. NICHOLS
     Assistant United States Attorneys

GREENBERG TRAURIG, LLP
     Attorneys for Defendant
BY:  DAVID I. MILLER
     DANIEL P. FILOR
     GREGORY W. KEHOE
     CHARLES BERK
     NICHOLAS BARNES

1      (Trial resumed; jury not present)

2           THE COURT:  Good morning, welcome back.  I obviously

3  got your submissions on the jury instructions, we'll talk about

4  those later.

5           Number one, I also got the government's submission

6  regarding Defense Exhibit 51, the redline of the Clerky form

7  against the contract.  Does the defense wish to be heard on

8  that?

9           MR. FILOR:  Yes, your Honor.

10          The government's letter from late last night explains

11 precisely why Defendant's Exhibit 51 is highly relevant and

12 necessary.  It is obviously a key document in the case.  With

13 respect to what --

14          THE COURT:  I think the window cleaners going by.

15          MR. FILOR:  As demonstrated in the government's

16 letter, both founders spoke about the agreement, the Clerky

17 form.  Alex Atallah said something different from what Mr.

18 Finzer said.  Mr. Atallah said they made modifications to the

19 form.  Unclear what those modifications are, unless we put in

20 Defendant's Exhibit 51 to show what the modifications are.

21 Certainly there was an opportunity to make changes.  Changes

22 were made.  All we would be doing with the document is

23 explaining what a legal redline is, comparing the two

24 documents, and showing what the modifications were.

25          THE COURT:  What's the relevance of the modifications?

1   There is no evidence that the defendant was aware that that's

2   where the form came from, no evidence that he was aware of

3   modifications or lack thereof. So obviously there were

4   modifications, because it has the company name and

5   Mr. Chastain's name. So at a minimum, there were those.

6   What's the relevance of what the nature and extent of the

7   modifications are?

8           MR. FILOR: It's relevant for two reasons. It goes to

9   the state of mind of OpenSea and its founders, under the

10   *Mahaffy* factors, and what steps they took to keep confidential

11   information confidential.

12           They downloaded a $19 Clerky form and changed the

13   names of the company and the signatory. They didn't make any

14   substantive changes. They didn't even read the form, at least

15   not in depth. They had the opportunity to make changes if they

16   wanted to customize it to talk about NFTs, to talk about

17   trading. Instead, they kept in biological masks and things

18   like that.

19           So it is certainly relevant to the state of mind about

20   how much OpenSea cared about that document, and about how it

21   was protecting its supposed confidential information. But it

22   also goes to impeachment of Mr. Atallah. He suggested there

23   were modifications. He was asked about certain things, could

24   you have changed this term or that term, and he just responded

25   I don't know, I don't remember, things like that. So it is

n4s3cha1

1  relevant for two reasons, your Honor.

2          THE COURT:  I am going to grant the government's

3  application.  I'm not persuaded.  I think it has minimal, if

4  any, relevance.  That is to say the precise changes, I think to

5  the extent it has relevance, it's already been elicited through

6  the witnesses.  And introducing the redline can only cause

7  confusion and undue prejudice.  The application is granted.

8          MR. FILOR:  Just briefly on 403, the test certainly

9  isn't if a document is bad for the government, it is

10  prejudicial.

11          THE COURT:  I understand what the law is.  Thank you.

12  You can have a seat, Mr. Filor.  Thank you.

13          Any change of plans for today?

14          MR. ROOS:  Two things.  One is Ms. Nichols has been I

15  think editing her cross down, so it is shorter than previously

16  previewed.  And the second is Mr. Filor just mentioned to me

17  there is another exhibit that they will seek to offer through

18  their paralegal I guess, which as I understand it is a tweet by

19  Dan Viau that your Honor did not permit to be offered

20  yesterday.  So, I thought it made sense to deal with that now

21  as opposed to when the paralegal is on the stand.

22          MR. FILOR:  I would appreciate a quick opportunity.  I

23  promise to be brief.

24          As the Court is probably aware -- I apologize for

25  being slow in the uptake yesterday on my cross exam of

1    Mr. Viau.  I didn't understand the sustained objections went to

2    beyond the scope.  So I apologize.  I realized it once --

3              THE COURT:  That should have been clear given our

4    colloquy at the end of the morning, but go ahead.

5              MR. FILOR:  With respect to DX 79, which is a critical

6    document in the case.  I'll explain it briefly, but I think

7    we've established both the authenticity and the foundation for

8    the document coming in.  Authenticity is provided by Government

9    Exhibit 1001, paragraph 3, which this document is an authentic

10   tweet.

11             THE COURT:  Tell me what the relevance is.

12             MR. FILOR:  Sure.  So Mr. Viau explained that he

13   signed the -- he sent this tweet out.  It is encouraging and

14   recruiting new employees for OpenSea.  If you look down it

15   refers to the OpenSea.IO forward slash career.  He explained

16   this was sent in his business duties.

17             What it is explaining, if you are trading NFTs out on

18   your own, he wants to hire you, or at least interview you to

19   come in, trade NFTs while you work at OpenSea.  And the carrot

20   is that the internal Slack channel they have, the OpenSea

21   Slack, in the first line, is the best place to get information

22   that's being shared between OpenSea employees, so you can trade

23   NFTs with that information.

24             Your Honor, we would proffer that the interview

25   process for these engineers, if you look down, what they are

looking for is engineers and some other types of potential

employees, we would proffer that the interview panel was

Mr. Viau, one other person Jessica Phan, and Nate Chastain.

They interviewed these engineers, talked about their NFT

trading on the outside, and were recruiting them with a carrot

of this internal Slack channel where OpenSea employees are

talking about NFTs.  And Mr. Viau is describing, the first

sentence, or that their open Slack is the best Discord server

in all of crypto.  It has the best information about NFTs.

That's the carrot to recruit these people to OpenSea.  It

certainly goes to the fact that everybody at OpenSea is trading

NFTs, it's fine, it's accepted, and there is information that

can be used that's only available within OpenSea.  I can't

imagine a more relevant document, your Honor.

THE COURT:  I think that is definitely an

overstatement.  But Mr. Roos?

MR. ROOS:  So, your Honor, I think first of all, the

top paragraph is hearsay.  But, when we objected to this at the

time, it was not just for scope, but also for relevancy and for

403 reasons.

In terms of relevancy, we dispute the reading of this.

But regardless, there are a few issues.  Number one, Mr. Viau

is not on trial, and to the extent this is even what Mr. Filor

suggests it is, that does not mean that it is relevant to the

defendant.

687

n4s3cha1

1     In particular, second, there is no evidence that the

2     defendant saw this or this informed his state of mind

3     whatsoever.

4     Third, it will create a sideshow in terms of whether

5     or not this is, in fact, this idea of a Slack channel is

6     sharing either confidential information or information people

7     couldn't trade on.  There has been testimony that of course

8     there were NFT buying and selling at OpenSea.  There is no

9     suggestion within the communication that this is confidential.

10     And anything else?  That's it.

11     THE COURT:  Okay.  Mr. Filor, can you just address,

12     absent any evidence that Mr. Chastain was aware of this tweet

13     or it affected his state of mind, what is the possible

14     relevance of this, even assuming your reading of it is correct.

15     MR. FILOR:  It certainly goes to the state of mind of

16     OpenSea.  This is how they're recruiting new employees.

17     Mr. Viau is the second employee hired at OpenSea.  He has an

18     important position there.  He was doing the interview process.

19     And so the state of mind of OpenSea of who you are looking for,

20     whether you are permitted to trade NFTs, whether you're

21     permitted to use information that's on this internal Slack

22     channel.  We heard a lot about the Slack channel.

23     THE COURT:  It would be one thing if it said come to

24     OpenSea because you'll be privy to confidential information and

25     you can trade on it.  That's not what it says.  The Slack has

1    all sorts of information.  It could be, hey, Celtics won last

2    night so we should buy the Celtics related NFTs.  It doesn't

3    follow that it has anything to do with confidential

4    information.

5         MR. FILOR:  I'm sure your Honor is correct that they

6    probably did talk about the Celtics sometimes.  What he's

7    describing is it's important for crypto, and Mr. Atallah --

8    sorry.  There has been testimony -- oh, from Mr. Atallah that

9    he considers the Clerky form to be an umbrella policy.

10   Everything is confidential within the company, until someone

11   gets permission, then it's not.

12        That testimony means everything that's happening on

13   this Slack channel, and certainly there is work-related

14   conversations, which is what Mr. Viau is saying when he said it

15   is the best Discord server in all of crypto.  This is a public

16   tweet.  This is not something they are hiding.  This is what

17   they are putting out to the entire world, which says it is okay

18   to have a leg up, it is okay to use information that's within

19   OpenSea.  So it is highly relevant to the state of mind of

20   OpenSea.

21        MR. ROOS:  Two things on this, very briefly.  Number

22   one, Mr. Atallah's testimony was about the scope of the

23   coverage or the protection of the confidentiality agreement.

24   Meaning its umbrella confidentiality policy.  He was not saying

25   all information within OpenSea is confidential, that there is

an umbrella confidentiality over all Slack communications.

Second, Mr. Filor's point about the state of mind of OpenSea, Mr. Viau, who serves some sort of legal function and is an engineer, is not one of the two people who could testify about the state of mind of OpenSea as the founder.

The Court has already had litigation on this. We moved to preclude, for instance, cross-examination of -- and the example we used was Jessica Phan, that various employees' sort of interpretation of things was not relevant to how OpenSea as the company treated it.

So I think there are a lot of reasons why this is neither relevant that your Honor identified, and why it will be very confusing. But it is also just not relevant to OpenSea's state of mind.

THE COURT: All right. Mr. Filor, final word.

MR. FILOR: Your Honor, the last thing that I would say is on pages 574 and 575 of the transcript where Mr. Viau is talking about this document. And he says -- I am trying to find the quote your Honor very quickly. With respect to the business -- oh.

"Mr. Viau, did you send this tweet in the course of your business for OpenSea?

"Yes."

That's at lines 10 through 12, your Honor, of 575.

THE COURT: I don't think there is a dispute about

1    that.

2          I think, well, bottom line is I am going to preclude

3    this as well.  Number one, it doesn't speak at all to

4    Mr. Chastain's state of mind, since there is no evidence that

5    he was aware of this tweet, that he had anything do with it,

6    that he saw it, etc.  I don't hear any argument to the

7    contrary.

8          To the extent it is being offered for OpenSea's state

9    of mind, number one, I don't read it the way the defense does.

10   I think it is a leap to suggest that because there is an

11   OpenSea Slack conversation, that it can be argued that that

12   relates in any way to confidential information.  I agree with

13   Mr. Roos that there is no testimony that all information within

14   OpenSea is confidential.  Again, if you are discussing the

15   Celtics won, that's not confidential information.  I don't

16   think anyone during this trial has suggested otherwise.  And in

17   that sense, I think it is not a fair or accurate representation

18   of this to make the argument that this is inviting people to

19   come to OpenSea because they'll be able to trade on

20   confidential information, and in that regard, it is not proper

21   argument.

22         But, beyond that, to the extent it's being offered to

23   reflect on OpenSea's state of mind, I don't think Mr. Viau is a

24   person whose state of mind is relevant here.  I have permitted

25   testimony regarding the state of mind of Mr. Atallah and Mr.

1   Finzer, because they were the principals of the company.  And

2   in that regard, I think what they were thinking and how they

3   considered the information and understood the agreement and so

4   forth is relevant.  And that's why I permitted that testimony.

5        But just as I indicated that Ms. Phan would not be

6   permitted to give her opinions about these sorts of things, I

7   think Mr. Viau is more akin to her than to him.  So even if it

8   were Mr. Viau inviting this, I don't think that is admissible

9   with respect to OpenSea's state of mind.

10        So, for those reasons, I will preclude it as

11  irrelevant.  And to the extent it has any relevance, also 403.

12        MR. FILOR:  One sentence of a proffer.

13        THE COURT:  Okay.

14        MR. FILOR:  Mr. Chastain was aware of the tweet.  He

15  was on the interview panel with Mr. Viau and Ms. Phan.  Those

16  were the three that were interviewing the recruits that were

17  brought to interview for the company.

18        THE COURT:  Okay.  Is there any evidence of that in

19  the trial?

20        MR. FILOR:  I thought your Honor said that we hadn't

21  proffered whether or not Mr. Chastain was aware of this, and so

22  I was proffering that.

23        THE COURT:  I was saying there is no evidence at the

24  trial he was aware.  If he plans to take the stand, if he wants

25  to take the stand and says he was aware of this tweet, that

n4s3cha1

1  would be one thing and it might well change it.  But in the

2  absence of that, unless you can anticipate and proffer there

3  will be evidence of that at this trial, it doesn't make it

4  relevant.

5           MR. FILOR:  Understood.

6           THE COURT:  On that subject, Mr. Miller or Mr. Filor,

7  I think this would be the appropriate time to allocute

8  Mr. Chastain, if indeed he has decided not to take the stand.

9           MR. MILLER:  Yes.  He's decided not to take the stand,

10  your Honor.

11           THE COURT:  Mr. Chastain, good morning.

12           THE DEFENDANT:  Good morning, your Honor.

13           THE COURT:  How are you feeling this morning?

14           THE DEFENDANT:  I'm feeling good, your Honor.

15           THE COURT:  In the last 48 hours, have you taken any

16  medicine, pills, drugs, or had any alcohol?

17           THE DEFENDANT:  No, your Honor.

18           THE COURT:  Is your mind clear today?

19           THE DEFENDANT:  Yes, your Honor.

20           THE COURT:  Do you understand what's happening here

21  today?

22           THE DEFENDANT:  Yes, your Honor.

23           THE COURT:  Do you understand as a defendant in a

24  criminal trial you have the right to testify on your own behalf

25  if you want to testify?

1          THE DEFENDANT:  Yes, your Honor.

2          THE COURT:  Do you also understand you also have the

3     right not to testify?

4          THE DEFENDANT:  Yes.

5          THE COURT:  Do you understand if you decide not to

6     testify, that no one, including the jury, could draw any

7     inference or suggestion of your guilt from the fact that you

8     did not testify?

9          THE DEFENDANT:  Yes, your Honor.

10          THE COURT:  Do you understand I will instruct the jury

11     to that effect if you do not testify?

12          THE DEFENDANT:  Yes, your Honor.

13          THE COURT:  Do you understand whether you testify or

14     not is a decision for you and you alone to make, with the

15     assistance and advice of your lawyers, but, again, ultimately

16     it's your decision to make and not your lawyers' decision to

17     make?

18          THE DEFENDANT:  Yes, your Honor.

19          THE COURT:  Please don't tell me the substance of your

20     discussions with your lawyers, but have you discussed -- just

21     yes or no -- have you discussed with your lawyers whether you

22     should or should not testify in this case?

23          THE DEFENDANT:  Yes, your Honor.

24          THE COURT:  Have you had enough time to do that, to

25     talk to them about whether to testify, and about the advantages

n4s3cha1

1  and disadvantages of testifying?

2          THE DEFENDANT:  Yes, your Honor.

3          THE COURT:  Is it your decision not to testify at your

4  trial?

5          THE DEFENDANT:  Yes, your Honor.

6          THE COURT:  Is that your decision, assisted by

7  counsel, but ultimately your decision?

8          THE DEFENDANT:  Yes, your Honor.

9          THE COURT:  Do both counsel agree that is sufficient

10 or think I should ask any additional questions?

11         MR. MILLER:  That's sufficient, your Honor.  Thank

12 you.  No additional questions needed.

13         MR. FILOR:  Agreed, your Honor.  Thank you.

14         MR. ROOS:  The same from the government.

15         THE COURT:  Very good.  Unless there is anything else,

16 let's get Dr. Edman back on the stand and get the jury in to

17 proceed.

18         Ms. Nichols, any estimate of how long the rest of

19 cross will be?

20         MS. NICHOLS:  Less than 30 minutes, your Honor.

21         THE COURT:  All right.

22         MR. MILLER:  Just so your Honor is aware, we intend to

23 rest after Dr. Edman.

24         THE COURT:  All right.  So the jury will be pleased to

25 be released early.  Where is Dr. Edman?

1          MR. FILOR:  I bet Charlie went to go get him, but I'll

2     make sure.

3               (Continued on next page)

1           (Jury present)

2           THE COURT:  Good morning, ladies and gentlemen.

3    Welcome back.  Thank you for being here on time.  We will

4    continue with the direct -- sorry -- the cross-examination of

5    Dr. Edman.

6           I will also give you a heads up that I suspect we are

7    going to have a short day for your purposes.  Hopefully that's

8    a welcomed thing.  It's like getting out of school early on a

9    Friday.  But, long story short, I suspect it will be a

10   relatively short day.  There are some things we need to take

11   care of before we proceed with summations, which is why, rather

12   than having you stick around for a large chunk, I'm going to

13   probably dismiss you early for the weekend.  I will have more

14   to say on that later.

15          And with that, Ms. Nichols, you may proceed.

16          MS. NICHOLS:  Thank you, your Honor.

17    MATTHEW EDMAN,

18   CROSS-EXAMINATION

19   BY MS. NICHOLS:

20   Q.  Good morning, Dr. Edman.

21   A.  Good morning.

22   Q.  You testified on direct examination yesterday that it is a

23   common misconception to call wallet addresses anonymous; is

24   that right?

25   A.  Correct.

1    Q.  And it's common, because some people use the term

2    "anonymous" to describe wallet addresses, correct?

3    A.  It is something that I've seen before, yes.

4    Q.  Can we please pull up Government Exhibit 201.  Let's turn

5    to page 4.

6           So the top message here in this exhibit is Nate

7    Chastain, correct?

8    A.  That's what it says.  Whether or not it's him actually

9    writing this, I can't say.

10   Q.  Understood.

11          So the first line reads "So if we really like it, I'll

12   buy it, and then send the funds to the creator once we can get

13   in touch with him."

14          Correct?

15   A.  That's what it says, yes.

16   Q.  And the second message says "From an anon account with no

17   OpenSea history."  Right?

18   A.  That's what it says, yes.

19   Q.  And "anon" is a shorthand for anonymous, correct?

20          MR. MILLER:  Objection.

21          THE COURT:  Sustained.

22   Q.  Let's pull up, please, Government Exhibit 306.

23          Dr. Edman, this appears to be an account on OpenSea,

24   correct?

25   A.  It appears so, yes.

N4s3cha1                    Edman - Cross

1    Q.  And the name associated with this account is Unnamed.

2    Right?

3    A.  Whether this account gave the pseudonym Unnamed or that's

4    just a placeholder that OpenSea put in there, I can't say.

5    Q.  Understood.  But the there is -- but the only word

6    associated with the account that you can see on this exhibit is

7    Unnamed, correct?

8    A.  There are words associated with the account, like the date

9    it joined.  But I only see Unnamed under the circle.

10   Q.  Understood.  So, right under -- whether it is a name or

11   whether it is a pseudonym, the title Unnamed, right under that,

12   is a string of letters and numbers, correct?

13   A.  Correct.

14   Q.  And you understand that that string of letters and numbers

15   is an abbreviated version of a wallet address, right?

16   A.  Yes.

17   Q.  You can't tell from looking at this page the true identity

18   of the person that made this account, right?

19   A.  In terms of their real, real world human name, no.

20   Q.  And there doesn't appear to be any link to a Twitter

21   account associated with this account, correct?

22   A.  I don't see one, no.

23   Q.  This string of letters and numbers that's now highlighted,

24   that's one of the wallet addresses that you looked at as part

25   of your work in this case, isn't it?

1   A.  I'd have to refresh my recollection.  I don't remember all

2   of the wallet addresses.

3   Q.  And that's because it's hard to remember the names of the

4   wallet addresses when they're just strings of random letters

5   and numbers, right?

6   A.  Yes.

7           MS. NICHOLS:  Mr. Bianco, can we just please take off

8   the highlighting and zoom out here.

9   Q.  So, Dr. Edman, I want to direct you to the activity log

10  that is reflected here.  There is only a handful of

11  transactions reflected on this page.  Would you agree?

12          MR. MILLER:  Objection.

13          THE COURT:  Sustained.

14  Q.  There are seven items in this activity log, correct?

15  A.  Sorry.  What do you mean by "items"?

16  Q.  Rows in the chart.

17  A.  Okay.  There are seven rows, yes.

18  Q.  Can we zoom in on those rows, Mr. Bianco.

19          And do you see the column that says "item"?

20  A.  I do.

21  Q.  And underneath that, there are seven pictures, correct?

22  A.  It looks to me like there are two different pictures, but

23  some of them are repeated.

24  Q.  Okay.  And one of the pictures corresponds to the bolded

25  all caps words THOUGHTS #34 out of 76, correct?

1  A.  Correct.

2  Q.  And one of the pictures corresponds to a bolded caption

3  Don't Get Me Wrong.  Correct?

4  A.  Correct.

5  Q.  We can take that down.  Let's go to Government Exhibit 309,

6  please.

7        This is another OpenSea account, right?

8  A.  It appears so, yes.

9  Q.  And the name of this account is Unnamed, right?

10 A.  Again, I can't say whether the individual controlling this

11 account gave the account the name Unnamed or if it was assigned

12 by OpenSea as a placeholder.

13 Q.  Right.  But there is nothing on this exhibit that shows you

14 the true identity of the person who made the account, right?

15 A.  In terms of their human name, not that I see.

16 Q.  Underneath Unnamed, there is a string of letters and

17 numbers, correct?

18 A.  Correct.

19 Q.  And do I have it right that you wouldn't be able to tell

20 from looking at this whether this is one of the letters and

21 numbers that you analyzed as one of the wallet accounts

22 associated with this case, right?

23 A.  I would have to go back to the documents to verify.

24 Q.  And there is no link to a social media account associated

25 with this account, right?

1   A.  Not that I see in this screenshot.

2   Q.  Okay.  And do you see in the activity log that there is a

3   column called "item"?

4   A.  I do.

5   Q.  And do you see that in the column called "item," there is a

6   series of pictures?

7   A.  I see that.

8   Q.  And those appear to be all the same picture, right?

9   A.  It appears so.

10  Q.  And the caption associated with that picture is The Brawl

11  2, right?

12  A.  Correct.

13  Q.  Let's go to Government Exhibit 310, please.

14          This is another OpenSea account, right?

15  A.  It appears so, yes.

16  Q.  And the name or its pseudonym associated with this account

17  is Unnamed, right?

18  A.  Correct.

19  Q.  There is no profile picture of a person.

20  A.  It doesn't appear so.

21  Q.  Underneath Unnamed, there is a string of letters and

22  numbers, right?

23  A.  There is, yes.

24  Q.  We can take that down.

25          Can we pull up Government Exhibit 307, please.

1          This is another OpenSea account, right?

2     A.  It appears so, yes.

3     Q.  And the name or perhaps the pseudonym of this account is

4     Unnamed, right?

5     A.  Correct.

6     Q.  And underneath Unnamed, there is a series of letters and

7     numbers, correct?

8     A.  Correct.

9     Q.  And that's, you understand, a wallet address, right?

10    A.  Correct.

11    Q.  By the way, as you look at this page, there's no IP address

12    associated with this account that you can see, correct?

13    A.  Not that's visible on this screenshot.

14    Q.  We can take that down.

15         Can we please pull up Government Exhibit 319.

16         This is another OpenSea account, right?

17    A.  It appears so, yes.

18    Q.  It has the same name or pseudonym, which is Unnamed, right?

19    A.  Correct.

20    Q.  And underneath Unnamed, there is a string of letters and

21    numbers, correct?

22    A.  Correct.

23    Q.  No social media that you can see, right?

24    A.  Not that I can see.

25    Q.  And the activity log that we can see consists of seven

1    rows, correct?

2    A.   Correct.

3    Q.   And in that column for "item", there is a picture, and it

4    appears to be the same picture seven times, right?

5    A.   It appears so.

6    Q.   And the caption or title associated with that item is

7    Revisit Childhood, right?

8    A.   That's what it says.

9    Q.   It says it for each of them, right?

10   A.   Yes.

11   Q.   All right.  We can take that down, and please pull up

12   Government Exhibit 320.

13           This is another account on OpenSea, right, Dr. Edman?

14   A.   It appears so.

15   Q.   And the name or title or pseudonym of this account is

16   Unnamed, right?

17   A.   Correct.

18   Q.   And underneath Unnamed, there is a series of letters and

19   numbers, right?

20   A.   Correct.

21   Q.   Those letters and numbers are corresponding to a wallet

22   address, right?

23   A.   Correct.

24   Q.   And you don't know off the top of your head whether that's

25   one of the wallet addresses that you looked at as part of this

1    case?

2    A.  Not off the top of my head.  I would have to go back to the

3    documents.

4    Q.  Let's take that down and pull up Government Exhibit 311,

5    please.

6            This is one of the ones we looked at yesterday.  I

7    just had a couple followup questions.

8            There is only six rows in the activity log here,

9    correct?

10   A.  I only see six, correct.

11   Q.  And in the column for "item," there is a little picture,

12   right?

13   A.  There is.

14   Q.  And it appears to be the same picture six times, right?

15   A.  It appears so.

16   Q.  And the title associated with the picture is Journey and

17   Her Loyal Fellowship, right?

18   A.  Correct.

19           MS. NICHOLS:  And Mr. Bianco, let's zoom out so we can

20   see the whole page.

21   Q.  And other than those six rows, there is no other activity

22   associated with this account that you can see reflected on this

23   page, correct?

24   A.  Not that I see.

25   Q.  All right.  Let's pull up, please, Government Exhibit 313.

1              This is another OpenSea account, right, Dr. Edman?

2    A.   It appears so.

3    Q.   And the name on this one is Unnamed, right?

4    A.   Whether that's the name assigned by OpenSea or a pseudonym

5    chosen by the account holder, I can't say.

6    Q.   Okay.  Under Unnamed, there is a string of letters and

7    numbers, right?

8    A.   There is.

9    Q.   And there's no IP address information reflected on this

10   page, correct?

11   A.   Not that I see.

12   Q.   And there is no social media linked on this page, right?

13   A.   Not that I see.

14   Q.   We can take that down and please pull up Government Exhibit

15   323.

16             This is another OpenSea account, right, Dr. Edman?

17   A.   It appears so.

18   Q.   And the name or title or pseudonym is Unnamed, right?

19   A.   Correct.

20   Q.   We can take that down.  Let's pull up Government Exhibit

21   318, please.

22             This is another OpenSea account, right?

23   A.   Correct.

24   Q.   And at the top, the name or pseudonym is Unnamed, right?

25   A.   Correct.

Q.   There's no profile picture of a person, correct?

A.   Not that I see.

Q.   There's no name on here that appears to be the kind of name

that would be on a birth certificate, right?

A.   Not --

          MR. MILLER:  Objection.

          THE COURT:  Sustained.

Q.   There's no social media account that you can see linked to

this page, correct?

A.   Not that I see.

Q.   And underneath Unnamed, there is a string of letters and

numbers, right?

A.   Correct.

Q.   And you understand that's a wallet address, correct?

A.   Correct.

Q.   Okay.  So we can take at that down.

          Dr. Edman, you testified yesterday about mixers and

tumblers.  Do you remember that?

A.   I do.

Q.   And your opinion is that the defendant did not use those,

correct?

A.   I saw no evidence that he had.

Q.   You never interviewed the defendant, right?

A.   I did not.

Q.   You didn't ask him any questions about his technology use,

1  true?

2  A.  Correct.  I never spoke with him.

3  Q.  So you didn't have a chance to ask him any questions about

4  his habits with respect to technology?

5  A.  I never spoke with him, so no.

6  Q.  And you didn't ask him any questions about his knowledge

7  with respect to different kinds of technology, right?

8  A.  I never spoke with him, so no.

9  Q.  So you can't say one way or another whether the defendant

10  knew how to use mixers and tumblers, right?

11  A.  I can't speak to what the defendant does or does not know.

12  But, it's my opinion, based on my experience, that using a

13  tumbler, there is plenty of public information that someone

14  could use to use a mixer or tumbler if they wanted to.

15  Q.  Okay.  So to understand your methodology with respect to

16  this case, I think you testified that you reviewed a universe

17  of transactions that you understood were at issue in the case;

18  is that right?

19  A.  That is correct.

20  Q.  And I think you testified that the list of those

21  transactions that were at issue came from the government; is

22  that right?

23  A.  That was my understanding, yes.

24  Q.  And you testified that one of your opinions that you were

25  able to form is that, for that universe of transactions that

1  you looked at, all of the wallet addresses were associated with

2  only two wallets.  Is that right?

3  A.  Sorry.  Could you please restate the question?

4  Q.  Sure.  I think I understand that one of your opinions is

5  that for the universe of transactions that you looked at, all

6  of the wallet addresses were associated with only two wallets.

7  Is that right?

8  A.  No.

9  Q.  So, it's not your opinion that the defendant only used two

10 wallets in this case?

11 A.  The question you are asking now is different than the

12 previous one.  In the transactions that I rereviewed that were

13 identified by the government, each of the transactions has a

14 sender and a recipient.  It is my opinion that the defendant

15 only used two wallets.  But each transaction involved addresses

16 that were not part of the defendant's wallets.

17          MS. NICHOLS:  Okay.  So, I'd like to pull up for the

18 witness and the parties and the Court Government Exhibit 1004,

19 which is a demonstrative.  Sorry.  1104.

20          Your Honor, we'd like to display this, we'd like to

21 publish this demonstrative.

22          THE COURT:  Any objection?

23          MR. MILLER:  No objection, other than there is an

24 exhibit sticker on the bottom, and it is just a demonstrative

25 we're consenting to.

1           THE COURT:  Understood.  You may display it.

2           Ladies and gentlemen, reminder that a demonstrative is

3     not evidence.  It is just something the parties are permitted

4     to use in connection with the witness's testimony on the theory

5     it helps you understand and evaluate the witness's testimony.

6     It is not, unless it's offered and admitted into evidence, it

7     is not in evidence, even if it has a government exhibit

8     sticker.  So with that understanding, you may display it.

9           MS. NICHOLS:  Thank you, your Honor.

10    Q.  Dr. Edman, this appears to be three different wallet

11    addresses, correct?

12    A.  That's what it appears to be.

13    Q.  And you can't tell from just looking at these wallet

14    addresses whether they were associated with one wallet or

15    multiple wallets, can you?

16    A.  Not just by solely looking at the addresses as displayed

17    here.

18    Q.  Okay.  We can take that down.

19          The reason that you are able to offer an opinion in

20    this case about the number of wallets that the defendant used,

21    is that you reviewed the defendant's laptop, right?

22    A.  In addition to the ledger cold storage device.

23    Q.  And you looked at that laptop and the ledger cold storage

24    device in counsel's office before your testimony I think you

25    said; is that right?

1   A.  Correct.

2   Q.  And the defendant was present, but you didn't speak to him,

3   correct?

4   A.  Correct.

5   Q.  And defense counsel was present, correct?

6   A.  Correct.

7   Q.  And in the presence of defense counsel, you looked at the

8   defendant's laptop and the cold storage device, correct?

9   A.  Correct.

10  Q.  And defense counsel told you that that cold storage device

11  belonged to the defendant, right?

12          MR. MILLER:  Objection.

13          THE COURT:  Overruled.

14  A.  They did, yes.

15  Q.  So defense counsel told you that the defendant had two

16  wallets, right?

17          MR. MILLER:  Objection.

18          THE COURT:  Overruled.

19  A.  No, they did not tell -- make that conclusion for me.  I

20  determined that based on my analysis.

21  Q.  And based on the fact that defense counsel told you that

22  the cold storage device belonged to the defendant, right?

23  A.  Correct.

24          MS. NICHOLS:  I'd like to pull up the defense

25  demonstrative that's been marked as Edman Demonstrative 1 for

1    the jury, your Honor.

2              THE COURT:  You may.

3    Q.  So you testified about this yesterday, right, Dr. Edman?

4    A.  I did.

5    Q.  And this is a demonstrative that you created, correct?

6    A.  Correct.

7    Q.  And the information that's being conveyed in this

8    demonstrative is that there can be multiple wallet addresses

9    within a singular wallet; is that right?

10   A.  Correct.

11   Q.  And so on the left side, we see a Meta Mask wallet, right?

12   A.  Yes.

13   Q.  And on the right side, we see a traditional wallet, right?

14   A.  Correct.

15   Q.  And there's arrows from the Meta Mask wallet into the

16   traditional wallet, correct?

17   A.  Correct.

18   Q.  And those arrows signify wallet addresses going from the

19   Meta Mask wallet into the traditional wallet, right?

20   A.  The arrows don't signify a wallet address going anywhere.

21   It is showing there is a relationship between the accounts

22   identified in Meta Mask and a wallet address.

23   Q.  It's signifying the relationship in the metaphor that

24   you've created, correct?

25   A.  Correct.

1   Q.  In the metaphor that you've created, the wallet addresses

2   are symbolized by credit cards, right?

3   A.  Credit cards, debit cards, whatever kind of card you want.

4   Q.  Physical, physical cards.

5   A.  Sure.

6   Q.  Okay.  And so you created three slots for these physical

7   credit cards or debit cards, correct?

8   A.  I didn't create the slots.  It was just a stock image that

9   had three slots in it.

10  Q.  This is your demonstrative, right?

11  A.  Correct.

12  Q.  And you sent it to defense counsel, right?

13  A.  I did.

14  Q.  And you testified yesterday that this demonstrative would

15  help illustrate your testimony, right?

16  A.  I did.

17  Q.  Okay.  So would you agree with me that there are only three

18  credit cards or debit cards represented in this demonstrative?

19  A.  Correct.

20  Q.  But, there were at least 22 wallet addresses at issue in

21  this case as associated with the defendant, correct?

22  A.  That is my recollection, yes.

23          MS. NICHOLS:  So, at this time, your Honor, the

24  government would like to display the demonstrative Government

25  Exhibit 1101.

1          THE COURT:  Any objection?

2          MR. MILLER:  No, other than, again, there is an

3  exhibit sticker, but this is just a demonstrative.

4          THE COURT:  Keep your voice up, Mr. Miller.

5          With that understanding, you may proceed.  And same

6  instructions, ladies and gentlemen.

7          MS. NICHOLS:  May we publish, your Honor?

8          THE COURT:  You may.

9  Q.  So if you were to make an image of a traditional wallet

10  that had 22 credit card or debit card slots, it would look more

11  like this, correct?

12  A.  It could, yes.

13          MS. NICHOLS:  No further questions, your Honor.

14          THE COURT:  All right.  Redirect.

15          MR. MILLER:  Yes, your Honor.

16  REDIRECT EXAMINATION

17  BY MR. MILLER:

18  Q.  Good morning, Dr. Edman.

19  A.  Good morning.

20  Q.  You were just shown by government counsel a number of

21  exhibits from screenshots from OpenSea.  Do you recall that?

22  A.  I do.

23  Q.  Do you recall that there was a profile that had Unnamed

24  under it?  Do you remember for all those exhibits?

25  A.  I do.

 1   Q.  In your experience and expertise in blockchain and

 2   cryptocurrency, do users always post their true identities on

 3   platforms like OpenSea?

 4   A.  No.

 5   Q.  Do users post their IP addresses associated with their

 6   accounts on such platforms?

 7   A.  They do not.

 8   Q.  In your expertise and experience in blockchain and

 9   cryptocurrency -- withdrawn.

10           In your experience and expertise in blockchain and

11   cryptocurrency, is it uncommon for users to post their

12   identity?  Is that uncommon?

13           MS. NICHOLS:  Objection.

14           THE COURT:  Can you ask the question again.

15           MR. MILLER:  Sure.

16   Q.  As an expert in blockchain and cryptocurrency, is it

17   uncommon for users to not post their true identities on

18   platforms like OpenSea?

19           THE COURT:  Can we try that again without the three

20   negatives.

21           MR. MILLER:  Understood.

22   Q.  I think the point is made.  Let's move on to --

23           MS. NICHOLS:  Move to strike.

24           THE COURT:  Hang on.  I don't think there was any

25   answer to strike.  So, I'll remind the jury that it is the

1    witness's answers, not any question that is evidence.

2            You may proceed.

3            MR. MILLER:  If we could put up, your Honor, Defense

4    Exhibit 49, which is in evidence.

5            THE COURT:  Can somebody bring it up so I can see it?

6    You may.

7            MR. MILLER:  Thank you.

8    Q.  So, Dr. Edman, do you remember testifying about this

9    exhibit yesterday?

10   A.  I do.

11   Q.  You were asked a series of questions this morning about how

12   you knew that there were two wallets.  Do you recall those

13   questions?

14   A.  I do.

15   Q.  And putting aside the particular cold wallet that you were

16   shown in counsel's office that you were asked about, was there

17   an independent basis for you to make the determination that, in

18   fact, there were two wallets and two wallets only that were

19   used by the defendant in terms of the transactions that you

20   reviewed from Etherscan?

21   A.  In terms of the transactions that I reviewed from

22   Etherscan, on the left you have one singular address that is

23   not part of the wallet shown in the middle there.  All of the

24   addresses shown in the middle are associated with the same Meta

25   Mask hot wallet, and all of the funds from that wallet go back

1    into the one singular address, which is separate and distinct

2    from the Meta Mask hot wallet.

3    Q.  Was that part of your analysis in forming your third

4    opinion that you testified about yesterday, that there were two

5    wallets that were used by the defendant in this case?

6    A.  It was.

7    Q.  You were just shown a demonstrative that showed essentially

8    a pretty large wallet with a number of addresses beyond the

9    three that were used in your demonstrative.

10           Was there any reason that you chose for your

11   demonstrative three slots?

12   A.  Again, only that was a stock image that was available for

13   use.

14   Q.  Is it common, from your expertise and experience as an

15   expert in blockchain and cryptocurrency, do users often have

16   multiple addresses within one wallet?

17           MS. NICHOLS:  Objection.

18           THE COURT:  Overruled.

19   A.  In my experience, it is very common to have multiple

20   addresses within one wallet.

21   Q.  There is nothing magical about the three slots that you had

22   in the demonstrative.  There could be more?

23   A.  No, sir.  It certainly could be more.

24           MR. MILLER:  Nothing further, thank you, your Honor.

25           THE COURT:  Can I see counsel at sidebar for a moment,

1   please.

2            (At the sidebar)

3            THE COURT:  So, I have a concern, and it may be that

4   the best thing is to leave it, but yesterday you made a

5   representation to me, Mr. Miller, that Dr. Edman's testimony

6   about the number of wallets and so forth was based on his

7   independent evaluation, and not based in any way, shape or form

8   on anything that Mr. Chastain communicated verbally or

9   otherwise or you communicated verbally or otherwise.

10           He just testified on cross-examination that your

11  telling him that was the cold storage wallet is part of what he

12  based his opinion on.

13           It is, number one, contrary to the representation you

14  made to me yesterday, which is disturbing, but second of all,

15  it raises the question whether he should have been able to

16  testify to that effect.  I am not sure whether this matters,

17  whether it was two wallets, 22 wallets, whatever.  I don't know

18  what that matters, but that's for you guys to argue.

19           My point is I'm not sure it should have come in, given

20  that testimony.

21           MR. MILLER:  So, your Honor, I absolutely did not

22  intend to make any misrepresentation to the Court.  My

23  understanding from talking to Dr. Edman before he testified was

24  that, even though determining whether there was actually this

25  particular cold wallet or not was in part based on looking at

1  the actual device, it was his understanding, from looking at

2  the transactions, that there were two wallets.  That's what I

3  understood.

4          THE COURT:  Okay.  But, he literally just testified:

5  "I determined that based on my analysis."

6          And Ms. Nichols asked:  "And based on the fact that

7  defense counsel told you that the cold storage device belonged

8  to the defendant, right?

9  "A.   Correct."

10          MR. MILLER:  I was surprised by that answer, because I

11  did discuss this with Dr. Edman.  I don't know how else to say

12  it.  I certainly would not make any misrepresentations to the

13  Court.

14          MS. NICHOLS:  So, I can speak to my understanding, but

15  I think, actually, maybe it will be more helpful to make a

16  suggestion about what we should do.

17          THE COURT:  I am raising it now in part because

18  Dr. Edman is still on the stand.  So if there is any further

19  inquiry that either side wishes to make on this, that's one

20  option.

21          MS. NICHOLS:  I don't know that further inquiry is

22  needed, your Honor.  I think that what we could do is strike

23  that testimony outside the presence of the jury, so as to not

24  put a bullseye on it, and prohibit counsel from arguing.

25          THE COURT:  Strike the testimony about two wallets?

1          MS. NICHOLS:  Right.  But I don't think we need to do

2     that in front of the jury.  I think sometimes, as your Honor

3     has noted in other contexts, curative instructions can be

4     counterproductive.

5          So I think our proposal would be we strike the

6     opinion, and not permit it to be part of summations.

7          THE COURT:  So you don't want to inquire further of

8     Dr. Edman?

9          MS. NICHOLS:  No.

10         MR. MILLER:  Can I make an alternative suggestion,

11    your Honor?

12         THE COURT:  Do you wish to inquire further of

13    Dr. Edman?

14         MR. MILLER:  I might, but I want to say this.  My

15    understanding, and what I believed and I represented to the

16    Court, was that in order to determine whether the cold storage

17    device had the address on it that was the address that he

18    identified as all those transactions happening with, he needed

19    to see that physically on that device, which is what I believe

20    I was talking about yesterday.  But my understanding is from

21    his analysis of the transactions on the blockchain, including

22    Etherscan, was that based on the fact that there were all these

23    transfers to this one address, that was consistent with having

24    two wallets.  That's what I understood.

25         THE COURT:  Here's my suggestion.  It doesn't sound

1   like, unless you can tell me otherwise, that there is further

2   inquiry of Dr. Edman needed in front of the jury.

3          So I propose that I excuse him, I presume that the

4   defense will then rest, and we can excuse the jury.  I propose

5   that Dr. Edman stick around, and that we discuss this.  I think

6   one possibility is that I take further testimony of him without

7   the jury's presence to determine whether that was necessary to

8   him forming the opinion.  If it was, then I'm prepared to grant

9   some sort of relief or at least discuss what relief ought to be

10  granted.  If it wasn't, then perhaps we leave well enough

11  alone.

12         That's my current thinking.  Unless someone can tell

13  me there is further inquiry necessary with Dr. Edman here in

14  front of the jury, we should get them out.

15         MS. NICHOLS:  I don't think that counsel should be

16  permitted to make further inquiry in front of the jury after

17  he's concluded his redirect, your Honor.

18         MR. MILLER:  One last point.  And that is, even if

19  that is the sole basis -- but I don't believe that is the

20  case -- but even if that was the basis for him determining that

21  this particular address was a cold wallet device, it still is

22  my understanding that he believes that there was actually two

23  wallets based on the transactions that occurred.  So, and

24  furthermore, even though he determined that from looking at the

25  device that Mr. Chastain plugged in, in our offices.

1          THE COURT:  Mr. Miller, let's argue this afterwards.

2     I think we are done with Dr. Edman in front of the jury.

3          (In open court)

4          THE COURT:  Sorry for that interruption, ladies and

5     gentlemen.

6          With that, Dr. Edman, you may step down from the

7     stand.  Thank you very much.

8          (Witness excused)

9          THE COURT:  All right.  Mr. Miller?

10         MR. MILLER:  Your Honor, the defense rests.

11         THE COURT:  All right.  So, ladies and gentlemen, you

12    just heard some magic words again.  Defense has rested its

13    case, which means that you have now heard all of the evidence

14    in this case.

15         I told you earlier I would let you go early.  Early

16    dismissal on a Friday, unless people are going to complain

17    about it.  Hopefully you are okay with it.

18         The reason for that is there are some issues I need to

19    discuss with the lawyers.  As I told you, the next phase of the

20    case is summations.  That's the parties' opportunity to argue

21    to you about the evidence and what conclusions you should draw

22    from the evidence.  And then after that, I give you

23    instructions about the law that you are to apply.  The law is

24    an exceedingly important part of the process.  As you will see

25    next week when I instruct you about the law, I am going to give

1    you the instructions in writing to follow along as I read.

2    But, because of its importance, both sides have an opportunity

3    to see what I am going to instruct you and to give their

4    thoughts and suggestions to me.  That's part of what we need to

5    take care of, and that sometimes takes a little -- a long time.

6         So, bottom line is, rather than having you sit in that

7    room for a while or wander around lower Manhattan, I think it

8    makes more sense to let you go for the weekend and then come

9    Monday, fresh and ready for summations and instructions and the

10   beginning of your deliberations.  So that's what we are going

11   to do and why I'm letting you go early.

12        Let me say a few things.  First of all, on Monday we

13   will begin promptly with summations, and then after that, my

14   instructions, and then once I complete those, you'll begin your

15   deliberations.  As I mentioned yesterday, I am going to ask

16   that you plan to be here or that you can be here until

17   5 o'clock.  Obviously, how long you deliberate is ultimately up

18   to you.  But bottom line is we won't have the same truncated

19   day.  That's in part because it's harder to manage with

20   summations, because they take a while, and I don't want to

21   interrupt those.  I want to make sure you can listen carefully

22   and so forth.

23        So, bottom line is be prepared to be here a full day

24   on Monday.  I Promise we'll take appropriate breaks.  I also --

25   Ms. Smallman will correct me if I'm wrong -- because your

1    deliberations will begin on Monday, we will actually arrange to

2    order lunch for you.  We'll have a longer lunch break and we'll

3    arrange for lunch.  So when you come in on Monday, you'll find

4    lunch order forms.  If you can each fill those out,

5    Ms. Smallman will collect them for you and there will be lunch

6    for you in the jury room.

7            Don't discuss the case with each other or anyone else.

8    We are coming upon a weekend.  I imagine that some of you will

9    be spending time with family and friends.  I hope you enjoy

10   that.  That's wonderful.  Don't talk to them about the case.

11   You can tell them you are sitting as a juror in a federal

12   criminal case.  That is all you should tell them.  Don't tell

13   them what it's about.  Don't tell them anyone's names.  Don't

14   tell them anything about it.  The day will come not too long in

15   the future where that restriction will be lifted and you can

16   tell anybody anything you want.  Not yet.

17           Please don't discuss the case with each other or

18   anyone else.  Don't do any research about the case and continue

19   to keep an open mind.  You have now heard all of the evidence,

20   but you haven't heard the lawyers' closing arguments, and I

21   told you that's an important part of the case and very helpful

22   in helping you come to whatever conclusions you ultimately come

23   to, and you haven't heard my instructions about the law.  So it

24   is still very important that you keep an open mind.

25           With that, I wish you a wonderful and pleasant

1    weekend.  Safe travels, and please be here Monday, no later

2    than 8:45, and hopefully we'll get off to a prompt start at

3    9 o'clock.

4            Thank you very much.  Have a great weekend.

5            (Jury excused)

6            THE COURT:  You may be seated.  All right.  So let's

7    talk about the issue that we were discussing at sidebar.

8            Mr. Miller, I appreciate your representation about

9    your representation, and let's put that aside.  Which is to say

10   that I trust and believe that you didn't make any

11   misrepresentations to me.

12           Be that as it may, I'm concerned that, based on the

13   testimony I heard on cross, there is at least a possibility

14   that the information conveyed by counsel was a necessary part

15   of his analysis in reaching the conclusion and opinion that he

16   testified to.  If so, then I think it should not have been

17   offered or admitted.  If not, if separate and apart from

18   whatever you may have told him, he could have come to that

19   conclusion, and it's not a necessary step, then perhaps we

20   leave it be.

21           MR. MILLER:  So if I may, your Honor.  I would like to

22   walk your Honor through exactly what happened.

23           One aspect of the technology that one of my co-counsel

24   reminded me about.  So, it was our understanding, in talking to

25   Dr. Edman, particularly in the last few days, that based on his

1    analysis in looking at the blockchain and looking at the

2    Etherscan records, that the movements between the addresses

3    were -- even without looking at anything, were consistent with

4    a grouping for two wallets.  And the first one was Meta Mask,

5    he believed, based on looking at some stuff, including the

6    Etherscan records, identified Meta Mask, which you heard on

7    direct examination.

8           Second, that usually it is a common practice that

9    second wallet would usually be a cold storage wallet.  Now,

10   these cold storage wallets, it is our understanding the way it

11   works, is it is like a USB plug-in, but the address is actually

12   on the ledger itself.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1            MR. MILLER:  (Continuing)  So part of him being able

2      to verify that it was, in fact -- I'm sorry.  My apologies.

3      The MetaMask info was not on Etherscan, it was on OpenSea

4      itself, but identifying it as from MetaMask.

5            But the cold storage device itself has the address on

6      it, so that in order to match it up, that it is actually an

7      address from a cold storage device, you have to physically see

8      the device itself.

9            So that is why he looked at Mr. Chastain's laptop,

10     which, again, was information that the government had in its

11     possession, as I represented to the Court, and included on the

12     laptop itself, my understanding is there's software about the

13     cold wallet.

14           And so, ultimately, he looked -- I told him to come

15     into our offices, that Mr. Chastain was going to open up his

16     laptop, verify that, in fact, these addresses were on that

17     MetaMask wallet, which he did, and then verify the cold wallet,

18     the USB device, had that address on it.  That is exactly what

19     happened.

20           And if, frankly --

21           THE COURT:  Mr. Miller, let me just stop you, because

22     do you disagree with what I have said?  If it is a necessary

23     part of his analysis, and he relied on a communication from

24     either you or Mr. Chastain, whether verbal or otherwise, in

25     forming his opinion, I think that that would render the opinion

1    inadmissible.

2              Do you agree with that?  Putting aside whether that is

3    accurate.

4              MR. MILLER:  I'm not sure, respectfully, your Honor,

5    that I do agree with that.

6              THE COURT:  All right.

7              MR. MILLER:  I think it goes to weight.

8              THE COURT:  Well --

9              MR. MILLER:  Because, your Honor, certainly,

10   government counsel ably cross-examined Dr. Edman about that,

11   and, obviously, the jury heard, clearly, that there was some

12   involvement in him looking at Mr. Chastain's device.

13             THE COURT:  Do you have authority for the proposition

14   that that goes to weight?  Because I would think unless I tell

15   the jury that the expert is not permitted to rely on

16   information that counsel gave, that -- I don't know how they

17   are able to evaluate the opinion and understand what it was

18   based on.  Do you have authority for that proposition?

19             MR. MILLER:  I will certainly check, your Honor.  But

20   the only thing I will mention, again, is it was our

21   understanding, prior to putting Dr. Edman on the stand, that

22   even without physically seeing the cold wallet device and the

23   address on the device, it was our understanding that, from his

24   view of the transactions, that it was consistent with two

25   wallets.  That's what we were told.

1      THE COURT:  So, putting aside the question I asked and

2  your answer and whether you have authority for that

3  proposition, that is a different question, that is a fact

4  question, of whether the information that you conveyed to him

5  was necessary to forming his opinion.  That is a different

6  question.  I'm inclined to think, let's get him on the stand,

7  and both sides can inquire about that, and then we'll have a

8  more fulsome record on this issue, and then the parties can

9  argue as to what belief, if any, should be granted.

10      In other words, if I had understood before Dr. Edman

11  testified that this might be part of the chain of what

12  permitted him to reach the opinion, number one, I might have

13  precluded the testimony, but, at a minimum, in order to discern

14  whether it was, I might have had a hearing outside the presence

15  of the jury.  Obviously, it's better to do that before the jury

16  hears evidence, but, based on your representations, I didn't do

17  it in that order.

18      I'm inclined to think we should now do that, and then

19  it may be that we leave well enough alone, and there's nothing

20  to be done, but at least both sides will have an opportunity to

21  make whatever arguments they want about it.

22      MR. MILLER:  That's fine, your Honor.

23      THE COURT:  All right.

24      Any objection from the government?

25      MS. NICHOLS:  Your Honor, I actually think the Court

1    has heard enough.  I think it's come in clearly what happened.

2    And I, too, credit Mr. Miller when he says that he didn't

3    understand that that was part of Dr. Edman's analysis or a

4    necessary part of it, but I think that it's now clear that it

5    was.

6              So I'm not sure that an ex post --

7              THE COURT:  I disagree only because I don't think the

8    question that you asked him makes clear whether it was a

9    necessary part of the analysis, that is to say, absent the

10   information that Mr. Miller conveyed, he could have and would

11   have reached the same conclusion.  If he is prepared to and

12   does say that, then I'm inclined to think, that question and

13   answer aside, the opinion could have been offered, and there's

14   probably no relief to be granted here.

15             But if he clarifies that it was a necessary part, then

16   I think we're in a different territory.

17             So I think that's the part we need to clarify.

18             MS. NICHOLS:  Understood.

19             MR. MILLER:  Sorry, just for the record, your Honor,

20   again, it was our understanding that his analysis of the

21   records, independent of physically coming into our office, was

22   consistent with the fact that there was likely two wallets that

23   were involved.

24             THE COURT:  I got it.  Let's get him on the stand, and

25   you can elicit that from him.

1              In the meantime, on the theory that you guys have

2    multiple people and can do multiple things at a time, I'm going

3    to expedite things and have my law clerk give you the draft

4    jury charge — I'll give three copies to each side — and you can

5    start reviewing that, and then we'll discuss timing about the

6    charge conference.

7              Dr. Edman, if you can come back to the witness stand,

8    please.

9              Dr. Edman, thank you.

10             For these purposes, you remain under oath.

11             Mr. Miller, do you want to inquire first?  Actually,

12   you know what, I will inquire.

13             Dr. Edman, earlier, Ms. Nichols asked you a question

14   about -- you indicated that counsel — I assume Mr. Miller, but

15   one of Mr. Chastain's lawyers — advised you that the cold

16   storage wallet, whatever it's called, belonged to Mr. Chastain,

17   correct?

18             THE WITNESS:  Correct.

19             THE COURT:  And then Ms. Nichols asked you a question

20   immediately thereafter.  You said that you determined that the

21   defendant had two wallets based on your own analysis, and then

22   the question was:  And based on the fact that defense counsel

23   told you that the cold storage device belonged to the

24   defendant, right?

25             Your answer was:  Correct.

1          Can you explain to me what role that information

2     played in forming your opinion?  In other words, what part did

3     the information that counsel conveyed to you play in your

4     opinion?

5          THE WITNESS:  So, counsel's representation that the

6     cold storage device belonged to Mr. Chastain really doesn't

7     play a role in my opinion.  My opinion is that there were two

8     wallets, and that's based on a technical analysis and not a

9     representation made by counsel.

10         THE COURT:  Okay.

11         I guess to ask the question differently, had counsel

12    not shared that information with you, would you have been able

13    to reach that same conclusion?  And, if so, can you explain

14    how?

15         THE WITNESS:  So I would have been able to reach the

16    conclusion that there were two separate wallets without that

17    information, and, really, without even inspecting the ledger

18    device itself, simply by inspecting the MetaMask wallet and the

19    addresses contained within it.  I know that based on how

20    addresses are generated within a MetaMask wallet, if the

21    address associated with the ledger is not in that wallet, then,

22    therefore, it belongs to a different wallet.

23         So the logical conclusion is that there are two

24    wallets.

25         THE COURT:  All right.

1          So, when you answered "Correct" to Ms. Nichols'

2    question, that your opinion, your analysis, was based, in part,

3    on the fact that defense counsel had told you that the cold

4    storage device belonged to the defendant, can you explain what

5    role that did play?

6          THE WITNESS:  That information would have only played

7    a role in my analysis to the extent that, based on that, I can

8    say, or reasonably believe, that the second wallet, the

9    non-MetaMask wallet, belonged to Mr. Chastain, other than

10   seeing him unlock it, which requires a PIN code, but it doesn't

11   change my opinion that there were two separate wallets.

12         THE COURT:  So, in other words, it was that

13   information that you were relying on to link the two wallets to

14   Mr. Chastain?  I'm not sure I understand precisely what role

15   that information conveyed by counsel played.

16         THE WITNESS:  Yeah, so maybe there are two separate

17   issues.

18         One is how many wallets are there, and based on

19   technical analysis alone, I can say that there are two.

20         THE COURT:  Keep your voice up.  Go ahead.

21         THE WITNESS:  And then second is ownership of those

22   wallets.  Based on inspecting Mr. Chastain's laptop, I believe

23   the MetaMask belongs to him based on -- well, one, seeing

24   Mr. Chastain unlock the ledger cold storage wallet, there's

25   reason to believe that it belonged to him.  But also, to an

1    extent, representation by counsel that that is Nate's ledger

2    device could play a role in that conclusion, but not the fact

3    that there are two separate wallets.

4             THE COURT:  If I understand correctly, you could

5    determine, without any information conveyed by counsel or

6    Mr. Chastain, whether orally or by unlocking the device, that

7    the transactions involved in this case that you were asked to

8    analyze, that they involved two wallets; is that correct?

9             THE WITNESS:  I needed to inspect the MetaMask wallet

10   to confirm that there were two separate wallets.  But, also,

11   the transaction analysis strongly suggests that analyzing the

12   MetaMask wallet simply confirms that.

13            THE COURT:  But just listen to my question.

14            You could, and did, reach that conclusion without

15   relying on any information conveyed by counsel or Mr. Chastain,

16   whether orally or by virtue of unlocking the device or anything

17   of that sort; is that accurate?

18            THE WITNESS:  That is accurate.

19            THE COURT:  So the portion of your opinion that you

20   said was based on the fact that you were told that it was his

21   device and/or your seeing that he unlocked it, that enabled you

22   to link the two wallets to the defendant; is that what you're

23   saying?  In other words, you relied on it for attribution, not

24   for the fact that there were two wallets involved in the

25   transactions that you were asked to look at?

1              THE WITNESS:  Correct.

2              THE COURT:  Okay.

3              Counsel, any follow-up?

4              MS. NICHOLS:  Should I inquire or just --

5              THE COURT:  If you want to, yes.  I'm giving you that

6      opportunity.

7              MS. NICHOLS:  Thank you, your Honor.

8      RECROSS EXAMINATION

9      BY MS. NICHOLS:

10     Q.  So, Dr. Edman, when you are looking at information from

11     Etherscan transactions, you can tell if the wallet address is

12     likely associated with MetaMask, right?

13     A.  Simply by looking at Etherscan?  No.

14     Q.  Okay.  So how were you able to tell that some of the wallet

15     addresses were MetaMask addresses?

16     A.  Two reasons principally.

17             One is inspecting the addresses associated with

18     Mr. Chastain's MetaMask wallet on his laptop, I was able to

19     confirm that those addresses were associated with the MetaMask

20     wallet, with a single MetaMask wallet.

21             Additionally, the records produced by OpenSea in this

22     matter associates wallet addresses with what's in the documents

23     they term a wallet -- a Web3 wallet provider, which identifies

24     the wallet as MetaMask.

25     Q.  Okay.  So I want to focus on that second part.

1          So the documents produced by OpenSea tell you that

2    some of the wallet addresses are associated with MetaMask,

3    right?

4    A.  Correct.

5    Q.  And am I right that some of them were not associated with

6    MetaMask, right?

7    A.  Correct.

8    Q.  So you understood that there was like a potential universe

9    of some MetaMask wallet addresses and some non-MetaMask wallet

10   addresses, right?

11   A.  Correct.

12   Q.  And it was your hypothesis, or supposition, that the ones

13   that were not MetaMask would likely be associated with a cold

14   storage device, right?

15   A.  Based on the pattern of transactions, it appeared that

16   there were two wallets, one of which was likely a cold storage

17   device.  The transaction pattern wouldn't make sense if both

18   were a hot wallet.

19   Q.  But in order to determine whether that pattern was --

20   whether the hypothesis that you formed associated with that

21   pattern was true, you had to actually inspect the cold storage

22   device provided by counsel, right?

23   A.  I had to inspect the MetaMask wallets to determine the set

24   of addresses associated with that wallet, the addresses not

25   associated with that wallet, which, in actuality, was just one

1    address, is clearly associated with a separate distinct wallet.

2    Q.  So you were able to tell before -- I'm asking you to stick

3    to the part before you go to counsel's office and look at the

4    two wallets.  Okay?

5            Before that, you were able to tell that some of these

6    are MetaMask and one of them is not; is that right?

7    A.  I'm able to determine that some of them are associated with

8    MetaMask, and I believe there was more than one address that,

9    in the OpenSea records, did not have a Web3 wallet provider

10   associated with it.  And so by analyzing Mr. Chastain's

11   MetaMask wallet, it allowed me to say which of those addresses

12   were indeed associated with the MetaMask wallet.

13   Q.  Let's take it step by step.  I want to go before you looked

14   at Mr. Chastain's wallets in the presence of counsel, before

15   that period of time, before you got that information, am I

16   right that you understand that some of the wallet addresses are

17   associated with MetaMask and some of them are not, right?

18   A.  Correct.

19   Q.  And then you go, and you look at the wallets that are

20   provided by counsel, and you're able to essentially

21   reverse-engineer the analysis, correct?  Like you're able to

22   say, okay, all of the MetaMask addresses are in a MetaMask

23   wallet and all of the non-MetaMask are in a non-MetaMask

24   wallet?

25   A.  I'm sorry, can you restate that?

1    Q.  Sure.

2         You were shown two wallets in counsel's office,

3    correct?

4    A.  I reviewed two wallets, yes.

5    Q.  And upon reviewing those wallets, you were able to

6    determine, I think, two things — one, all the MetaMask wallet

7    addresses that you had looked at were, in fact, in the MetaMask

8    wallet that you were being shown, correct?

9    A.  Correct.

10   Q.  And that led you to conclude that there was only one

11   MetaMask wallet associated with those transactions, right?

12   A.  Correct.

13   Q.  And all of the non-MetaMask wallet addresses that you had

14   looked at prior to coming to counsel's office, you determined

15   that those were found on the defendant's ledger device, right?

16   A.  No.

17   Q.  One of the wallet addresses was found on the ledger device,

18   correct?

19   A.  Correct.

20   Q.  And so before you walked into counsel's office, you were

21   not able to determine, based on looking at the blockchain, how

22   many wallets were involved in those transactions, right?

23   A.  Not entirely.  Based on analyzing the transactions on the

24   blockchain, and the pattern of transactions, it seemed

25   reasonable that there were two separate –- one which likely was

1    a cold storage device.  In addition to analyzing the OpenSea

2    records, I was able to determine a set of addresses associated

3    with a MetaMask wallet, as well as a small number of addresses

4    that did not have a wallet attribution.

5    Q.  And your supposition that the one was likely associated

6    with a cold storage wallet is based on your expertise, in part,

7    right?

8    A.  Correct, my expertise and my analysis of the blockchain

9    transactions.

10   Q.  But until the defendant used his password to unlock the

11   cold storage device in the office, you were not able to

12   determine that, in fact, that wallet address was associated

13   with that particular cold wallet, correct?

14   A.  Correct.  Though, for the purposes of my opinions, it

15   doesn't particularly matter whether that address was associated

16   with that specific ledger, only that there were two separate

17   wallets.

18   Q.  And your knowledge that the defendant's ledger was a cold

19   storage device was informed by your looking at the device in

20   counsel's office, right?

21   A.  And my analysis of the blockchain transactions, where there

22   were a group of addresses that had transactions among them, and

23   then all of those addresses either received funds or sent funds

24   back to the same singular address, which is often indicative of

25   a cold storage wallet.

1    Q.  Well, let me ask it differently.

2           If you hadn't been in a room with counsel and the

3    defendant and the cold storage device, would you have been able

4    to offer an opinion, based on your review of the blockchain,

5    that that wallet address was definitely from a cold storage

6    wallet?

7    A.  I think with a reasonable degree of certainty, based on my

8    review of the transactions and my experience conducting

9    cryptocurrency analysis; however, in terms of saying absolutely

10   definitely 100 percent that address is associated with a cold

11   storage device, I'm not sure that I would be able to come to

12   that degree of certainty.

13           THE COURT:  Let me refine that a little bit.

14           Let's say you came into a room, and there were four

15   cold storage devices there, and nobody told you anything about

16   them.  Could you look at those and connect them to the

17   transactions that you examined from other sources and connect

18   them without anyone telling you anything about those cold

19   storage devices?  In other words, could you, by looking at them

20   and forensically examining them, say, this is totally unrelated

21   to these transactions, oh, look, these match these

22   transactions?

23           THE WITNESS:  Presuming that someone -- that I had the

24   information available to me to unlock them — usually they

25   require a numeric PIN to unlock — assuming that was available

1    to me, then, yes, I could do that analysis.

2              THE COURT:  All right.  Thank you.

3              You can probably leave it there, unless, Mr. Miller,

4    you want to ask some questions as well.

5              MR. MILLER:  I think that's fine.

6              Just one thing:

7              I'm not sure if we can just lead or if you want me to

8    ask open questions.

9    REDIRECT EXAMINATION

10   BY MR. MILLER:

11   Q.  One part of this that I don't think was discussed, and,

12   that is, before you came into our offices, when you saw that

13   the OpenSea records indicated that at least a good number of

14   these addresses were from MetaMask, do you recall telling us

15   that they were likely all from the same MetaMask wallet because

16   it wouldn't make sense to have another MetaMask wallet?

17   A.  I do, yes.

18   Q.  Okay.

19   A.  I do believe I mentioned that already.

20   Q.  Before you --

21             MR. MILLER:  Sorry?

22             THE COURT:  I didn't hear that.  You said I believe I

23   mentioned that already?

24             THE WITNESS:  I believe so, where, based on my

25   analysis, it's reasonable to conclude that the address to which

1    all of the funds were sent and received from the MetaMask

2    wallet would likely be a cold storage wallet.  It wouldn't make

3    much sense to have a second MetaMask wallet.

4              THE COURT:  All right.

5              Can we let Dr. Edman go?

6              MR. MILLER:  Yes, thank you.

7              THE COURT:  All right.  You may step down.  You're

8    excused at this time.

9              (Witness excused)

10             THE COURT:  All right.

11             First, as to that, I'm inclined to say that suffices

12   and leave it as is.  Obviously, the cross-examination raised

13   concerns, but I think that puts my mind at ease, at least --

14   poorly timed window cleaning.

15             But, obviously, there are some technical complications

16   here.  Maybe I'm not understanding everything.  The bottom line

17   is if the government thinks there is relief to be had, you can

18   tell me now.  If you don't, we can move on.  Or if you do, if

19   you want an opportunity to brief it, you can submit a letter to

20   me, let's say, by 6:00 p.m. tomorrow.

21             So, what's your thinking?  Now, let me also say more

22   broadly, as I said at sidebar, maybe there is more significance

23   to this than I see, and I know you guys have been dwelling on

24   the distinction between wallets and wallet addresses, but,

25   honestly, at the end of the day, I find it hard to imagine that

1    the jury is going to understand why that's significant, let

2    alone care.  I think if they think that Mr. Chastain was

3    engaging in these transactions through wallets or wallet

4    addresses in an effort to conceal proceeds of wire fraud, I

5    suspect they will convict him.  If they do not find that, I

6    suspect that they will not convict him.  And I don't think it's

7    going to turn on this distinction, but I could be wrong, and

8    those are the arguments for you to make.

9             So, government, you can also sit on it and submit

10   something in writing by 6:00 p.m. tomorrow if you want to think

11   about it.

12            MS. NICHOLS:  That's what I was going to propose, your

13   Honor.  I'm not sure we'll have a letter, but if we do, it will

14   be by 6:00 p.m. tomorrow.

15            THE COURT:  All right.

16            Then I want a response by 2:00 p.m. on Sunday if the

17   government does file anything.  If the government doesn't file

18   anything, then I will assume that everyone has agreed to move

19   on and that I raised all this trouble for no particular reason.

20   That's not true, but I'll leave it there.

21            All right.  Charge conference:  It's 10:26.  Since

22   you've gotten a jump on it, and it's relatively short, can we

23   reconvene at 11:15?  Does that give you enough time?

24            MR. FILOR:  Any chance we can do 11:30?

25            THE COURT:  We'll do 11:30, but let me say a few

things.

First, I have considered your submissions, including your submissions last night. You should, for purposes of preserving any objections, renew your -- identify anything that is not consistent with what you submitted last night that you want to preserve an objection to. But suffice it to say that I have given your submissions careful consideration, and I'm not likely to reconsider because the issues have been fully aired. So, again, you should preserve your objection, but I'm not going to engage in argument on those points.

So, that will hopefully speed things along.

Number two, here's how it will work: I've given you a draft of the charge with respect to substantive instructions. It includes annotations, which identify what I relied on for those purposes. When we finalize this, and I give it to the jury on Monday, the annotations will come out, but, otherwise, it will remain as is.

I'll begin with the government and then the defense. In each case, I will expect you to go through and identify page and line number — that's why there are line numbers in here, to facilitate this — any objection you have or correction you have, identify the page, the line number, and it's incumbent on you not only to identify the problem, but also propose a solution; that is to say, to the extent you have an objection or you think that it ought to be changed, you should have

1    specific language that you're recommending, and to the extent

2    that you think it is legally required, be prepared to cite

3    authority for that proposition.

4            I can't remember what I was about to say, but the

5    bottom line is that's how we will proceed.

6            Any questions about that?

7            MS. NICHOLS:  No, your Honor.

8            MR. FILOR:  No questions, your Honor.  Thank you.

9            THE COURT:  All right.

10           Have you guys figured out what we're doing on the

11   evidentiary front with respect to submitting things to the

12   jury?  Are we squared away on that?

13           MS. NICHOLS:  Your Honor, I'm not sure if we talked to

14   defense counsel about that, but we I think expect to have a

15   clean laptop that we could submit, and we have been conferring

16   nightly about the exhibits.  So I think it will be very

17   straightforward to get that together.

18           THE COURT:  All right.

19           Why don't you guys do that while everyone is together

20   today so everyone is on the same page, and make sure that by

21   Monday morning, we have assembled it.

22           Who is closing on Monday for each side?

23           MR. BURNETT:  I am, for the government, your Honor.

24           MR. FILOR:  Your Honor, I'm going to do it.

25   Mr. Miller is allowing me the opportunity.

1          THE COURT:  Okay.  Very generous of him.

2          And rebuttal?

3          MS. NICHOLS:  That's me, your Honor.

4          THE COURT:  Do we have estimates on length of the

5     principal summations?

6          MR. BURNETT:  Still in flux, your Honor.  Right now,

7     it's somewhere between an hour and 15 and an hour and 30.

8          THE COURT:  Mr. Filor?

9          MR. FILOR:  He's got the jump on me, I haven't started

10    it, but that sounds about right.  Thank you, your Honor.

11         THE COURT:  All right.

12         Ms. Nichols, I assume up to a half hour?

13         MS. NICHOLS:  Yes, your Honor.

14         THE COURT:  Great.

15         We'll see you at 11:30.  Thank you.

16         COUNSEL:  Thank you, your Honor.

17         (Recess)

18         THE COURT:  Please be seated.  Welcome back.

19         Starting with the government, any objections or

20    corrections?  And I think I remember the thing that I meant to

21    say and had my law clerk convey it, but to the extent that you

22    found any typos or any corrections, I would appreciate your

23    bringing those to my attention, too, since having six

24    additional sets of eyes read these is always helpful.

25         So, page and line number, please.

1              MR. BURNETT:  Yes, your Honor.

2              So starting with some that are just nonsubstantive,

3     the first one is page 3, line 18.

4              THE COURT:  Yes.

5              MR. BURNETT:  We were considering proposing adding,

6     "unless and until you determine that the government proves

7     beyond a reasonable doubt."

8              THE COURT:  Any objection to that from the defense?

9              MR. MILLER:  No.  Thanks.

10             THE COURT:  All right.  We will make that change.

11             Next?

12             MR. BURNETT:  The next one, also nonsubstantive, is

13    page 7, lines 18 to 19.

14             THE COURT:  Okay.

15             MR. BURNETT:  The sentence here that you are not

16    required to accept uncontradicted testimony, we just noticed it

17    showed up twice.  It's fine if you want to have it twice, but

18    we're flagging it in case it wasn't something that was

19    intended.

20             THE COURT:  Where is the other place?

21             MR. BURNETT:  The other one was page 10, lines 14 to

22    15.

23             THE COURT:  I appreciate your pointing that out.  I'd

24    be inclined to delete it on page 10, on the theory that it's

25    more appropriate in the general instructions about credibility

1    of witnesses.

2                MR. BURNETT:  That makes sense.

3                THE COURT:  Any objection to striking it on page 10,

4    from the defense?

5                MR. MILLER:  No.  Thank you, your Honor.

6                THE COURT:  All right.  Next?

7                MR. BURNETT:  The next one?  Page 11, lines 6 and 7,

8    there were no testimonial stipulations, so we were thinking of

9    deleting from "or" through "live testimony."

10               THE COURT:  All right.

11               Any objection to that from the defense?

12               MR. MILLER:  No.  Thank you, Judge.

13               THE COURT:  Okay.  We'll make that change.

14               Next?

15               MR. BURNETT:  The next one was page 3.  The searches

16   and seizures instruction, we realize that because the way the

17   stipulation on the evidence from the defendant's phone was

18   written, there's actually no evidence before the jury that

19   there was ever, like, a search or seizure by the government in

20   the case.  It just said these records come from the defendant's

21   cell phone.  So we didn't necessarily want to flag a search

22   issue for the jury that they may not necessarily be thinking

23   about to begin with.

24               We were thinking maybe just replacing this with an

25   instruction that all of the evidence presented to you in this

1 case was lawfully obtained, and then whether you approve or

2 disapprove of how the evidence was obtained should not enter

3 into your deliberations, period.

4    THE COURT:  All right.  Before we get into the

5 particulars, Mr. Miller, Mr. Filor, your thoughts?

6    MR. MILLER:  I don't think that we have a disagreement

7 that there shouldn't be sort of a --

8    THE COURT:  Microphone closer.

9    MR. MILLER:  I'm sorry.

10    I don't think we have a disagreement that there should

11 be some detailed instruction about searches and seizures, but

12 I'd be curious to hear the language again that's being

13 proposed.

14    MR. BURNETT:  Yes, I think our proposal was to replace

15 the first paragraph with these two sentences:  Sentence one is:

16 "All of the evidence presented to you in this case was lawfully

17 obtained."  Then sentence two would be:  "Whether you approve

18 or disapprove of how the evidence was obtained should not enter

19 into your deliberations."

20    I guess you could flip those, also.

21    THE COURT:  Mr. Miller?

22    MR. MILLER:  I think that's fine, Judge.

23    THE COURT:  What would you title the instructions

24 since searches and seizures is probably not appropriate?

25    MR. BURNETT:  Maybe say procurement of evidence.

1          THE COURT:  I'll tell you what — my suggestion would

2     be to move those two sentences to the end of the what is and is

3     not evidence instruction on page 7, line 6, on the theory that

4     it pertains to what is evidence, and just say, "finally, I

5     instruct you that," and then the substance of what Mr. Burnett

6     suggested.

7          Does that make sense?

8          MR. BURNETT:  Yes, your Honor.

9          MR. MILLER:  Yes, your Honor.

10          THE COURT:  All right.  "Finally, I instruct you that

11     all of the evidence presented to you in this case was lawfully

12     obtained.  Whether you approve or disapprove of how," I'll say,

13     "any evidence was obtained should not enter into your

14     deliberations."

15          MR. MILLER:  Sorry, Judge.  One point just for the

16     record that I realized I should preserve:  Obviously in this

17     case, we did make a motion to suppress early in the case.  So

18     I'm just preserving it.

19          THE COURT:  Understood.  It doesn't waive that.

20          MR. MILLER:  Yes.

21          THE COURT:  Very good.

22          So I'll strike the search-and-seizure instruction

23     altogether.

24          Next, Mr. Burnett?

25          MR. BURNETT:  The next one is just a grammatical

1    point, on page 16, line 19.  Maybe it has some substance to the

2    grammar, but I don't think it's controversial.

3              THE COURT:  Keep your voice up.  19, yes?

4              MR. BURNETT:  Page 16, line 19.  We were proposing

5    editing the beginning of that -- sorry, I guess this begins

6    with "as is pertinent" on line 18.  We were proposing revising

7    that sentence to say, "As is pertinent here, the scheme to

8    defraud alleged is fraudulently embezzling," just to make sure

9    the jury concludes or the jury could come up with other fraud

10   theories that are not the theory of the case.

11             THE COURT:  I think that probably makes sense.

12             Mr. Miller?

13             MR. MILLER:  I think we're fine with that.

14             THE COURT:  Okay.

15             I'm going to say, "the alleged scheme to defraud,"

16   just to make it less wordy.

17             MR. BURNETT:  Yes.

18             The next one, same page, line 21, the sentence that

19   begins "a person commits," our proposal is to add, "under such

20   circumstances," before that sentence.  The reason for that is

21   we want to make sure the point about the defendant being

22   entrusted with the information is clear that it applies to that

23   second sentence, because you could lawfully obtain information

24   without it being entrusted to you.

25             THE COURT:  Mr. Miller?

1          MR. MILLER:  Sorry, one moment.

2          (Pause)

3          MR. MILLER:  I'm not sure that's necessary, your

4     Honor.  I think your Honor's statements here are pretty clear.

5          THE COURT:  Mr. Miller, I'm going to ask you again to

6     move the microphone.

7          MR. MILLER:  I'm sorry, I keep doing that, Judge.

8          I don't think that's necessary.  I think those two

9     sentences are pretty clear.

10          MR. BURNETT:  If the defense thinks it's clear, I'm

11     fine leaving it as is.

12          THE COURT:  Okay.  Next?

13          MR. BURNETT:  The next one is page 17, line 12.

14          THE COURT:  All right.

15          MR. BURNETT:  Our proposal would be to change "written

16     company policies" to "written company policies and agreements."

17     I guess starting with the legal authority, I think *Mahaffy* is

18     clear that the list of factors that it lists out there can be

19     adapted for case-specific purposes, and I think our concern is

20     that policy has sort of taken on a specialized meaning in this

21     case because there are policies the company announced, but then

22     they had their agreement before.  So we want to make sure it

23     doesn't give the impression that you should consider policies,

24     but not something else like an agreement.

25          THE COURT:  All right.

1          I assume there's no dispute that the jury can consider

2     the agreement, Government Exhibit 214, Mr. Miller, in

3     evaluating whether the information is confidential.

4          Is that correct?

5          MR. MILLER:  I think that's right, Judge.

6          THE COURT:  Given that, any objection to the proposed

7     change?

8          MR. MILLER:  I see where your Honor is going.  I'll

9     just say, obviously, *Mahaffy* says what it says, we think it

10     should be relied on, but I understand where you're going.

11          THE COURT:  *Mahaffy* is quite clear that its list is

12     not exhaustive for all purposes, and it should be adapted to

13     particulars of a case here.  I think that agreement is central

14     to the parties' argument, so I think it's appropriate for the

15     jury to know that it may consider that in the analysis.  So I

16     will add "and agreements" after "policies."

17          Next?

18          MR. BURNETT:  The next one is page 19, line 3.

19          THE COURT:  All right.

20          MR. BURNETT:  So after the sentence that ends

21     "victims' money or property," we would include adding the

22     following sentence:  "Depriving a property owner of its

23     exclusive right to use the property, even if temporarily, is a

24     form of harm."

25          To explain, I think, as has sort of been previewed

through defense questions, I expect there will likely be an

argument during closing that Mr. Chastain loved OpenSea, had

some financial interest in the success of OpenSea, but, in a

case like this one, where he's alleged to have misappropriated

a property right, the intent to harm the company's property

interest is a form of intent to harm, which I think, in a

jury's mind, can get confused from the general, like, intent to

harm the company. That's, I think, very specifically

identified both in *Carpenter* and in *Grossman*. In both cases

there, both the Supreme Court and the Second Circuit identified

the relevant harm as interfering with the entity's exclusive

use of or right to exclusive use of the information at issue.

So it's the same instruction here. I'm just making that clear

for the jury because it's not an intuitive thing.

THE COURT: So, hold on. Before I hear from you,

Mr. Miller, I think the point is reasonably well taken, though

I'll obviously hear from Mr. Miller, but I'm not sure about the

"even if temporarily" language. I think that's appropriate

where there is some suggestion that someone takes something,

and perhaps at the time intends to repay it or give it back or

some such thing, and, you know, that's not a defense to wire

fraud. The Avenatti case is a good example of that. I don't

think that's the issue here. He either took and

misappropriated confidential business information or he didn't.

MR. BURNETT: That's fair, your Honor. I don't think

1    the "temporarily" part is central to our concern.

2           THE COURT:  All right.

3           So, Mr. Miller?

4           MR. MILLER:  We object to that, your Honor.  We think

5    the sentence there is appropriately written.  There is no

6    reason to start trying to apply it to the government's theory

7    of this case.

8           The issue and the way it's spelled out in the case law

9    is whether or not the defendant contemplated a harm or injury

10    by depriving the victim of its property.  That's central to

11    your Honor's instructions.  To have a separate sentence that

12    highlights the fact that depriving the property owner of its

13    exclusive property is a form of harm is essentially signaling

14    to the jury, we submit, that in this particular case, the

15    government's theory that what Mr. Chastain allegedly did by

16    taking, supposedly, this information is almost like a

17    derivation of the right to control theory.  And we think that

18    that's completely inappropriate.

19           THE COURT:  And you think it's an inaccurate statement

20    of the law?

21           MR. MILLER:  Well, I certainly have some concerns.

22    Obviously, right now, on the right to control theory, which is,

23    again, about sort of the exclusive depriving a business owner

24    of their exclusive control and access to the information and

25    making discretionary economic decisions, is before the Court.

1    So I don't think this is necessary.

2         THE COURT:  You're mixing apples and oranges.  The

3    sentence literally says "depriving a property owner of its

4    exclusive right to use the property."  That still requires a

5    property interest; it's not just a right to control.

6         MR. MILLER:  True.  But I fear that this is going to

7    confuse the jury when the sentence was clear as written.  I

8    don't think this is necessary.

9         THE COURT:  Mr. Burnett?

10        MR. BURNETT:  I think on the right to control issue,

11   that's a totally separate line of cases, and even in the

12   briefing before the Supreme Court, the appellant there was

13   distinguishing types of cases where a property right is harmed

14   in the sense of these *Carpenter* line of cases.  The reason why

15   I think it's important is because I don't think it's intuitive

16   or known really at all to nonlawyers that property is

17   essentially a bundle of rights, including the right to

18   exclusive use, so taking away one of those sticks in the bundle

19   is inflicting harm on the property interest.  I think it's

20   entirely likely that without this instruction, the jury could

21   reasonably be confused that, hey, OpenSea still got to put up

22   their featured NFT, so no harm there, Mr. Chastain loved the

23   company overall, so there couldn't possibly be intent to harm

24   the company, and proceed from that line of thinking, which

25   would be going from a legally wrong premise.

1      THE COURT:  I agree.  I'm going to do it not as an

2   independent sentence, but following a semicolon at the end of

3   the word "property" on line 3, semicolon, "depriving a property

4   owner of its exclusive right to use property is a form of

5   harm."

6          Next?

7          MR. BURNETT:  The next is page 22, lines 16 and 17.

8          THE COURT:  Yes.

9          MR. BURNETT:  So this might be one that already falls

10  into the category of something that you might have considered

11  from our previous instructions.  We think under the revised or

12  amended definition of proceeds in 1956, it's wrong to include

13  the profits there because profits is not part of the statute.

14          We would propose --

15          THE COURT:  Maybe I'm not up to date on this.  I read

16  *Quinones* -- is there something that postdates *Quinones* that

17  speaks to this?

18          MR. BURNETT:  My understanding is that 1956(c)(9)

19  postdates *Quinones*.  I have to double-check the timing there,

20  but that's what I had in my notes.

21          THE COURT:  (c)(9)?

22          MR. BURNETT:  Yes, the definition of proceeds.

23          THE COURT:  When do you think it was added?  There is

24  a (c)(9), and it does seem to speak to this, and it does seem

25  to address the issue that is discussed in *Quinones* and *Santos*.

1    Do you have a sense of when that might date to?

2            MR. BURNETT:  *Quinones* is 2011.

3            We're just checking.

4            (Pause)

5            MR. BURNETT:  So the statute looks like it was 2009.

6    *Quinones* was decided in 2011.  Mr. Roos just pointed out we're

7    actually not sure when *Quinones* was charged, which would have

8    been the relevant point for that case, although there, the

9    Court held that 1956 is not limited to profits either.  So I

10   think our view is that *Quinones* is consistent with this version

11   of the statute.

12           THE COURT:  Do you know if there are any cases that

13   have addressed this post the amendment?

14           MR. BURNETT:  I don't believe there have been any in

15   the Second Circuit, your Honor.  I know there have been

16   out-of-circuit cases, but I apologize, I don't have a citation

17   at the ready.

18           THE COURT:  So let me ask you:  Obviously, I'll hear

19   from the defense depending on your answer — given the language

20   of the statute — and I confess that I missed that it had been

21   amended after *Quinones*, I think there is a reasonable argument

22   for instructing the jury that proceeds -- I take it your point

23   is that proceeds can include the NFTs themselves, not just

24   money?

25           MR. BURNETT:  That's right.

1          THE COURT:  So maybe that's right.  I guess my

2     question is:  Does it really matter in this case?  Which is to

3     say, to the extent that that is an unsettled question, it

4     obviously raises an appellate issue in the event of a

5     conviction.  My gut is, if the jury finds -- somebody in the

6     back is holding something up.  I don't know if you were looking

7     for my attention or -- okay.

8          My gut is if the jury -- the transactions here were

9     basically all combined, which is to say, if the jury finds that

10    the transactions were done to conceal the source, et cetera, of

11    the proceeds, I suspect it's not going to matter whether they

12    are considering them to be the NFTs or the money, Ether,

13    whatever it may be.  If I add this, then it's not clear whether

14    the jury is relying on the NFTs or on the Ether, and then

15    there's a potential appellate issue that may not be necessary,

16    given that I'm not sure there's a distinction that matters for

17    this case.

18         So, I guess that's a long way of saying, do you want

19    to press the point?  If you do, I'll hear from the defense, and

20    then I'll ultimately decide whether you're correct, but I just

21    wonder if it's worth it.

22         MR. BURNETT:  Let me just confer quickly, your Honor.

23         THE COURT:  Yes.

24         (Pause)

25         MR. BURNETT:  Your Honor, I think we're fine leaving

1    it as is, just so the record is clear on the issue.

2    Apparently, *Quinones* was charged before the amendment and noted

3    it in a footnote, but that's the way it shook out.

4           THE COURT:  Yes, my clerk brought that to my

5    attention.  I overlooked it, but footnote 4 does say that

6    Congress amended it in 2009, but it was applying the

7    preamendment law.

8           So, to be clear, you're fine with the language as is,

9    and recognizing that in a different case, you might take a

10   different position, given the amendment, you're fine with --

11          MR. BURNETT:  Yes, your Honor.

12          THE COURT:  Okay.  Next?

13          MR. BURNETT:  The next one is page 23, line 18.

14          THE COURT:  Yes.

15          MR. BURNETT:  We propose changing "disguise the true

16   origin" to "disguise the true origin or ownership of the

17   property in question."  And I think there's a typo changing the

18   "or" that's in there to an "of."

19          THE COURT:  All right.

20          Mr. Miller?

21          MR. MILLER:  I'm not sure that I have seen that in any

22   of the precedent or instructions we've looked at before.

23   Unless I'm missing this, I don't think that's in the statute.

24          MR. BURNETT:  It's on line 11, Mr. Miller.

25          MR. MILLER:  Line, I'm sorry?

1          MR. BURNETT:  Line 11.

2          MR. MILLER:  Oh, I see, I see.

3          Wait, so you're looking -- I thought we were at 18.

4          MR. BURNETT:  That's right.  Basically what I'm doing

5     is I'm taking -- page 23, lines 10 and 11, list a number of

6     things.  Only origin got translated down.

7          MR. MILLER:  I got it.

8          THE COURT:  The proposal is on 18 after origin or to

9     add ownership of?

10         MR. BURNETT:  Yes.

11         MR. MILLER:  I think that's probably fine.

12         THE COURT:  Next?

13         MR. BURNETT:  The only other thing, your Honor, is on

14    the instruction related to the defense theory of the case,

15    there's a sentence there about hot and cold wallets.  We'd just

16    ask that we could reserve on potentially objecting to the

17    sentences related to hot or cold wallets until we file or don't

18    file a letter tomorrow at 6:00 o'clock.

19         THE COURT:  All right.  Understood.  I think that

20    makes sense since it would have some bearing on whether that is

21    a defense theory of the case.

22         Let me just clarify and confirm, assuming that you do

23    not file a letter, or I reject any request for relief, any

24    objection to the instruction that I have here?

25         MR. BURNETT:  That's right, your Honor.

1          THE COURT:  Okay, great.

2          Any other objections or corrections?

3          MR. BURNETT:  No, thank you.

4          THE COURT:  That includes the verdict form, I take it?

5          MR. BURNETT:  Let me check.

6          Yes, your Honor.

7          THE COURT:  All right.

8          Mr. Miller, your turn.

9          And let me just say, obviously, my draft has different

10   language on willfulness.  You've made your argument, it's

11   preserved; you don't need to renew that.  So, too, on the

12   language that you have requested ostensibly on the basis of

13   *Cuellar*, and I've considered that you've preserved your

14   argument on that, so you don't need to renew that.

15         MR. MILLER:  So page 6, lines 10 through 13 or 14, did

16   we have redacted material?  My memory is escaping me.  I

17   thought there was no redacted material in evidence.

18         MR. BURNETT:  I think that's right.

19         THE COURT:  So just strike 10 through 13?

20         Okay.

21         MR. MILLER:  I guess 10 to 13, yes.

22         THE COURT:  The less I read, the better.

23         Next?

24         MR. MILLER:  Page 13, line 18 to the beginning of 19,

25   it says, "No adverse inference against the defendant may be

1    drawn," et cetera.  We would propose changing that to, "No

2    positive or negative inference, for or against the defendant,

3    may be drawn," rather than it should be highlighting that no

4    adverse inference.

5          THE COURT:  Any objection?

6          MR. BURNETT:  No objection.

7          THE COURT:  All right.

8          MR. MILLER:  Page 14 — I think this was a typo — page

9    14, line 10 — it starts on 9, actually — "A verdict of not

10    guilty on Count One, however, requires that you return a count

11    of not guilty."  We assume that your Honor meant a verdict of

12    not guilty rather than a count.

13          THE COURT:  I did.  Thank you.

14          MR. MILLER:  This is more by way of preservation.  At

15    the bottom on line 22 of page 14, we obviously had proposed a

16    curative instruction on insider trading.  Depending upon what

17    the closing arguments are, we still want to preserve that

18    argument, that a curative instruction may be needed.

19          THE COURT:  All right.  This is my form of a curative

20    instruction.  I also would note for the record that, unless it

21    changes in the closings, the government hasn't used the term

22    "insider trading" in this case; only you have.

23          MR. MILLER:  Well, to be fair, just again for the

24    record, they did open on inside information, inside edge,

25    stocks, bonds, stock market, et cetera.

1          THE COURT:  No dispute there, but the litigation was

2     over the term insider trading, and those words have not come

3     out of the government's mouth in front of the jury.

4          Next?

5          MR. MILLER:  Okay.

6          Page 16, lines -- well, it starts at the word "you" on

7     line 15 and goes to "business life of society" on 18.  Again,

8     preserving our objection, this was in our letter, we don't

9     believe that the jury should be instructed on departing from

10    traditional notions of fundamental honesty and fair play in the

11    general and business life of society.  Respectfully, as we

12    outline in our letter, we think this is not consistent with

13    *Kelly* and *Cleveland*.

14         THE COURT:  All right.  I think *Kelly* and *Cleveland*,

15    for reasons I've already explained, are addressing different

16    issues in a different context.  This language comes from the

17    Second Circuit's decisions in *Males* and *Trapilo*, both cited in

18    the annotation consistent with Judge Abrams' instruction in

19    *Tagliaferri*, all of which is to say I think it is an accurate

20    statement of the law, and given that I include somewhere in

21    here — I'm not finding where at the moment — advise the jury

22    that they may not convict Mr. Chastain merely based on a

23    violation of employment policies — it's on page 18, lines 13 to

24    15 — I think it is a fair and accurate instruction.

25         Next?

1              MR. MILLER:  Thanks.

2              Page 17, line 3.  And I think your Honor previewed

3      this yesterday.  Very briefly, I'll note that, in the

4      government's opening, the government said — and I'm just

5      looking at page 48 of the transcript as an example — the

6      government noted that NFTs can sell for thousands or, even in

7      some cases, millions of dollars, and then said it again, why is

8      someone paying thousands or even millions of dollars, and goes

9      on with all the other descriptors that I already explained for

10     your Honor.

11             So, obviously, the government went first, so we don't

12     believe that just because we mentioned that we're not talking

13     about millions or hundreds of thousands of dollars, that

14     somehow that means that the defense put in play that your Honor

15     should instruct the jury that the amount involved need not be

16     large, any amount suffices.

17             THE COURT:  All right.  I assume that you agree this

18     is an accurate statement of the law?

19             MR. MILLER:  It is, your Honor.

20             THE COURT:  All right.  So I think, given that, and

21     given that both sides have made reference to millions of

22     dollars, it makes sense to make sure the jury understands it.

23             Next?

24             MR. MILLER:  Page 17, lines 14 through 16, this is

25     just to preserve.  We obviously do believe, and have submitted

1    in this case, that inherent value should be a test under

2    whether or not something is property, to preserve the point.

3            THE COURT:  Thanks.

4            Next?

5            MR. MILLER:  Your Honor already noted our willfulness

6    preservation, which leads us, I think, to our last point, on

7    page 23, lines 14 through 15.  In the context of the purpose

8    instruction, under money laundering, there's a sentence in here

9    that says, "To prove that an act is done knowingly, the

10    government is not required to prove that the defendant knew

11    that his acts were unlawful."  Certainly, that sentence is

12    true.  The problem that we respectfully submit, your Honor, is

13    that this comes in the context of this instruction, where the

14    paragraph before, it notes that the government has to prove

15    beyond a reasonable doubt that the financial transactions were

16    conducted knowing that the proceeds were from a specified

17    unlawful activity.

18            So the juxtaposition of those two sentences, your

19    Honor, in close proximity, we're concerned could confuse the

20    jury.

21            THE COURT:  What's your suggestion?

22            MR. MILLER:  We don't think that sentence is

23    necessary, and we would strike it.  Your Honor already has

24    discussed what knowingly and willfully mean, and to add this

25    here, we submit, would only add confusion.

1          THE COURT:  Mr. Burnett?

2          MR. BURNETT:  I actually think the argument proves the

3    opposite.  The defendant does not need to have known that the

4    money came from a specified unlawful activity.  That's what the

5    second element is.

6          THE COURT:  Well, I think he needs to know that it

7    came from some unlawful activity.

8          MR. BURNETT:  Right.  And that's addressed in the

9    second element.  I guess my understanding here is that the

10   fourth element is attempting to instruct the jury that the

11   purpose relates to concealment, not that the defendant's

12   purpose is to do something unlawful in the course of that

13   concealing.

14         THE COURT:  How about this:  I think Mr. Miller's

15   point is somewhat well taken, in the sense that the government

16   obviously does need to prove that the defendant knew that the

17   financial transactions involved proceeds of some form of

18   unlawful activity.  So, in that regard, there is knowledge of

19   some form of unlawful activity that's required, but I think

20   Mr. Burnett's point is well taken that this is in connection

21   with a different element.

22         So what about — I'm just thinking out loud here — if

23   at the beginning of the relevant sentence — this is page 23,

24   line 14 — I were to say, "For purposes of this element, to

25   prove that an act is done knowingly, the government is not

1    required," et cetera?  In other words, to make it specific to

2    this element or to put it at the end of the initial clause, "to

3    prove that an act is done knowingly for purposes of this

4    element."

5          MR. BURNETT:  I think that's fine from the

6    government's perspective, your Honor.

7          MR. MILLER:  I'm sorry, one moment, your Honor?

8          (Pause)

9          THE COURT:  Mr. Miller?

10          MR. MILLER:  Your Honor, I think that is probably

11    fine.  Obviously, your Honor could say element only for

12    purposes of this element only, or something to that extent,

13    but, otherwise, I think it's probably fine.

14          THE COURT:  Okay.  I'm just going to leave it for

15    purposes of this element, in part, because I think, for Count

16    One's purposes, the same is true, and I do not want to suggest

17    by implication that it's not.

18              Any other objections or corrections, Mr. Miller?

19              MR. MILLER:  No, I think that's it for us, Judge.

20              THE COURT:  And the verdict form looks okay as well?

21              MR. MILLER:  Yes.

22              THE COURT:  Very good.

23              Anything else to discuss?

24              MS. NICHOLS:  Thank you, your Honor.

25              I just wanted a little clarification on the schedule.

1    Your Honor anticipates sitting 9:00 to 5:00; is that right, and

2    would not offer the jury the opportunity to sit later than

3    5:00, just for our planning purposes?

4            THE COURT:  I would not.

5            MS. NICHOLS:  Okay.

6            THE COURT:  Out of deference to the court reporter, my

7    staff, and the jury, yes.

8            So we'll begin promptly at 9:00 with openings.  I do

9    expect at that time you'll be able to represent that everyone

10   is in agreement about how the evidence is going to the jury and

11   that it's ready to go.  Obviously, if there's anything for me

12   to resolve, based on any application by the government by

13   6:00 p.m. tomorrow, I'll either resolve it then or before then,

14   and then we'll proceed directly with closings, followed by my

15   instructions, with whatever appropriate breaks in between,

16   depending on how long things take.

17           I usually do break between the principal summations.

18   Whether I break before the rebuttal turns on sort of where we

19   are in the day and whether I think everybody needs a break or

20   not.

21           Any other questions, concerns, issues from the

22   government?

23           MR. ROOS:  Just in preparing the evidence, does your

24   Honor send back the entirety of the transcript or just upon

25   being requested by the --

1          THE COURT:  I'm glad you asked that.  My typical

2    practice is not just upon their request as consistent, I think,

3    with the jury instructions, but, number one, if both sides are

4    in agreement and okay with sending the entirety of the

5    transcript, I'm open to that.  I certainly think it would

6    obviate any notes and need to then figure out which portions

7    they want.  But if either side has an objection, let's stick to

8    my principal practice.

9          Having said that — and you should confer about this —

10   even if we do it the latter way, that is to say, not send it in

11   the first instance, but only upon request, I think it would

12   make sense, since it's not an especially long transcript, if

13   you guys prepared a redacted version of the transcript, taking

14   out what the jury shouldn't receive if they request any

15   portions, so that if there are any notes, we can promptly have

16   a copy of the relevant pages for them and don't need to bicker

17   about that.

18          All right?

19          MR. ROOS:  Yes.  I think we'll stick with your Honor's

20   normal practice, but we will clean up the transcript.

21          THE COURT:  Great.

22          And, obviously, discussions outside the presence of

23   the jury, sustained objections, that sort of thing.

24          Anything else from the government?

25          From the defense?

1      MR. MILLER:  One quick question.  Your Honor doesn't

2  send back the indictment, right?

3      THE COURT:  It actually varies, but I'm not intending

4  to here, given that it's a speaking indictment, and I think the

5  evidence is the evidence, and the indictment is not evidence.

6      MR. MILLER:  Thank you, Judge.

7      THE COURT:  All right.  Thank you very much.  Have a

8  wonderful weekend.  Get some rest, and see you Monday.

9      COUNSEL:  Thank you, your Honor.

10      (Adjourned to May 1, 2023, at 9:00 a.m.)

1                    INDEX OF EXAMINATION

2    Examination  of:                          Page

3     MATTHEW EDMAN

4    Cross By Ms. Nichols . . . . . . . . . . . 696

5    Redirect By Mr. Miller . . . . . . . . . . 713

6    Recross By Ms. Nichols . . . . . . . . . . 734

7    Redirect By Mr. Miller . . . . . . . . . . 740

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300